## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS; STATE OF CALIFORNIA; STATE OF COLORADO; and STATE OF MINNESOTA, | |
|        Plaintiffs, | |
|        v. | |
| RUSSELL VOUGHT, *in his official capacity as Director of the Office of Management & Budget*; U.S. OFFICE OF MANAGEMENT AND BUDGET; ROBERT F. KENNEDY JR.*, in his official capacity as Secretary of the U.S. Department of Health & Human Services*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JIM O'NEILL, *in his official capacity as Acting Director of the U.S. Centers for Disease Control & Prevention*; U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION; DONALD J. TRUMP, *in his official capacity as President of the United States*; and the UNITED STATES; | Case No. 26-cv-1566 |
|        Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     On February 9, the Department of Health and Human Services ("HHS") began a three-day countdown clock by notifying Congress of its intent to cut more than $600 million in Centers for Disease Control and Prevention ("CDC") grants to the four Plaintiff States. *See* Consolidated Appropriations Act of 2026, Pub. L. No. 119-75, § 524, 140 Stat 173. Defendants have targeted these four sovereign States—California, Colorado, Illinois, and Minnesota—with devastating funding cuts to basic public health infrastructure based on political animus and

1

disagreements about unrelated topics such as federal immigration enforcement, political protest, and clean energy.

2.      The Administration has made numerous attempts to strip funds from programs in States whose policies it disagrees with. In particular, throughout January of this year, the President repeatedly threatened to stop all federal payments to what he calls "sanctuary" jurisdictions. Defendant the Office of Management and Budget ("OMB") then spent the last two weeks of January developing a hit list of funds for potential targeting in disfavored States. In early February, OMB issued a directive (the "Targeting Directive") commanding agencies to cut funding to Plaintiff States, starting with more than $600 million in CDC public-health funding to Plaintiff States, with further cuts to come. The President himself has conceded that, after implementing the Targeting Directive, "they [the targeted States] can sue us, and maybe they'll win."

3.      Defendants are jointly implementing the Targeting Directive to slash funding to Plaintiff States based on arbitrary political animus. This action is lawless. It violates the Administrative Procedure Act's requirement of reasoned decisionmaking, and it exceeds the agencies' statutory authority. Even more fundamentally, it violates basic tenets of our constitutional order: the Tenth Amendment, the Separation of Powers, and the Spending Clause.

4.      For these reasons, the Targeting Directive should be declared unlawful, set aside, and preliminarily and permanently enjoined.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 702, 705, and 706.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. Plaintiff the State of Illinois

is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Northern District of Illinois.

## PARTIES

### I.    Plaintiffs

7.     Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State in the United States of America. The Attorney General of Illinois is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

8.     Plaintiff the State of California is a sovereign state of the United States of America. California Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510–12511; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761–62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state[.]").

9.     Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General is the chief legal representative of the State and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action on behalf of the State of Colorado.

10.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of state concern. Minn. Stat. § 8.01.

3

## II.     Defendants

11.     Defendant Russell Vought is the Director of OMB, and that agency's highest ranking official. 31 U.S.C. § 502(a). He is responsible for overseeing OMB, providing direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements, and ensuring that its directions are implemented by all federal agencies that provide relevant funding and support. He is sued in his official capacity.

12.     Defendant the United States Office of Management and Budget is a cabinet agency within the executive branch of the United States government. The Office of Management and Budget is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. § 501.

13.     Defendant Robert F. Kennedy, Jr., is the Secretary of HHS, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. §§ 3501a, 3502.

14.     Defendant United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 3501, 3501a.

15.     Defendant Jim O'Neill is Acting Director of CDC, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

16.     Defendant United States Centers for Disease Control and Prevention is an executive branch agency within the federal government and a component of HHS, headquartered in Atlanta, Georgia. 44 U.S.C. § 3502(1); 5 U.S.C. § 551(1).

17.     Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

18.     The United States may be named as a defendant in any action seeking relief other than money damages against the United States. *See* 5 U.S.C. § 702.

**ALLEGATIONS**

19.     Defendants' Targeting Directive forms part of their ongoing campaign to punish Plaintiff States using the tool of federal funding for partisan political purposes. In particular, the Targeting Directive took as its starting point a hit list of grants directed to Plaintiff States that defendants have repeatedly retaliated against, or penalized, for their sovereign policy choices. The Targeting Directive, if allowed to go into effect, would impose catastrophic irreparable harm on Plaintiff States.

**I.     Defendants Have Engaged in a Campaign of Retaliation Marked By Arbitrariness and Political Animus.**

20.     The Targeting Directive is part of a long-running pattern of defendants' targeting disfavored jurisdictions for funding terminations and other retaliatory actions.

21.     On January 20, 2025, his first day in office of his second term, President Trump issued an executive order directing the Secretary of the Department of Homeland Security (DHS) to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the DHS Secretary deems warranted. Exec. Order No. 14,159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

22.     On February 19, 2025, the DHS Secretary issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions." The memorandum directed all DHS agencies and offices to review all federal financial assistance and cease federal funding to what DHS deems "sanctuary" jurisdictions.

23.     On April 28, 2025, President Trump issued another executive order relating to jurisdictions with policies designed to improve relations between law enforcement and

communities. *See* Exec. Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025). The EO requires "the Attorney General, in coordination with [DHS]" to "publish a list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2. Section 3(a) of the April 28 executive order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), expanding to all federal agencies a similar directive in the January 20 executive order that applied only to the Attorney General and DHS. 90 Fed. Reg. at 8446.

24.     In accordance with the April 28 executive order, DHS and DOJ have both published their own lists of so-called "sanctuary jurisdictions," which included all Plaintiff States here and many of their political subdivisions. DHS first published its list on May 29, 2025, but then took it down two days later. In an interview with Fox News on June 1, 2025, however, Secretary of Homeland Security Kristi Noem stated that the "list is absolutely continuing to be used, and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." The Department of Justice, meanwhile, published its own list of "sanctuary" jurisdictions on August 5, 2025.[1]

25.     In accordance with the president's effort to defund disfavored jurisdictions, the Trump administration also has sought to require Plaintiff States and others to agree to cooperate

---

[1] *See* Press Release, Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

with federal immigration enforcement activities as a condition for receiving billions of dollars in federal funding—which Plaintiff States here have challenged in federal court.[2]

26.     The Trump administration—including defendant OMB—has also targeted the Plaintiff States for their advancement of what it derisively terms "the green new scam."  For example, on October 1, 2025, OMB Director Vought posted on X that the Department of Energy would be terminating "[n]early $8 billion in Green New Scam funding to fuel the Left's climate agenda."[3]  The post listed sixteen States where projects would be defunded; the list included the four Plaintiff States in this action, each of which subsequently experienced the termination or abandonment of energy and infrastructure funding.

27.     In addition, three of the four Plaintiff States—California, Illinois, and Minnesota— have seen large public protests in response to aggressive federal immigration operations. In two Plaintiff States, Illinois and California, the administration's response was to retaliate by unlawfully federalizing the National Guard in those States, ostensibly pursuant to 10 U.S.C. § 12406.  The States successfully challenged those deployments in court. *See Trump v. Illinois,* 607 U.S. __, __, 2025 WL 3715211 (U.S. Dec. 23, 2025); *Newsom v. Trump*, No. 25-cv-04870, 2025 WL 3533818 (N.D. Cal. Dec. 10, 2025).

28.     And just last month, the administration arbitrarily targeted all four Plaintiff States— plus New York—by freezing crucial social-services funding.[4] Around the same time, the President expressed that animus in crystal-clear terms through press statements and posts on social media.

---

[2] *See Illinois v. Noem*, No. 25-cv-00495, 2025 WL 3707011 (D.R.I. Dec. 22, 2025); *California v. United States Dep't of Transp.*, No. 25-cv-00208, 2025 WL 3072541 (D.R.I. Nov. 4, 2025); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025); *see also New Jersey v. U.S. Dep't of Justice*, 25-cv-00404 (D.R.I. filed Aug. 18, 2025).
[3] Russell Vought (@russvought), X, https://perma.cc/7YP9-QU4V.
[4] *See New York v. ACF*, 26-cv-00172 (S.D.N.Y.)

In a January 5, 2026, social media post, for example, President Trump reiterated his intent to target Democratic-led States: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job."[5]

## II.    The Targeting Directive Threatens To Cut Funds to Plaintiff States Based on Political Animus.

29.    The Targeting Directive forms a part of the same campaign to punish Plaintiff States because of political animus.

30.    The Targeting Directive is the culmination of a year of repeated attacks by the Trump administration singling out Plaintiff States for retaliation, most recently and brazenly in a series of public statements and actions by the President and OMB in January and February 2026.

31. In a speech at the Detroit Economic Club on January 13, the President declared:

> Additionally, starting February 1, we're not making any payments to sanctuary cities or States having sanctuary cities because they do everything possible to protect criminals at the expense of American citizens, and it breeds fraud and crime and all of the other problems that come. So we're not making any payment to anybody that supports sanctuary cities.[6]

32.    The same day, when asked by reporters what kind of funding would be affected on February 1, he replied: "You'll see. It'll be significant."[7]

33.    The next day, the President took to his social media channel to reiterate the same message:[8]

---

[5] Donald J. Trump (@realDonaldTrump), Truth, https://truthsocial.com/@realDonaldTrump/posts/115844083693194821.

[6] Donald J. Trump, *Remarks to the Detroit Economic Club* 58:47 (Jan. 13, 2026), https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-detroit-economic-club/.

[7] Geoff Mulvihill, *Trump Threatens to Halt Federal Money Next Month not only to Sanctuary Cities but also Their States*, Assoc. Press (Jan. 13, 2026), https://apnews.com/article/trump-sanctuary-cities-states-federal-funding-f0bb01398d9d955a498170e7334ce14a.

[8] https://truthsocial.com/@realDonaldTrump/posts/115893309945152200.



EFFECTIVE FEBRUARY FIRST, NO MORE PAYMENTS WILL BE MADE BY THE FEDERAL GOVERNMENT TO STATES FOR THEIR CORRUPT CRIMINAL PROTECTION CENTERS KNOWN AS SANCTUARY CITIES. ALL THEY DO IS BREED CRIME AND VIOLENCE! If States want them, they will have to pay for them! MAKE AMERICA GREAT AGAIN!!!

8.79k ReTruths   33.1k Likes                    Jan 14, 2026, 5:52 AM

34.     On January 20, President Trump reiterated the same threat to cut off funding "as of the beginning of the month" at a White House press conference:

> You've got to get rid of your sanctuary cities, and I hope our people know that we're not going to pay sanctuary cities. We're not going to pay them anymore. They are sanctuary for criminals. They hold criminals. We're not going to pay. They can sue us, and maybe they'll win, but we're not giving money to sanctuary cities anymore as of the beginning of the month.[9]

35.     That same day, the Office of Management and Budget sent a "budget data request" to all federal agencies (except for the Departments of Defense and Veterans Affairs) seeking "a detailed report on Federal funds provided to components, agencies, or instrumentalities of *certain States*."[10]

36.     The data request construed "components, agencies, or instrumentalities" to include "localities." It indicated that its "purpose" was "to facilitate efforts to reduce the improper and fraudulent use of those funds," though it sought only data from those "certain States." Upon information and belief, those States are California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island,

---

[9] *Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026/.
[10] Office of Mgmt. & Budget, Budget Data Request No. 26-09, *Federal Awards to Entities in Select States*, at 1 (Jan. 20, 2026) (emphasis added).

Vermont, Virginia, and Washington.[11] Nearly all of these States either appeared on the "list of sanctuary jurisdictions" published by the Department of Justice on August 5, 2025, or contain localities that appeared on the list.[12]

37.     The OMB budget data request set a short deadline of only eight days, to January 28, 2026, for agencies to report to OMB. Thus, the OMB budget data request laid out a timeline that would allow OMB to centralize a purportedly complete inventory of funds flowing to these 14 disfavored jurisdictions by the end of January 2026—just before February 1 arrived.

38.     Last, on February 2, on a podcast, the President proclaimed: "Sanctuary cities are a disaster. So I put out an order, anybody that does a sanctuary city is not getting any money. Let's see what happens, you know, it'll get wiped out by these liberal courts."[13]

39.     On a date between February 1 and February 4, OMB issued the Targeting Directive, the agency action challenged in this case, commanding other federal agencies to cut funding to Plaintiff States.

40.     On February 4, the *New York Post* reported that OMB was directing the Department of Transportation and CDC to terminate more than $1.5 billion of grants to "blue" (meaning, Democratic-led) States.[14] With regard to CDC grants specifically, the *Post* reported that the terminations were targeted solely at the four Plaintiff States. An OMB spokesperson told the *Post* that "more grant cancellations were expected."

---

[11] Gregory Svirnovskiy, *Trump Administration Targets 14 Blue States, DC with Federal Funding Review*, Politico (Jan. 22, 2026), https://www.politico.com/news/2026/01/22/trump-administration-federal-funding-blue-states-00741440.

[12] *See* Press Release, Dep't of Just., *supra*. The sole exception is Virginia, which elected a new Governor and Attorney General on November 3, 2025.

[13] Dan Bongino Show: *I'm Back* (Ep. 2443), at 1:34:13 (Feb. 2, 2026).

[14] Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026), https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-green-grants-for-dem-states/.

41.     The next day, an OMB spokesperson confirmed to *The Hill* that "OMB directed the . . . [CDC] to rescind $602 million from [Colorado, Illinois, California and Minnesota]."[15]

42.     This Targeting Directive, originated by OMB and put into effect so far by HHS and its CDC component, stems from President Trump's threats throughout the month of January to stop "making any payments to sanctuary cities or States having sanctuary cities," followed by OMB's data collection effort to develop a hit list of grants to be targeted in disfavored States.

43.     On February 9, the *New York Times* reported that a spokesman for HHS confirmed the cuts were forthcoming and stated that the reason for slashing funds in Plaintiff States was that "they do not reflect agency priorities."[16]

44.     That same day, February 9, HHS notified Congress of its intention to terminate a wide swathe of CDC grants in Plaintiff States. This notification ("the HHS Notification") was mandated by the current appropriations law, which requires HHS (among other agencies) to "notify the Committees on Appropriations of the House of Representatives and the Senate not less than 3 full business days prior to announcing . . . the termination or non-continuation of any grant, including a short description of the reason for the termination or non-continuation." Consolidated Appropriations Act of 2026 § 524.

45.     Although the notification was required to contain "a short description of the reason for the termination," *id.* at § 524(2), the "Reason for Termination" given was merely, "Inconsistent

---

[15] Rachel Frazin, *Trump Administration Directs Rescission of $1.5B from Blue States on Health, Transportation*, The Hill (Feb. 5, 2026), https://thehill.com/policy/energy-environment/5725217-trump-blue-states-funding-minnesota-colorado-evs-hiv/.

[16] Apoorva Mandavilli, *Trump Administration to Cut $600 Million in Health Funding from Four States*, N.Y. Times (Feb. 9, 2026), https://www.nytimes.com/2026/02/09/health/trump-public-health-cuts-california.html.

with Agency Priorities – https://www.cdc.gov/about/cdc/index.html," hyperlinked to a page on the CDC's website titled "CDC priorities."

46. The Targeting Directive is the latest salvo in this concerted campaign to punish disfavored jurisdictions based on political animus. *See supra* ¶¶ 20-29. Indeed, upon information and belief, the CDC grant terminations announced thus far are merely the first shot fired under the Targeting Directive, with further retaliatory actions to follow. As an OMB spokesperson told the *New York Post*, "more cancellations" due to the Targeting Directive "are expected." Indeed, as this complaint was being drafted, Plaintiff States learned that HHS today notified Congress of its intent to cut 42 more grants in the four Plaintiff States pursuant to the Targeting Directive.

### III. If Implemented, the Targeting Directive Would Irreparably Harm Plaintiff States.

47. The first round of funding cuts implemented under the Targeting Directive would deprive Plaintiff States of $600 million in public health funding. The vast majority would be cut directly from Plaintiff States, including their instrumentalities and political subdivisions.

48. The targeted grants fund essential public health infrastructure, as well as testing and treatment for lethal diseases.

49. None of the targeted programs is related in any way to enforcement of federal immigration law.

50. The largest grant program targeted for termination is the Public Health Infrastructure Grant ("PHIG"), which is a five-year award that accounts for the majority of the announced cuts. This program has operated in all 50 States since 2022, and funds both short-term critical infrastructure and workforce needs as well as long-lasting strategic investments across the nation, not just in Plaintiff States. It is organized into three major components:

o Workforce, which is funded as a non-competitive five-year award where funds are awarded in one lump sum for the full five-year period;

12

- o Foundational Capabilities, which is funded as a non-competitive annual award, with funds awarded in installments; and

- o Data Modernization, which is funded through a combination of non-competitive five-year awards and a competitive annual award.

51.     In Plaintiff States, hundreds of State employees' positions are funded by this grant. These essential public health workers would lose their jobs—and Plaintiff States would lose their services, expertise, and institutional knowledge—if the Targeting Directive is carried out.

52.     The PHIG is the backbone of federal public health funding, providing critical financial support, not only to Plaintiff States directly, but to hundreds of local public health agencies through pass-through funding.

53.     For example, in Illinois, the PHIG funds Lead Poisoning Prevention grants to 25 local health departments, as well as Local Health Department Workforce Development Support Grants that support 674 public health jobs at 96 local agencies. Loss of PHIG funds would force Illinois to cancel 55 contracts supporting strategic planning, data modernization, emergency preparedness, workforce training, and community engagement—halting multi-year initiatives that are foundational to a modern public health system. Most damaging of all, it would force Illinois to terminate 99 Illinois Department of Public Health employees (78 full-time and 21 contractual), which would directly reduce the agency's capacity to perform core public health functions including disease surveillance, data analysis, workforce management, and regulatory compliance—and lead to an irreparable loss of institutional knowledge. Once lost, these capabilities will take years of hard work and additional funding to regain.

54.     California also uses PHIG grant funding for critical public health needs. For instance, it uses PHIG funds to hire interns and fellows for a training program for future healthcare

professionals, to pay experienced epidemiologists to mentor less experienced public health staff, to pay a nurse to work in areas lacking healthcare professionals, to update the State's ability to send and receive electronic laboratory data, and to provide urgent dental care to underserved children. More broadly, PHIG funds support over 400 positions in the State and over 85 operations. These positions and operations improve and save lives. The loss of the PHIG grant funding would undermine these efforts, reducing the State's public health capacity to perform vital public health functions, disrupting workforce development programs that are critical to building the State's future public health workforce, disrupting the State's ability to train public health staff and to prepare for public health emergencies, and requiring widespread layoffs of public health employees. The result would be worsened patient outcomes, including greater risk of death, through the loss of effective public health programs addressing community need.

55.     In Colorado, loss of PHIG funding will significantly degrade public health infrastructure and capabilities across the State, ranging from reduced diabetes care for low-income residents, to elimination of resources for rural Coloradans who lack access to local care providers, to harming the State's ability to respond to immediate public health needs and future public health emergencies. PHIG funding supports 53 local public health agencies (LPHAs) and two tribal partners. This funding bolsters various LPHA capabilities, including data management, community health assessment and planning, organizational performance management, and strategic planning, while also providing full or partial support for approximately 160-199 positions. Terminations of PHIG funding will disproportionately impact small, rural health departments. Further, PHIG funding supports 48 full-time CDPHE employees. Losing these employees would degrade important functions across CDPHE, including health outreach efforts to rural Colorado communities, public health data infrastructure modernization, and public health

14

emergency response. Losing these skilled public health workers will deprive CDPHE of crucial subject matter expertise that would be difficult to replace, even if funding is later restored.

56.     In Minnesota, the PHIG fully or partially funds positions for approximately 57 employees (equating to approximately 50 full-time equivalents), who support critical public health services like detecting and monitoring health threats, responding to disease outbreaks, and planning for and responding to public health emergencies. Minnesota Department of Health ("MDH") staff also provide support to local public health and Tribal public health agencies, and MDH distributes PHIG funding to 45 Community Health Boards and nine Tribes across the state. The termination of PHIG funds would have immediate, adverse impacts on Minnesota's highly skilled and trained public health force as well as the critical services they provide, and these adverse impacts will be most acutely felt in rural and underserved areas.

57.     In addition to the PHIG grants, the Targeting Directive, as implemented through this first round of CDC cuts, would also cut more than 60 other grants, including more than 30 grants directly to the States, including their instrumentalities and political subdivisions, causing further irreparable harm.

58.     For example, in Illinois, one of the grants slated for termination funds the collection of basic survey data about Illinoisans' health, including health behaviors, demographics, chronic disease, screening, and health care access—which is used by stakeholders to make data-driven decisions about allocation of public health resources, and which CDC itself uses for its national Behavioral Research dataset. Another Illinois grant on the chopping block funds the collection and publication of state injury data, which State and local health departments need to track trends in preventable injuries and accurately target prevention efforts. Another targeted grant funds Illinois' implementation of the CDC's own Medical Monitoring Project for patients living with HIV, which

gathers data that the State needs to evaluate the effectiveness of HIV care programs, and to focus interventions on the populations most at risk. Yet another data-focused grant slated to be cut funds Illinois' HIV surveillance system; without that system, Illinois would have no reliable way of tracking the spread of HIV within the State, and the State's capacity to detect and respond to HIV outbreaks would collapse.

59.     In addition, in California, one of the grants set for termination funds a four-year project to provide rigorous evidence on the effects of multiple state-level policies on preventing sexual and dating violence among youth, including sexual minority youth. Another grant set for termination supports building capacity for extreme heat events.

60.     In Colorado, one of the grants targeted for termination is a comprehensive data collection system focused on populations disproportionately affected by HIV. This data helps CDPHE better understand behavioral risk factors for HIV as well as testing behaviors and use of prevention strategies. Two others slated for termination focus on sexually transmitted infection (STI) prevention and control efforts, including programs to promote testing best practices as well as one to provide enhanced surveillance of STIs in clinical settings. Loss of these grants will degrade CDPHE's ability to analyze and report on county-level STI rates and risk reversing progress in reducing rates of congenital syphilis and other STIs.

61.     Another Minnesota grant listed for termination funds the collection and publication of state injury data, which State and local health departments use to inform injury prevention efforts, including reducing violence, abuse, or neglect experienced by children, improving traffic safety, and supporting Minnesotans impacted by traumatic brain injury.

62.     As many Americans were reminded during the COVID-19 pandemic, public health is a matter of life and death. And a pandemic "does not respect the differences between citizens

and noncitizens." *Cook County v. Wolf*, 962 F.3d 208, 231 (7th Cir. 2020). If the Targeting Directive succeeds in stripping Plaintiff States of these grants, Plaintiff States will be unable to replace the lost federal dollars with their own money, especially because the cuts are immediate, made without warning or time to plan, and in the middle of funding cycles. The result will be preventable deaths, injuries, and needless suffering due to HIV and other disease outbreaks the States can no longer track, lead exposure that the States can no longer mitigate, public health emergencies to which the States are less prepared and equipped to respond, and other core public health dangers that any developed public health system should easily quell.

**IV.    Defendants' Asserted Justification Is Pretextual.**

63.    As alleged above, Defendants have claimed to the press and to Congress that the grant terminations implementing the Targeting Directive are based on some "inconsisten[cy]" between the funded programs and the CDC's priorities.

64.    The "CDC priorities statement" to which Defendants directed Congress, however, lists priorities such as:

     o    "strengthening our public health system";

     o    "investing in innovation to prevent, detect, and respond to such public health threats," meaning "infectious and communicable diseases"; and

     o    "modernizing public health infrastructure while enhancing our approach to health data".

65.    In particular, in a section titled "[a] commitment to modernizing public health infrastructure and enhancing our approach to health data," the priorities statement asserts, "Modernizing public health infrastructure is essential to . . . detect and respond to outbreaks in real time," notes the importance of "investing in modern tools, integrated data, and state-of-the-art capabilities," and declares, "Enhancing CDC's (and HHS's) approach to health data must

17

recognize that the states serve as key partners and must be encouraged to maintain robust and up-do-date [sic] health data systems."

66.     As alleged above, the largest grants selected for termination are the CDC's foundational "public health infrastructure" grants, which are awarded to the States as "key partners" and aimed at "modernizing" State and local public health infrastructure. By any measure, Plaintiff States' PHIG funding is an "invest[ment] in modern tools, integrated data, and state-of-the-art capabilities"—which the CDC itself identifies as a major agency priority.

67.     Many of the other grants to Plaintiff States that stand to be terminated due to the Targeting Directive fund the collection and analysis of "health data" and allow States to "detect and respond to outbreaks in real time"—which, again, the CDC itself identifies as a current agency priority.

68.     Moreover, at least one of the targeted grants was issued by CDC approximately one month ago. Defendants' notification to Congress is silent as to any change in agency priorities that could have taken place in the last four weeks.

69.     Upon information and belief, all 50 States receive PHIG grants, and all are utilized by the States in generally the same way—but only the four Plaintiff States' PHIG grants have been chosen for termination. Defendants' notification to Congress is silent as to how forty-six out of fifty substantially identical PHIG grants could be compatible with agency priorities, while the remaining four are not.

## FIRST CAUSE OF ACTION
### Violation of the Tenth Amendment and State Sovereignty

70.     Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

71.     Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

72.     The President's actions may be reviewed for constitutionality. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

73.     The Tenth Amendment exists to "preserve[] the integrity, dignity, and residual sovereignty of the States." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)).    An "essential attribute of the States' retained sovereignty" is "that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997). States "retain broad autonomy in structuring their governments and pursuing legislative objectives," *Shelby County*, 570 U.S. at 543, including through setting local policies and law enforcement priorities. *See San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1184 (N.D. Cal. 2025).

74.     The Targeting Directive punishes Plaintiff States based on their sovereign choices about how to allocate their own limited law enforcement resources. It attempts to coerce them into adopting the current presidential administration's preferred policies by cutting off critical funding. The Targeting Directive violates the Constitution by singling out Plaintiff States for harmful executive action based on their exercise of sovereign powers.

75.     Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Targeting Directive and its implementation are unconstitutional and that the Executive may not retaliate against Plaintiff States based on their exercise of sovereign authority reserved for the

States by the Constitution. Plaintiff States are also entitled to injunctive relief preventing defendants from implementing or effectuating the Targeting Directive.

## SECOND CAUSE OF ACTION
### Violation of the Separation of Powers

76.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

77.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

78.    The President's actions may be reviewed for constitutionality. *Franklin*, 505 at 801; *Youngstown Sheet & Tube Co.*, 343 U.S. 579; *Panama Refining Co.*, 293 U.S. 388.

79.    The Constitution "grants the power of the purse to Congress, not the President." *San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

80.    Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

81.    The Targeting Directive violates the separation of powers because the executive branch has overridden Congress's direction to spend appropriated funds based on defendants' desire to use federal funds as leverage and punishment against Plaintiff States.

82.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Targeting Directive and its implementation are unconstitutional. Plaintiff States are also entitled to injunctive relief preventing defendants from implementing or effectuating the Targeting Directive.

## THIRD CAUSE OF ACTION
### Violation of the Spending Clause

83.     Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

84.     Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

85.     The President's actions may be reviewed for constitutionality. *Franklin*, 505 U.S. at 801; *Youngstown Sheet & Tube Co.*, 343 U.S. 579; *Panama Refining Co.*, 293 U.S. 388.

86.     The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Under this Clause, Congress may "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207. Most importantly here, the Spending Clause requires "clear notice" of conditions and prohibits "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

87.     Through the Targeting Directive, defendants have violated the Spending Clause by attempting to impose retroactive conditions on funding. Defendants have targeted Plaintiff States because they are purportedly "sanctuary jurisdictions" and due to other political animus. Plaintiff States were not put on notice of retroactive conditions based on political animus or any other condition not related to the purpose of the award at the time of acceptances.

88.     Defendants have similarly attempted to retroactively allow termination for "agency priorities" when no such condition existed at the time of acceptance for many of the grants.

89.     Because Defendants may not surprise Plaintiff States with these post acceptance or retroactive conditions, Defendants' actions are unconstitutional.

90.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Targeting Directive and its implementation are unconstitutional. Plaintiff States are also entitled to injunctive relief preventing defendants from implementing or effectuating the Targeting Directive.

**FOURTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority**

91.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

92.    Defendants OMB, HHS, and CDC are "agencies" under the APA, 5 U.S.C. § 551(1), and the Targeting Directive is an "agency action" under the APA, *id.* § 551(13).

93.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

94.    Defendants lack the statutory authority to implement the Targeting Directive. The substantive statutes and appropriations laws that created and funded the grant programs at issue did not evince a purpose to condition funds on the President's political whims or federal immigration priorities. An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

95.    Pursuant to 5 U.S.C. §§ 705 and 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Targeting Directive violate the APA because they are contrary to law, a stay of the Targeting Directive, vacatur of the Targeting Directive, and a preliminary and permanent injunction preventing defendants from putting the Targeting Directive into effect.

## FIFTH CAUSE OF ACTION
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action

96.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

97.     Defendants OMB, HHS, and CDC are "agencies" under the APA, 5 U.S.C. § 551(1), and the Targeting Directive is an "agency action" under the APA, *id.* § 551(13).

98.     The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made" (quotation omitted)); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"). Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

99.     Defendants failed to comply with these bedrock requirements in making the Targeting Directive.

100.     First, the Targeting Directive singles out jurisdictions for disfavor based not on any rational purpose related to the goals of any program but rather based on partisan animus. "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that . . . work a violation of the arbitrary-and-capricious standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted).

101.    Second, the Targeting Directive changed agency position without explanation. But, when changing positions, an agency "must show that there are good reasons for the new policy," *Fox Television Stations, Inc.*, 556 U.S. at 515, and consider any "serious reliance interests" engendered by the status quo, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation omitted).

102.    Pursuant to 5 U.S.C. §§ 705 and 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Targeting Directive violate the APA because they are contrary to law, a stay of the Targeting Directive, vacatur of the Targeting Directive, and a preliminary and permanent injunction preventing defendants from putting the Targeting Directive into effect.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

   a.  Enter judgment for Plaintiff States and against defendants;

   b.  Declare that the Targeting Directive and all implementation of it is unlawful;

   c.  Set aside the Targeting Directive;

   d.  Prohibit any implementation or enforcement of the Targeting Directive by any defendant against Plaintiff States, including their instrumentalities, subdivisions, and any bona fide fiscal agents of Plaintiff States or their instrumentalities and subdivisions;

   e.  Prohibit any terminations of grants based on the Targeting Directive issued to Plaintiff States, including their instrumentalities, subdivisions, and any bona fide fiscal agents of Plaintiff States or their instrumentalities and subdivisions;

   f.  Declare that the United States may not retaliate against Plaintiff States by withdrawing, conditioning, or impairing Plaintiff States' federal funding or other participation in federal programs based on Plaintiff States' lawful exercise of their sovereign authority;

g. Enjoin defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct regarding federal funding or other participation in federal programs based on Plaintiff States' lawful exercise of their sovereign authority;

h. Retain jurisdiction to monitor defendants' compliance with this Court's judgment;

i. Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

j. Award such additional relief as this Court may deem just and proper.

Dated: February 11, 2026

**ROB BONTA**
*Attorney General of California*

By: */s/ Harald H. Kirn*
R. MATTHEW WISE*
KATHLEEN BOERGERS*
*Supervising Deputy Attorneys General*
HARALD H. KIRN*
CHRISTOPHER KISSEL*
CARTER JANSEN*
DAVID GREEN*
*Deputy Attorneys General*
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-210-6111
Harald.Kirn@doj.ca.gov
Christopher.Kissel@doj.ca.gov
Carter.Jansen@doj.ca.gov
David.Green@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
*Attorney General of Colorado*

By: */s/ David Moskowitz*
DAVID MOSKOWITZ*
*Deputy Solicitor General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

\* Pro Hac Vice Forthcoming

Respectfully submitted,

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ R. Henry Weaver*
KATHARINE ROLLER
*Complex Litigation Counsel*
SARAH HUNGER
*Deputy Solicitor General*
MOLLY MAUCK
AKANKSHA SHAH
R. HENRY WEAVER
BRIANNA YANG
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Katharine.Roller@ilag.gov
Sarah.Hunger@ilag.gov
Molly.Mauck@ilag.gov
Akanksha.Shah@ilag.gov
Robert.Weaver@ilag.gov
Brianna.Yang@ilag.gov

*Counsel for the State of Illinois*

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/ Katherine Bies*
KATHERINE BIES*
ED STOCKMEYER*
*Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
Ed.Stockmeyer@ag.state.mn.us

*Counsel for the State of Minnesota*