# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STATE OF ILLINOIS; STATE OF
CALIFORNIA; STATE OF COLORADO;
and STATE OF MINNESOTA,

       Plaintiffs,

       v.

RUSSELL VOUGHT, *in his official capacity as Director of the Office of Management & Budget*; U.S. OFFICE OF MANAGEMENT AND BUDGET; ROBERT F. KENNEDY JR*., in his official capacity as Secretary of the U.S. Department of Health & Human Services*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JIM O'NEILL, *in his official capacity as Acting Director of the U.S. Centers for Disease Control & Prevention*; U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION; DONALD J. TRUMP, *in his official capacity as President of the United States*; and the UNITED STATES;

       Defendants.

Case No. 1:26-cv-1566

## PLAINTIFF STATES' EMERGENCY MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND 5 U.S.C. § 705 STAY

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Factual Background .......................................................................................................... 2

Legal Standard ................................................................................................................. 6

Argument .......................................................................................................................... 7

I.      Plaintiff States are likely to succeed on the merits. ............................................ 7

        A.     The Targeting Directive is arbitrary and capricious................................ 8

        B.     The Targeting Directive is unconstitutional......................................... 11

II.     The equities compel emergency relief. .............................................................. 14

        A.     Preliminary relief is needed to avert irreparable harm.......................... 14

        B.     Preliminary relief is needed to prevent the United States from manipulating this Court's jurisdiction............................................................................. 17

        C.     The balance of the equities and public interest favor emergency relief.............. 19

Conclusion ...................................................................................................................... 20

Certificate of Service ...................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.A.R.P. v. Trump,*
  605 U.S. 91 (2025) ........................................................................................................17

*Am. Council of the Blind v. Mnuchin,*
  878 F.3d 360 (D.C. Cir. 2017) ......................................................................................19

*Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman,*
  147 F.4th 40 (1st Cir. 2025) ..........................................................................................12

*California v. U.S. Dep't of Transp.,*
  788 F. Supp. 3d 316 (D.R.I. 2025) ................................................................................11

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.,*
  24 F.4th 640 (7th Cir. 2022) ..........................................................................................18

*City & Cnty. of San Francisco v. Trump,*
  783 F. Supp. 3d 1148 (N.D. Cal. 2025) .........................................................................12

*City of Chicago v. U.S. Dep't of Homeland Sec.,*
  2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) .................................................................17

*Colorado v. U.S. Dep't of Health & Hum. Servs.,*
  783 F. Supp. 3d 641 (D.R.I. 2025) ................................................................................17

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd,*
  601 U.S. 416 (2024) ......................................................................................................11

*Cook Cnty. v. Wolf,*
  962 F.3d 208 (7th Cir. 2020) .................................................................6, 8, 10, 13, 16

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ..................................................................................................9, 15

*Dep't of Educ. v. California,*
  604 U.S. 650 (2025) ......................................................................................................17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ......................................................................................................7, 15

*Encino Motorcars, LLC v. Navarro,*
　　579 U.S. 211 (2016)................................................................10, 15

*FCC v. Fox Television Stations, Inc.,*
　　556 U.S. 502 (2009)..............................................................9, 10, 15

*FCC v. Prometheus Radio Project,*
　　592 U.S. 414 (2021)..................................................................8, 15

*GEFT Outdoors, LLC v. City of Westfield,*
　　922 F.3d 357 (7th Cir. 2019)......................................................6, 15

*Harris Cnty., Texas v. Kennedy,*
　　786 F. Supp. 3d 194 (D.D.C. 2025) ...............................................16

*Illinois v. Fed. Emergency Mgmt. Agency,*
　　801 F. Supp. 3d 75 (D.R.I. 2025)...................................................13

*Illinois v. Noem,*
　　2025 WL 3707011 (D.R.I. Dec. 22, 2025)....................................9, 13

*In re Aiken Cnty.,*
　　725 F.3d 255 (D.C. Cir. 2013).......................................................11

*Indiana Right to Life Victory Fund v. Morales,*
　　112 F.4th 466 (7th Cir. 2024).......................................................5, 6

*Korte v. Sebelius,*
　　735 F.3d 654 (7th Cir. 2013)...........................................................6

*League of Women Voters of United States v. Newby,*
　　838 F.3d 1 (D.C. Cir. 2016)...........................................................18

*Level the Playing Field v. Fed. Election Comm'n,*
　　961 F.3d 462 (D.C. Cir. 2020).......................................................7, 2

*Looney v. E. Tex. R.R. Co.,*
　　247 U.S. 214 (1918).....................................................................18

*LTD Commodities, Inc. v. Perederij*
　　699 F.2d 404, 406 (7th Cir. 1983)...............................................5, 15

*McHenry Cnty. v. Kwame Raoul,*
　　44 F.4th 581 (7th Cir. 2022).........................................................13

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ...................................................................................17

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ...................................................................................................13

*Missouri v. Trump*,
    128 F.4th 979 (8th Cir. 2025) ...............................................................................6, 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ...........................................................................................7, 8, 15

*Mozilla Corp. v. Fed. Commc'ns Comm'n*,
    940 F.3d 1 (D.C. Cir. 2019) .....................................................................................16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .............................................................................................12, 13

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) .............................................................................................17

*New York v. Sullivan*,
    906 F.2d 910 (2d Cir. 1990) .....................................................................................16

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................18

*Patterson v. Kentucky*,
    97 U.S. 501 (1878) ...................................................................................................13

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ...............................................................................................11, 12

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................................................19

*Rivera Lujan v. Fed. Motor Carrier Safety Admin.*,
    2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) .........................................................16

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) (9th Cir. 2013) ....................................................10, 16

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .................................................................................19

*Santa Clara v. Noem*,
  No. 25-CV-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ........................11

*Shelby Cnty., Ala., v. Holder*,
  570 U.S. 529 (2013) ..........................................................................................................12

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ..........................................................................................................11

*Train v. City of New York*,
  420 U.S. 35 (1975) ............................................................................................................11

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*,
  402 F. Supp. 3d 427 (N.D. Ill. 2019) ...........................................................................6, 16

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ............................................................................................18

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) .....................................................................................7, 16

**Constitutional Provisions, Statutes, Orders, and Rules**

5 U.S.C.
  § 705 ....................................................................................................................................6
  § 706(2)(A) ..........................................................................................................................7

Consolidated Appropriations Act of 2026, Pub. L. 119-75, § 524 ..............................................2, 5

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ...........................................................4

Tucker Act, 28 U.S.C. § 1491(a)(1) ..............................................................................................17

U.S. Const. art. I, § 8, cl. 1 ......................................................................................................10, 11

**Other Authorities**

Centers for Disease Control & Prevention, *CDC Priorities*,
  https://www.cdc.gov/about/cdc/index.html ......................................................................3

Dan Bongino Show, Ep. 2443 (Spotify, Feb. 2, 2026) ....................................................................5

Donald Trump (@realDonaldTrump), Truth Social (Jan. 14, 2026),
  https://truthsocial.com/@realDonaldTrump/posts/115893309945152200 ........................4

The Federalist No. 45 (J. Madison), ..............................................................................................13

Geoff Mulhivill, *Trump Threatens to Halt Federal Money Next Month Not Only to Sanctuary Cities But Also Their States*, Assoc. Press (Jan. 13, 2026) https://apnews.com/article/trump-sanctuary-cities-states-federal-funding-f0bb01398d9d955a498170e7334ce14a ...............................................................................4

Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'Waste and Mismanagement,'* N.Y. Post (Feb. 4, 2026) https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-green-grants-for-dem-states .......................................................................................5

Off. of Mgmt. & Budget, Budget Data Request No. 26-09, *Federal Awards to Entities in Select States* (Jan. 20, 2026) ..............................................................................................5

*President Trump Delivers Remarks to the Detroit Economic Club* 58:47 (Jan. 13, 2026), https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-detroit-economic-club...........................................................................................................4

Press Release, Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions .....................................................................................................................5

Press Release, Gov. of Va., *Governor Spanberger Establishes Principles for Virginia Law Enforcement, Signs Executive Order and Directive* (Feb. 4, 2026), https://www.governor.virginia.gov/newsroom/news-releases/name-1112242-en.html .......5

*Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026...................................................................................................1, 4

Va. Exec. Order No. 12 (2026), *Public Safety, Constitutional Policing, and Community Trust*, https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/ed/EO-12-Public-Safety,-Constitutional-Policing,-and-Community-Trust.pdf. ....................................................................................................................................5

## INTRODUCTION

On February 9, the Department of Health and Human Services ("HHS") began a three-day countdown clock by notifying Congress of its intent to cut more than $600 million in Centers for Disease Control and Prevention ("CDC") grants to the four Plaintiff States, based on sheer political animus. That animus has been expressed in recent months—and more broadly over the last year— as an intent to punish Plaintiff States for their sanctuary policies, for their clean energy policies, for the existence of protests against federal actions in their jurisdictions, and for countless other reasons. The grants at risk, which could be terminated as soon as February 12, are the backbone of Plaintiff States' public health infrastructure. Without them, Plaintiff States will have diminished capacity to track disease outbreaks, maintain and improve their data systems, and collect basic public health data—data on which CDC itself relies. Most damaging of all, Plaintiff States would be forced to lay off hundreds of trained public health professionals—a devastating and irreparable loss of institutional knowledge and expertise.

These drastic and potentially life-threatening harms have their genesis in a directive from the Office of Management and Budget ("OMB") commanding other agencies (of which CDC is the first) to punish States disfavored by this administration by stripping them of funding. Defendants do not even attempt to offer a rational explanation for this directive (the "Targeting Directive"), nor can there be one, given the retaliatory nature of this policy. Indeed, the President himself has conceded that, after implementing the Targeting Directive, "they [the targeted States] can sue us, and maybe they'll win."[1]

---

[1] *Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026.

Instead, Defendants claim only that the targeted programs are "inconsistent with agency priorities." But this vague justification is obvious pretext and, in any event, lacks sufficient reasoning to support the change in policy effectuated by the Targeting Directive. Accordingly, the Targeting Directive is arbitrary and capricious. Indeed, Defendants' own words show that the basis of the Targeting Directive is nothing more than "unjustifiable bias or partisanship," which constitutes "a violation of the arbitrary-and-capricious standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted). Moreover, the Targeting Directive appears to be an attempt to punish Plaintiff States and/or coerce Plaintiff States into adopting policies more favorable to the administration by threatening their residents' very lives. That violates the Spending Clause and the separation of powers, and is inconsistent with the core principles of federalism and state sovereignty enshrined in the Tenth Amendment.

Given the severity of the harm that Plaintiff States and their people will suffer if the Targeting Directive is implemented, and the clear illegality of Defendants' Targeting Directive, Plaintiff States respectfully request that the Court enter a time-limited temporary restraining order keeping in place the status quo until Thursday, February 19, 2026, or other such date on which a preliminary injunction can be heard. In light of the urgent circumstances underlying this motion, **Plaintiff States respectfully request that a temporary restraining order be entered by 11 a.m. on Thursday, February 12, 2026.**

## FACTUAL BACKGROUND

On February 9, 2026, Defendants notified Congress of their intent to imminently terminate more than 60 CDC grants only to Plaintiff States and entities therein, totaling more than $600 million. Under the terms of the most recent consolidated appropriation, that started a clock of "3 full business days" before the terminations to ensue. *See* Consolidated Appropriations Act of 2026,

Pub. L. 119-75, § 524. The targeted grants fund basic public health infrastructure in Plaintiff States, including hundreds of state and local public health positions in key areas such as disease surveillance and information-technology modernization. Without those funds, Plaintiff States will immediately be forced to lay off scores of experienced public health professionals—a loss of talent and institutional knowledge that will be impossible to replace. Many of the other state grants slated for termination fund disease surveillance, outbreak tracking, and other data collection—and that lost data, too, will be impossible to replace, leaving months-long or years-long gaps in the information Plaintiff States use to detect outbreaks, identify injury trends, and respond to emerging public health threats. The same is true of interruptions in funding for grants supporting long-term projects: If multi-year studies are cut off or contracts are broken halfway through, Plaintiff States cannot simply pick up where they left off.

In their notification to Congress of these impending cuts, Defendants stated—to the extent they identified any reasoning whatsoever—that they were targeting these particular grants in these particular States because they were "inconsistent with agency priorities." Defendants linked, however, to a CDC "priorities statement"[2] that lists "investing in innovation to prevent, detect, and respond to . . . infections and communicable diseases," "strengthening" and "modernizing public health infrastructure," and "enhancing our approach to health data"—i.e., precisely the areas supported by the targeted grants. Moreover, identical grants in the other 46 States, which necessarily stand in the same position with regard to CDC's priorities, are not scheduled to be cut.

Instead, these terminations trace back to a long-running campaign by the Trump Administration to punish States for various policy disagreements, including so-called "sanctuary

_____

[2] Centers for Disease Control & Prevention, *CDC Priorities*, https://www.cdc.gov/about/cdc/index.html.

policies," purported "fraud" in their provision of social services, their opposition to national-guard deployments in their jurisdictions, their commitment to clean-energy programs, and other disagreements. This campaign began on the first day of President Trump's second term, with the issuance of an executive order directing the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds,"[3] and continued with near-monthly acts of retaliation against such jurisdictions, either by stripping them of funding or by imposing draconian and unlawful grant conditions.[4]

The most recent salvo in this campaign, and the one responsible for the retaliatory terminations at issue here, is the "Targeting Directive" issued by OMB targeting Plaintiff States for funding cuts. The Directive is unexplained and irrational, but one explanation is that it is based on the President's stated intention in a speech on January 13 to "not mak[e] any payments to anybody that supports sanctuary cities."[5] The President doubled down on those comments in later comments to reporters and on social media over the following days.[6] In particular, on January 20, President Trump remarked, "They can sue us, and maybe they'll win, but we're not giving money to sanctuary cities anymore as of the beginning of the month."[7]

---

[3] Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).
[4] *See* Compl. ¶¶ 28–28.
[5] *President Trump Delivers Remarks to the Detroit Economic Club* 58:47 (Jan. 13, 2026), https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-detroit-economic-club.
[6] Geoff Mulvihill, *Trump Threatens To Halt Federal Money Next Month not only to Sanctuary Cities but also Their States*, Assoc. Press (Jan. 13, 2026), https://apnews.com/article/trump-sanctuary-cities-states-federal-funding-f0bb01398d9d955a498170e7334ce14a; Donald Trump (@realDonaldTrump), Truth Social (Jan. 14, 2026), https://truthsocial.com/@realDonaldTrump/posts/115893309945152200.
[7] *Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026/.

That same day, the Office of Management and Budget ("OMB") sent a "budget data request" to all federal agencies (except for the Departments of Defense and Veterans Affairs) seeking "a detailed report on Federal funds provided to components, agencies, or instrumentalities of *certain States*."[8] Those States are California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington. With the exception of Virginia, each of these States (or their localities) appeared on a "list of sanctuary jurisdictions" published by the Department of Justice on August 5, 2025.[9] And since that time, the Virginia Governor issued an executive order with provisions similar to those in the laws of the States that appear on the "sanctuary jurisdiction" list.[10] Under the timeline in the request, agencies were required to provide OMB with sufficient data to centralize a purportedly complete inventory of all non-defense federal funding to those 14 jurisdictions by the end of January.

Sometime in early February, OMB issued the Targeting Directive, following through on President Trump's January threats by commanding other agencies to cut funding to Plaintiff States. The President himself described an "order" on February 2.[11] On February 4, the first dominos fell when a *New York Post* article announced that OMB was instructing the Department of

---

[8] Off. of Mgmt. & Budget, Budget Data Request No. 26-09, *Federal Awards to Entities in Select States*, at 1 (Jan. 20, 2026) (emphasis added).
[9] *See* Press Release, Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.
[10] *See* Press Release, Gov. of Va., *Governor Spanberger Establishes Principles for Virginia Law Enforcement, Signs Executive Order and Directive* (Feb. 4, 2026), https://www.governor.virginia.gov/newsroom/news-releases/name-1112242-en.html; Va. Exec. Order No. 12 (2026), *Public Safety, Constitutional Policing, and Community Trust*, https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/ed/EO-12-Public-Safety,-Constitutional-Policing,-and-Community-Trust.pdf.
[11] Dan Bongino Show, Ep. 2443, at 1:34:13 (Spotify, Feb. 2, 2026).

Transportation and the CDC to terminate more than $1.5 billion of grants to Plaintiff States.[12] In the article, an OMB spokesperson promised that "more grant cancellations were expected."[13]

On February 9, HHS took the penultimate step in implementing the Targeting Directive by providing Congress with notice of its intent to terminate a wide swath of CDC grants in Plaintiff States—and only Plaintiff States. Pursuant to the Consolidated Appropriations Act of 2026, Pub. L. 119-75, § 524, HHS must provide such notice "not less than 3 full business days" before carrying out grant terminations. Thus, because notice was provided on February 9, starting on February 12, nothing will stand in the way of Defendants implementing the Targeting Directive—beginning with the CDC grants mentioned above, and with OMB promising more to come.

## LEGAL STANDARD

The fundamental purpose of temporary relief is to preserve "the interim *status quo*," meaning "the last uncontested status preceding the controversy," so that a "prevailing party . . . will not find his victory valueless." *LTD Commodities, Inc. v. Perederij*, 699 F.2d 404, 406 (7th Cir. 1983). To be entitled to a preliminary injunction or a temporary restraining order, a plaintiff must first "demonstrate[e] a likelihood of success on the merits and a likelihood of irreparable harm in the absence of preliminary relief." *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466, 471 (7th Cir. 2024) (cleaned up); *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). Once that is established, the plaintiff must show that "the balance of equitable interests tips in favor of injunctive relief." *Indiana Right to Life*, 112 F.4th at 471. This inquiry requires a court to "consider both 'the public interest' as well

---

[12] Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'Waste and Mismanagement,'* N.Y. Post (Feb. 4, 2026), https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-green-grants-for-dem-states.
[13] *Id.*

as the 'competing harms' that would flow to the parties from a grant or denial of the requested injunction." *Id.* (*quoting Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)). When the government is a party to the lawsuit, the public interest and the harm to the party merge. *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025). The Seventh Circuit employs a "sliding scale" approach to this balancing: "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up). The APA also allows courts to stay "agency action" to "prevent irreparable injury." 5 U.S.C. § 705. This standard mirrors the preliminary injunction standard. *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## ARGUMENT

Plaintiff States' request to preserve the status quo should be granted. Plaintiff States are highly likely to succeed on the merits of their claim that the Targeting Directive, grounded in no rational consideration but only retaliatory partisan animus, is arbitrary and capricious. They are also likely to succeed in showing that Defendants' confessed intention to punish them based on disfavor for their policies violates the Constitution. Plaintiff States face irreparable and immediate harm if the Targeting Directive's first repercussions, the forthcoming CDC grant terminations, are allowed to go into effect today or tomorrow. The Court should act to preserve the status quo.

## I. Plaintiff States are likely to succeed on the merits.

Plaintiff States are highly likely to succeed in establishing that the Targeting Directive violates the APA because it is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). A blanket command to cut funds, divorced from any purpose of the funding at issue, could not be anything else. The partisan animus behind the Targeting Directive will never add up to a "rational

connection" between any "facts found" and "choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the Targeting Directive threatens to slash funding for critical public health infrastructure, which has no rational relationship to Plaintiff States' policies on unrelated topics where the President happens to disagree with Plaintiff States. Even more fundamentally, this retaliation against Plaintiff States, attempting to force them to change their policies through funding cuts, is unconstitutional.[14]

A.    **The Targeting Directive is arbitrary and capricious.**

The Targeting Directive mandated that CDC cut over $600 million in critical health funds because of political animus toward Plaintiff States. There could be no clearer violation of the "reasoned decisionmaking" that the APA requires. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation omitted). "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that … work a violation of the arbitrary-and-capricious standard." *Level the Playing Field*, 961 F.3d at 464 (quotation omitted). "A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Rather than treat like cases alike, Defendants have singled out four disfavored jurisdictions and intend to slash their public health funding. That action is—to put it mildly—deeply irrational.

Stated another way, the purposes of public health funding are completely unrelated to either the President's general animus toward these targeted jurisdictions or, more specifically, their policies around cooperation with federal immigration enforcement. An agency action is arbitrary

---

[14] In order to file this motion as expeditiously as possible, Plaintiff States have briefed only a subset of the claims on which they would ultimately plan to seek judgment in this case.

or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (cleaned up).

No "rational connection" could possibly lie between promoting the public health, on the one hand, and partisan animus, on the other. The grants at issue support the core infrastructure of state public health agencies, including these agencies' workforce, foundational capabilities, and data systems. Ex. 3 (Underwood Decl.), ¶ 9; Ex. 4 (Thoele Decl.), ¶ 10. The Public Health Infrastructure Grant ("PHIG") program provides the basic funds that allow States to run modern public health systems. Ex. 1 (Rudman Decl.), ¶ 16; Ex. 3 (Underwood Decl.), ¶ 10; Ex. 4 (Thoele Decl.), ¶ 10. It is irrational for an agency to ignore public health impacts like "reduce[d] access to vaccines and other medical care." *Wolf*, 962 F.3d at 231. It is doubly irrational for the Targeting Directive to ignore those impacts in pursuit of unrelated goals: Infectious disease "does not respect the differences between citizens and noncitizens" or partisan affiliation. *Id.* So the purposes of public health have nothing to do with whether a State elects a Democratic or Republican governor, or whether a State uses its own law enforcement resources to enforce federal immigration law.

To be sure, Defendants have offered another account of the Targeting Directive: The reason given to Congress for the forthcoming grant terminations, to Plaintiff States' current knowledge, is a generic invocation of "agency priorities." But agency action cannot be upheld based on "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The "agency priorities" that Defendants cite would support continuing, not terminating, these critical public health grants. *See supra* p. 3. The threadbare explanation for the Targeting Directive cannot

erase Defendants' extensive and public expressions of animus toward the four targeted Plaintiff States. *See supra* pp. 1, 3–4. Indeed, all 50 States receive these public-health grants, and all are utilized by the States in generally the same way, Ex. 1 (Fanelli Decl.), ¶ 10, but only the four Plaintiff States' PHIG grants have been chosen for termination.

This Court "cannot ignore the disconnect between the decision made and the explanation given," and it should not credit "contrived reasons." *Dep't of Com*, 588 U.S. at 785. Plaintiff States are highly likely to show, in the course of this litigation, that Defendants were motivated by partisan prejudice and animus toward Plaintiff States' policies regarding civil immigration enforcement. *See, e.g.*, *Illinois v. Noem*, _ F. Supp. 3d. _ 2025 WL 3707011, at *12 (D.R.I. Dec. 22, 2025) (at summary judgment, rejecting the Department of Homeland Security's argument that it did not consider "sanctuary jurisdiction designation").

In any event, even if Defendants had not made their true motivation abundantly clear through public statements, the Targeting Directive is arbitrary because it dramatically changed Defendants' position without offering even a shred of explanation in any of the documents effectuating the change of policy. When changing positions, an agency "must show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and consider any "serious reliance interests" engendered by the status quo, *Regents*, 591 U.S. at 30. "In explaining a change in policy, 'an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Wolf*, 962 F.3d at 229–30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)). In the grant context, just as in any other, if an agency has "determined that the grant was the best way to fulfill the purposes of" a program, then "[i]n rescinding that determination, the [agency is] clearly

compelled to give adequate reasoning for the dramatic change of course." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985).

The Targeting Directive cuts funding without regard for these reliance interests and without a word of explanation. The Directive abandons longstanding support for basic public health infrastructure on which the States heavily rely, and one which the CDC still claims as a priority. *See supra* p. 3. For instance, to date, CDC has never provided the California, Colorado, or Illinois Departments of Public Health any kind of notice that their administration of the PHIG grant was in any way unsatisfactory. Ex. 1 (Fanelli Decl.), ¶ 17; Ex. 3 (Calonge Decl.), ¶ 17; Ex. 4 (Thoele Decl.), ¶ 15. Defendants thus provide no "good reasons for the new policy" grounded in the purpose of the grants at issue. *Fox Television Stations*, 556 U.S. at 515.

**B. The Targeting Directive is unconstitutional.**

Plaintiff States are likely to succeed on the merits of their second and third causes of action because the Targeting Directive transgresses the Constitution by violating the separation of powers and by attaching retroactive conditions to awarded federal funds in violation of the Spending Clause and fundamental principles of state sovereignty embodied in the Tenth Amendment.

The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress's authority over spending is broad and exclusive. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd*, 601 U.S. 416, 429–30 (2024). Its will cannot be undone by the Administration to support its own policy prerogatives, regardless of how well reasoned or related it may be. *Train v. City of New York*, 420 U.S. 35, 47 (1975); *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Here, the administration does so based solely on ill-defined political animus and

a desire to punish its enemies. Such action violates the separation of powers. U.S. Const. art. I, § 8, cl. 1.

These actions similarly run afoul of the limits placed on Spending Clause authority. Under the Clause, Congress may "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207. Most importantly here, the Spending Clause requires "clear notice" of conditions and prohibits "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). These Spending Clause limitations apply equally to the Executive Branch. *See, e.g.*, *Santa Clara v. Noem*, No. 25-CV-08330-WHO, 2025 WL 3251660, at *34 (N.D. Cal. Nov. 21, 2025); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322–23 (D.R.I. 2025).

Defendants have violated the Spending Clause by attempting to impose post-acceptance or retroactive conditions on funding. Defendants have targeted the four Plaintiff States because they disagree with Plaintiff States overall policy choices, including apparently Plaintiff States' choices about how to deploy their own law enforcement resources. *See supra* pp. 2–4. That Defendants' action is premised on this animus-based targeting is demonstrated not only by the President's statements and OMB's directive but also by the fact that non-targeted States continue to receive funding under the same grants for materially identical purposes. Indeed, some of the funding at issue was awarded by CDC just a few weeks ago, based on the same agency priorities, *e.g.*, Ex. 3 (Calonge Decl.), ¶¶ 12(i), 24; making clear that the real reason for the action was to target Plaintiff States.

Yet Defendants provided no clear notice, before acceptance or at the time of acceptance, that funding could be terminated based on sheer political animus. The Targeting Directive

12

effectively mandates compliance with these retroactive and unspecified requirements because it requires termination of funds as punishment for failure to comply. *See, e.g.*, *Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 46 (1st Cir. 2025) (observing that a rule can be "enforced via penalty"). This violation of the Spending Clause simultaneously violates Plaintiff States' reserved sovereign powers under the Tenth Amendment. "Respecting [the] limitation" that a "State voluntarily and knowingly accepts" conditions on federal funds is "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) ("*NFIB*") (quoting *Pennhurst*, 451 U.S. at 17). The constitutional order also preserves to the States "broad autonomy in structuring their governments and pursuing legislative objectives," *Shelby Cnty., Ala., v. Holder*, 570 U.S. 529, 543 (2013), including through setting local policies and law enforcement priorities. *See City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1184 (N.D. Cal. 2025). Defendants' effort to impose retroactive funding conditions to retaliate against Plaintiff States for their civil immigration enforcement policies is an improper attempt to force Plaintiff States to abandon their sovereign choices and to dragoon Plaintiff States into obeying the President's demands.

Nor may the federal government retroactively impose spending clause conditions to punish Plaintiff States for embracing "sanctuary" laws. *Cf. Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025); *Noem*, 2025 WL 3707011 (D.R.I. Dec. 22, 2025). The Framers ensured that "powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people'" are "held by governments more local and more accountable than a distant federal bureaucracy." *NFIB*, 567 U.S. at 536 (quoting *The Federalist* No. 45, at 293 (J. Madison)). Those powers include the ability to allocate state and local law enforcement resources in

accordance with statewide policies. The federal government may disagree with such decisions, but that is "not the province of the national authorities to determine." *Patterson v. Kentucky*, 97 U.S. 501, 504 (1878). "Illinois and the other States are not bound by [the federal government's] hope or expectation" that the State's law enforcement resources are diverted to the federal government's priorities. *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 592 (7th Cir. 2022). The Spending Clause does not authorize the imposition of retroactive conditions to punish Plaintiff States for their policy decisions. And here, the federal government is punishing Plaintiff States by intruding on yet another area of state sovereign power: administration of public health. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). The slashed funds, which had already been allocated by states for critical public health projects, are targeted to disrupt the Plaintiff States' ability to carry out this core sovereign function. By foisting an impermissible retroactive demand on Plaintiff States to accede to the President's favored policy or risk devastating public health funding cuts that threaten the lives of their residents, the Targeting Directive violates the Separation of Powers, Spending Clause and the Tenth Amendment as alleged in counts two and three of the complaint and must be enjoined from taking effect.

## II.     The equities compel emergency relief.

The balance of the equities weighs heavily in favor of preserving the status quo by preventing Defendants from implementing the Targeting Directive until a preliminary injunction can be heard.

### A.     Preliminary relief is needed to avert irreparable harm.

Plaintiff States will suffer irreparable harm absent emergency relief. The Targeting Directive, if allowed to be implemented, would be devasting to Plaintiff States' public health systems, depriving them of over $600 million in critical funds. And because Plaintiff States lack

the resources to replace this massive loss of funding, the result would be public health systems with less staff, poorer equipment and data systems, and a diminished ability to serve the needs of patients, putting patients' health and lives at risk.

The impacts from the loss of PHIG funding readily demonstrate this irreparable harm. PHIG grants are meant to strengthen the U.S. public health system by building capacity in three core areas: workforce (which aims to increase the size and capabilities of the public health workforce), foundational capabilities (which aims to strengthen overall systems, processes, and policies to ensure a strong core infrastructure necessary to support essential public health services), and data modernization (which, among other things, aims to increase recipients' ability to use public health data to identify and address issues of public health concern).

PHIG grant funds are key to Plaintiff States' efforts to strengthen public health infrastructure. The loss of these funds would result in the immediate and severe disruption of state public health capacity. Across Plaintiff States, nearly 500 State employees' positions are funded by this grant. *See* Ex. 1 (Fanelli Decl.), ¶ 11 (265.5 employees); Ex. 3 (Calonge Decl.) ¶ 32 (48 employees); Ex. 4 (Thoele Decl.), ¶ 31 (99 employees); Ex. 5 (Underwood Decl.), ¶ 24 (57 employees). These positions are put at risk by the Targeting Directive.

California, for instance, uses PHIG grant funding to pay experienced epidemiologists to mentor less experienced public health staff, to pay a nurse to work in areas lacking healthcare profession, to update the State's ability to send and receive electronic laboratory data, and to provide urgent dental care to underserved children. *See* Ex. 1 (Fanelli Decl.), ¶ 22. And one of California's local grant recipients, the County of Santa Clara Department of Public Health, used PHIG funds to launch of a new data management system that has allowed the department to transition from outdated paper- and fax-based disease reporting and tracking to modernized

electronic data ingestion more readily able to adapt to new diseases and outbreaks. *See* Ex. 2 (Rudman Decl.), ¶ 18. Similarly, Illinois uses PHIG grant funding to pay State disease surveillance teams, support emergency preparedness work, and fund data modernization projects. *See* Ex. 4 (Thoele Decl.), ¶¶ 10, 31.

The loss of the PHIG grant funding would undermine similar efforts in all Plaintiff States, disrupting workforce development programs that are critical to building the State's future public health workforce, disrupting the States' ability to train skilled public health staff and to prepare for public health emergencies, and requiring widespread layoffs of public health employees. *See* Ex. 4 (Thoele Decl.), ¶¶ 30–36; Ex. 5 (Underwood Decl.) ¶¶ 25–29. The result would be worsened patient outcomes, including greater risk of death. In California, abrupt termination of these critical public health infrastructure grants would occur amidst record breaking levels of measles cases in our state and across the U.S., including our first measles outbreak in California in 5 years: loss of these resources will make it more difficult to detect public health threats early, and lead to delayed response such as post-exposure prophylaxis for exposed vulnerable populations such as infants, pregnant women, and those with compromised immune systems, resulting in preventable hospitalizations and deaths. *See* Ex. 1 (Fanelli Decl), ¶ 26.

PHIG funds are also passed through to hundreds of local public health agencies. Ex. 1 (Fanelli Decl), ¶ 23; Ex. 2 (Rudman Decl), ¶ 15; Ex. 3 (Calonge Decl.) ¶ 34; Ex. 4 (Thoele Decl.), ¶ 33; Ex. 5 (Underwood Decl.), ¶ 26. For example, in Illinois, the PHIG funds Lead Poisoning Prevention grants to 25 local health departments, as well as Local Health Department Workforce Development Support Grants that support 674 public health jobs at 96 local agencies. Ex. 4 (Thoele Decl), ¶ 33. In Minnesota, similarly, PHIG funds support about 200 positions for 52 local health departments, including for community health assessments and planning. Ex. 5 (Underwood Decl),

¶ 27. Losing these funds would disproportionately impact small, rural health departments—the very health departments with the greatest needs. *Id.*; *see also* Ex. 1 (Fanelli Decl), ¶ 23; Ex. 3 (Calonge Decl.), ¶ 35; Ex. 4 (Thoele Decl.), ¶ 35.

These "potentially dire public health consequences" constitute irreparable harm. *Wolf*, 962 F.3d at 234. Like the Seventh Circuit, courts across the country have repeatedly acknowledged that these types of harms are irreparable. *See Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 62 (D.C. Cir. 2019) (irreparable harm that "[p]eople could be injured or die"); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (finding irreparable harm when the "[d]enial of benefits potentially subjected claimants to deteriorating health, and possibly even to death"); *Rivera Lujan v. Fed. Motor Carrier Safety Admin.*, No. 25-1215, 2025 WL 3182504, at *2 (D.C. Cir. Nov. 13, 2025) (finding irreparable harm because of the "potential injury or death for residents"); *see also Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 220 (D.D.C. 2025) (finding irreparable harm based on lost funding and stating that "[e]ven restoring all funding at a later date cannot make up for lost time that would have been spent fulfilling plaintiffs' public-health departments' missions of preventing infectious disease"); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 783 F. Supp. 3d 641, 650 (D.R.I. 2025) ("the immediate, unilateral termination of these public health grants has disrupted the States' public health systems and caused direct and irreparable harm to public health"), *appeal dismissed,* No. 25-1671, 2025 WL 4057116 (1st Cir. July 29, 2025).

### B. Preliminary relief is needed to prevent the United States from manipulating this Court's jurisdiction.

The Supreme Court has held that even the chance that "the Government *may have argued*" later "that no U.S. court had jurisdiction to order relief" suffices to grant an "injunction pending further proceedings." *A.A.R.P. v. Trump*, 605 U.S. 91, 93–94 (2025) (emphasis added). A temporary

restraining order is needed for this purpose here. The Tucker Act, 28 U.S.C. § 1491(a)(1), vests "jurisdiction over government contract disputes . . . exclusively in the Court of [Federal] Claims." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 963 (D.C. Cir. 1982). Thus, "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quotation omitted). On the other hand, a challenge to agency policies or guidance is properly within the jurisdiction of the district courts. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring); *City of Chicago v. U.S. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3043528, at *11 (N.D. Ill. Oct. 31, 2025) (Tucker Act precludes only "orders reversing or vacating grant terminations").

Defendants will almost certainly argue, as they have in many other cases, that this dispute must be consigned to the Court of Federal Claims simply because it relates to federal funding generally. That is wrong because Plaintiff States' complaint does not contain any claims to enforce a contractual obligation; Plaintiff States' claims attack a blanket policy, the Targeting Directive, whereby Defendants seek to wield their control over federal funds arbitrarily against Plaintiffs. But Defendants may try to hinder Plaintiff States' claims by effectuating grant terminations, literally at any moment, as an attempt to deprive this Court of jurisdiction. This Court should prevent such jurisdictional gamesmanship by holding any planned terminations in abeyance. *See Looney v. E. Tex. Ry. Co.*, 247 U.S. 214, 221 (1918) (recognizing "familiar and long-established practice" to order a temporary injunction "for the purpose of protecting and preserving [the Court's] jurisdiction until the object of the suit is accomplished and complete justice done between the parties").

**C.      The balance of the equities and public interest favor emergency relief.**

The final two factors, harm to the opposing party and the weighing of the public interest, "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both weigh heavily in favor of granting Plaintiff States' request for a temporary restraining order.

First "there is a substantial public interest 'in having governmental agencies abide by the Federal laws that govern their existence and operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). As Plaintiff States have shown, the Targeting Directive transgresses both the APA and constitutional limitations. Put simply, the public has a strong interest in the Federal government playing by the rules.

The public interest also "takes into account the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022); *see also Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 368 (D.C. Cir. 2017) (same). And the public has a strong reliance interest in preserving the continuity of existing federal funding, especially in the realm of critical public health infrastructure. Above, Plaintiff States have detailed myriad benefits conferred by these funds, and, conversely, the harms they will suffer should the Administration be allowed to carry out its threatened termination. Efforts to combat child abuse will be defunded. Ex. 5 (Underwood Decl.), ¶ 17. The response to an ongoing measles outbreak will be threatened. Ex. 1 (Fanelli Decl.), ¶ 26. The absence of these funds will have immediate consequences to the States and their public health systems.

In contrast, defendants have nothing to place on the other arm of the scale since it "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715

19

F.3d 1127, 1145 (9th Cir. 2013)). And the public's interest similarly lies with ensuring the Government follows the law. Accordingly, the balancing of the harms to the Plaintiffs against those to the Government tips decisively in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court:

1. Grant Plaintiff States' motion and enter a temporary restraining order pending resolution of a forthcoming request for preliminary injunction;

2. Enter a 5 U.S.C. § 705 stay of the Targeting Directive pending resolution of a forthcoming request for preliminary injunction;

3. Prohibit any implementation or enforcement of the Targeting Directive by any Defendant against Plaintiff States, including their instrumentalities, subdivisions, and any bona fide fiscal agents of Plaintiff States or their instrumentalities and subdivisions;

4. Prohibit any terminations of grants based on the Targeting Directive issued to Plaintiff States, including their instrumentalities, subdivisions, and any bona fide fiscal agents of Plaintiff States or their instrumentalities and subdivisions;

5. Provide that the Court's order shall remain in effect for seven days, unless extended by further Court order.

Dated: February 11, 2026

Respectfully submitted,

**ROB BONTA**
*Attorney General of California*

By: */s/ Harald H. Kirn*
R. MATTHEW WISE*
KATHLEEN BOERGERS*
*Supervising Deputy Attorneys General*
HARALD H. KIRN*
CHRISTOPHER KISSEL*
CARTER JANSEN*
DAVID GREEN*
*Deputy Attorneys General*
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-210-6111
Harald.Kirn@doj.ca.gov
Christopher.Kissel@doj.ca.gov
Carter.Jansen@doj.ca.gov
David.Green@doj.ca.gov

*Counsel for the State of California*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ R. Henry Weaver*
CARA HENDRICKSON
*Executive Deputy Attorney General*
KATHARINE ROLLER
*Complex Litigation Counsel*
SARAH HUNGER
*Deputy Solicitor General*
MOLLY MAUCK
AKANKSHA SHAH
R. HENRY WEAVER
BRIANNA YANG
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Katharine.Roller@ilag.gov
Sarah.Hunger@ilag.gov
Molly.Mauck@ilag.gov
Akanksha.Shah@ilag.gov
Robert.Weaver@ilag.gov
Brianna.Yang@ilag.gov

*Counsel for the State of Illinois*

**PHILIP J. WEISER**
*Attorney General of Colorado*

By: */s/ David Moskowitz*
DAVID MOSKOWITZ*
*Deputy Solicitor General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

* Pro Hac Vice Forthcoming

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/ Katherine Bies*
KATHERINE BIES*
ED STOCKMEYER*
*Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
Ed.Stockmeyer@ag.state.mn.us

*Counsel for the State of Minnesota*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2026, I caused a copy of the foregoing motion for a temporary restraining order and its exhibits to be sent to individuals at the U.S. Department of Justice by electronic mail:

Thomas Walsh
Chief, Civil Division
United States Attorney's Office, Northern District of Illinois
Thomas.Walsh2@usdoj.gov

Eitan Sirkovich
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
eitan.r.sirkovich@usdoj.gov

/s/ R. Henry Weaver
R. Henry Weaver