**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

STATE OF ILLINOIS, *et al.*,

      Plaintiffs,

v.

RUSSELL VOUGHT, in his official
capacity as Director of the Office of
Management and Budget, *et al.*,

      Defendants.

No. 26-cv-1566

**MEMORANDUM IN SUPPORT OF DEFENDANTS' COMBINED
MOTION TO TRANSFER OR DISMISS, AND TO CLARIFY**

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Background ............................................................................................................ 2

I.     Legal Background ........................................................................................ 2

II.    Factual Background ..................................................................................... 4

III.   Procedural History ...................................................................................... 9

Legal Standard .................................................................................................... 10

Argument ............................................................................................................ 11

I.     The Court Of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims .......... 12

     A.    Plaintiffs Have An Adequate Remedy In The Court Of Federal Claims ............. 13

          1.    Plaintiffs' grant agreements are contracts with the United States ........... 14

          2.    The contracts are enforceable with money damages ................................ 15

          3.    Plaintiffs' claims ultimately seek monetary reward specified in the contracts .............................................................................. 16

     B.    The Tucker Act Impliedly Precludes Relief ......................................... 19

II.    Plaintiffs Fail To State A Claim Under The APA .......................................... 21

     A.    Plaintiffs Do Not Challenge Final Agency Action ................................. 22

     B.    Plaintiffs Seek To Challenge Actions Committed To Agency Discretion By Law ............................................................ 24

     C.    Plaintiffs' Statutory Authority Claim Fails ......................................... 25

     D.    Plaintiffs' Arbitrary And Capricious Claim Fails ................................. 26

III.   Plaintiffs' Constitutional Claims Likewise Fail ........................................... 27

     A.    Plaintiffs' Tenth Amendment Claim Fails ............................................ 27

     B.    Plaintiffs' Separation of Powers Claim Fails ....................................... 28

     C.    Plaintiffs' Spending Clause Claim Fails .............................................. 29

IV.   Plaintiffs' Claims Against The President Must Be Dismissed .......................... 30

Conclusion ........................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) .................................................................................. 10

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007) .................................................................................. 10

*Bennett v. Spear*,
　520 U.S. 154 (1997) .................................................................................. 23

*Boaz Hous. Auth. v. United States*,
　994 F.3d 1359 (Fed. Cir. 2021) ................................................... 15, 16, 17

*Brazos Elec. Power Coop., Inc. v. United States*,
　144 F.3d 784 (Fed. Cir. 1998) .................................................................. 18

*California v. U.S. Dep't of Educ.*,
　769 F. Supp. 3d 72 (D. Mass. 2025) .......................................................... 5

*Christopher Vill., L.P. v. United States*,
　360 F.3d 1319 (Fed. Cir. 2004) ................................................ 11, 12, 13, 19

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
　401 U.S. 402 (1971), abrogated on other grounds by Califano v. Sanders,
　430 U.S. 99, 105 (1977) ............................................................................ 26

*Columbus Reg'l Hosp. v. United States*,
　990 F.3d 1330 (Fed. Cir. 2021) ................................................... 13, 14, 17

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*,
　247 F.3d 1378 (Fed. Cir. 2001) ................................................... 12, 13, 17

*Crowley Gov't Servs., Inc. v. GSA*,
　38 F.4th 1099 (D.C. Cir. 2022) .................................................................. 3

*Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*,
　770 F.3d 586 (7th Cir. 2014) ..................................................................... 10

*Dalton v. Specter*,
　511 U.S. 462 (1994) ....................................................................... 18, 27, 28

*Delano Farms Co. v. California Table Grape Comm'n*,
　655 F.3d 1337 (Fed. Cir. 2011) ................................................................ 12

*Dep't of Com. v. New York*,
　588 U.S. 752 (2019) .................................................................................. 26

*Dep't of Educ. v. California*,
  604 U.S. 650 (2025) ............................................................................................ *passim*

*FAA v. Cooper*,
  566 U.S. 284 (2012) .................................................................................................. 2, 12

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ...................................................................................................... 26

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ...................................................................................................... 10

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .................................................................................................. 23, 30

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ................................................................................... 18, 27

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  *534 U.S. 204 (U.S., 2002)* .......................................................................................... 19

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................................................... 25

*Holley v. United States*,
  124 F.3d 1462 (Fed. Cir. 1997) .................................................................................... 17

*Iddir v. INS*,
  301 F.3d 492 (7th Cir.2002) ........................................................................................ 10

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ...................................................................................................... 24

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ...................................................................................................... 24

*Loving v. United States*,
  517 U.S. 748 (1996) ...................................................................................................... 28

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ...................................................................................................... 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ...................................................................................................... 19

*McGee v. Mathis*,
  71 U.S. (4 Wall.) 143 (1866) ........................................................................................ 15

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867) ............................................................... 30

*U.S. v. Mitchell*,
   *463 U.S. 206 (U.S.Ct.Cl., 1983)* ......................................................... 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................. 26

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n (NIH)*,
   2025 WL 1747128 (D. Mass. June 23, 2025) .................................... 5

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025) ........................................................ 1, 5, 20, 21

*New York v. United States*,
   505 U.S. 144 (1992) ............................................................................ 27

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .............................................................................. 23

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ................................................................................ 29

*Printz v. United States*,
   521 U.S. 898 (1997) ............................................................................ 28

*Rocky Mountain Helium, LLC v. United States*,
   841 F.3d 1320 (Fed. Cir. 2016) ......................................................... 16

*San Juan City Coll. v. United States*,
   391 F.3d 1357 (Fed. Cir. 2004) ......................................................... 15

*Sanders v. United States*,
   252 F.3d 1329 (Fed. Cir. 2001) ......................................................... 15

*Sapperstein v. Hager*,
   188 F.3d 852 (7th Cir. 1999) ............................................................. 10

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ............................................................................ 29

*Suburban Mortg. Assocs. v. U.S. Dep't of Housing & Urban Dev.*,
   480 F.3d 1116 (Fed. Cir. 2007) .................................................. *passim*

*Sustainability Inst. v. Trump*,
   No. 25-1575, 2026 WL 157120 (4th Cir. Jan. 21, 2026) ................... 18

*Telecare Corp. v. Leavitt*,
    409 F.3d 1345 (Fed. Cir. 2005) ........................................................................ 13

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025) .................................................................................... 20

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003) ........................................................................................ 29

*United States v. Miller*,
    604 U.S. 518 (2025) ........................................................................................ 20

*United States v. Mitchell*,
    463 U.S. 206 (1983) .......................................................................................... 3

*United States v. Sherwood*,
    312 U.S. 584 (1941) .......................................................................................... 2

**U.S. Constitution**

U.S. Const. art. I, § 8, cl. 1 ........................................................................................ 28

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................................................ 24

5 U.S.C. § 702 ........................................................................................................ 20

5 U.S.C. § 704 .................................................................................................. *passim*

5 U.S.C. § 705 .......................................................................................................... 9

5 U.S.C. § 706(2)(A) .............................................................................................. 25

5 U.S.C. § 706(2)(B) .............................................................................................. 26

5 U.S.C. §§ 706(2) .................................................................................................. 22

28 U.S.C. § 1292(a)(1) .............................................................................................. 3

28 U.S.C. § 1292(d)(4)(A) ...................................................................................... 12

28 U.S.C. § 1292(d)(4)(B) ................................................................................. 1, 4, 11

28 U.S.C. § 1491 ...................................................................................................... 1

28 U.S.C. § 1491(a)(1) .......................................................................................... 3, 20

28 U.S.C. § 1631 .............................................................................................. 1, 10, 11

Pub. L. No. 100–702 ................................................................................................ 4

Pub. L. No. 119-75 ................................................................................................. 1

U.S.C. § 1491(a)(1) ........................................................................................... 3, 20

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................................... 2

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 2

**Regulations**

2 C.F.R. 200 ............................................................................................................ 8

2 C.F.R. Part 200 .................................................................................................. 14

2 C.F.R. § 200.340 ............................................................................................... 30

2 C.F.R. § 200.340(a) ..................................................................................... *passim*

2 C.F.R. § 200.340(a)(4) ................................................................................... 8, 25

2 C.F.R. § 200.340(b) ............................................................................................. 8

90 Fed. Reg. 38929 (Aug. 7, 2025) .................................................................... 7, 21

90 Fed. Reg. at 38,930 (Aug. 12, 2025) ................................................................. 7

**Other Authorities**

*Additional Measures to Combat Anti-Semitism*, (Jan. 29, 2025),
  Exec. Order No. 14188 ....................................................................................... 6

*Ending Taxpayer Subsidization of Open Borders,* (Feb. 19, 2025),
  Exec. Order No. 14218 ....................................................................................... 6

*Reevaluating and Realigning United States Foreign Aid*, (Jan. 20, 2025),
  Exec. Order No. 14169 ....................................................................................... 6

U.S. Centers for Disease Control and Prevention, *CDC Priorities*, (Sept. 17, 2025),
  https://perma.cc/K54F-4K3U ............................................................................ 7

U.S. Department of Health and Human Services, *HHS Priorities,* (Sept. 30, 2025),
  https://perma.cc/7TCR-E8EN ........................................................................... 7

## INTRODUCTION

On February 9, 2026, the Department of Health and Human Services ("HHS") notified Congress of the Centers for Disease Control and Prevention's ("CDC") intention to terminate various public health grants. Per their terms and conditions, these grants could "be terminated in part or [their] entirety . . . if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). Defendants notified Plaintiffs that this was the basis for the terminations three business days later, as Congress contemplated. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 524, 140 Stat. 173 (Feb. 3, 2026) (directing HHS to give appropriations committees notice "3 full business days" before the "termination or non-continuation of any grant").

Because Plaintiffs' claims sound in contract, the Court of Federal Claims ("COFC") has exclusive jurisdiction over this case under the Tucker Act. 28 U.S.C. § 1491; *Nat'l Inst. of Health v. Am. Pub. Health Ass'n* ("*NIH"*), 145 S. Ct. 2658 (2025); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam). Defendants therefore respectfully move the Court to transfer this case to the COFC pursuant to 28 U.S.C. § 1631. Defendants further request that the Court stay proceedings in this case pending resolution of this motion, as required by statute. 28 U.S.C. § 1292(d)(4)(B).

Plaintiffs try to plead around these bedrock requirements by positing the existence of a so-called "Targeting Directive" allegedly issued by the Office of Management and Budget ("OMB"). Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 2, 39, ECF No. 1. But Plaintiffs may not circumvent the requirements of the Tucker Act by pleading contract claims under another name. Furthermore, even assuming the facts as pleaded by Plaintiffs, they fail to state a claim. To start, Plaintiffs fall well short of showing that a supposed OMB "directive" amounts to final agency

action.  Given OMB's statutory mandate, it should be unsurprising that it would play a role in coordinating the federal government's budgetary and grantmaking decisions.  But as Plaintiffs' own allegations recognize, at issue here are *CDC* grants, terminated for inconsistency with *CDC* (and HHS) priorities, as explained in *CDC's* termination notices to Plaintiffs—the only plausible final agency action here.  Moreover, an agency's decisions about how to allocate lump-sum appropriations are committed to its discretion. And even if they were reviewable, Defendants' decisions to terminate these awards were reasonable and reasonably explained, and Plaintiffs' attempts to cloak their contract claims in constitutional garb fails.

For these reasons, the Court should transfer the case to the COFC and stay all further proceedings, or alternatively, dismiss Plaintiffs' claims for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) or alternatively for failure to state a claim under Rule 12(b)(6).  In all events, the Court should clarify that its Temporary Restraining Order was not intended to reach the President given the separation of powers concerns such an order would present.

## BACKGROUND

### I.    LEGAL BACKGROUND

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  To sue a federal agency and its officials, a plaintiff must therefore identify a waiver of sovereign immunity and show that its claim falls within the waiver's scope.  *See FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text").  So "if one wishes to sue the United States for a wrong committed by one of its agents (and agencies), one must find an appropriate Act of Congress that waives the Government's immunity from suit for that particular

wrong." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1121 (Fed. Cir. 2007).

Two statutes waiving sovereign immunity are at issue here: the Administrative Procedure Act ("APA") and the Tucker Act. The APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). That waiver only comes into effect when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Moreover, "[t]he APA's waiver of sovereign immunity does not apply" so long as "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *California*, 604 U.S. at 651 (quoting 5 U.S.C. § 702).

In the Tucker Act, Congress provided consent to suit and granted "the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* at 651 (quoting 28 U.S.C. § 1491(a)(1)); *see United States v. Mitchell*, 463 U.S. 206, 215 (1983) (recognizing the waiver of sovereign immunity). Specifically, the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). And Congress has expressly forbidden federal district courts from hearing contract claims against the United States exceeding $10,000 in value. *See id.* § 1346(a)(2). Thus, the "Tucker Act both waives sovereign immunity for, and grants the Court of Federal Claims exclusive jurisdiction over, [certain] actions for money damages of more than $10,000." *Suburban Mortg. Assocs.*, 480 F.3d at 1121 (citing 28 U.S.C. § 1292(a)(1)).

"With these limitations, the APA and the Tucker Act were understood to cover quite different challenges to Government action." *Id.* at 1122. "For jurisdictional purposes between the district courts under the APA and the Court of Federal Claims under the Tucker Act, the money

3

distinction [has generally] seemed to provide a relatively watertight barrier." *Id.* As a result, "dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction and make it an APA case." *Id.* at 1124.

In 1988, Congress recognized that it needed to "bring some order to the process" of determining whether the district courts, or the Court of Federal Claims, should have jurisdiction over a given suit. *Id.* at 1123. This resulted from "a sort of cottage industry among lawyers attempting to craft suits, ultimately seeking money from the Government, as suits for declaratory or injunctive relief without mentioning the money." *Id.* at 1124. As a result, Congress amended the interlocutory appeal statute to provide for immediate review of motions to transfer such cases to the Court of Federal Claims. Judicial Improvements and Access to Justice Act, Pub. L. No. 100–702, Title V, § 501, 102 Stat. 4642, 4652 (1988) (codified at 28 U.S.C. § 1292(d)(4)). "To ensure uniform adjudication of all Tucker Act issues in a single forum, when Congress established interlocutory review of these jurisdictional disputes it assigned the Federal Circuit exclusive jurisdiction over such appeals." *Suburban Mortg. Assocs.*, 480 F.3d at 1124. And it directed that "[w]hen a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion" and, if that ruling is appealed, "until the appeal has been decided by the Court of Appeals for the Federal Circuit." 28 U.S.C. § 1292(d)(4)(B). While such a stay "shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary," *id.*, such relief would be inappropriate here, as this motion explains.

## II.    FACTUAL BACKGROUND

The Federal Government has broad authority to terminate or suspend contracts that no longer effectuate program goals or agency priorities. Federal regulations provide that a "Federal

award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *See* 2 C.F.R. § 200.340(a).  These terms are typically incorporated into grants, which are in effect simple contracts.

As the Court is likely aware, the current administration has placed an increased focus on ensuring that federal spending on discretionary grants is consistent with its priorities, generating a great deal of litigation, some of which has reached the Supreme Court.  In *Department of Education v. California*, 604 U.S. 650 (2025), the Department of Education issued termination letters explaining that "[i]t is a priority of the Department of Education to eliminate discrimination in all forms of education through the United States" and "this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in [DEI] initiatives."  *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 77 (D. Mass. 2025) (quoting Termination Letter).  On appeal the Supreme Court issued a stay explaining that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *California,* 604 U.S. at 651 (quoting 28 U.S.C. § 1491(a)(1)).

Similarly, in *NIH*, that agency, which is also a component of HHS, conducted a review of grants in light of the new administration's goals and terminated various awards.  *Am. Pub. Health Ass'n v. NIH,* No. 1:25-CV-10787-WGY, 2025 WL 1747128, at *1 (D. Mass. June 23, 2025).  On appeal, the Supreme Court granted a stay "as to the District Court's judgments vacating the Government's termination of various research-related grants."  *NIH*, 145 S. Ct. 2658 (2025).  On

remand, the district court retained jurisdiction only over NIH's own "internal guidance documents" for how "the agency will not fund research related to DEI objectives, gender identity, or COVID-19" or "based on race." *Id.* at 2661 (Barrett, J., concurring); *see also id.* (describing documents as "internal agency guidance" and "internal policies related to grants"). The Court acknowledged but did not adjudicate "claims about the guidance," such as whether "NIH's guidance is final agency action." *Id.* at 2662.

President Trump has issued several executive orders describing the Executive Branch's goals and priorities when disbursing federal funds. *See, e.g.*, *Reevaluating and Realigning United States Foreign Aid*, Exec. Order No.14169, § 3(a), 90 Fed. Reg. 8619 (Jan. 20, 2025) (directing "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy"); *Additional Measures to Combat Anti-Semitism*, Exec. Order No. 14188, § 2, 90 Fed. Reg. 8847 (Jan. 29, 2025) (establishing "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools"); *Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14218, § 2, 90 Fed. Reg. 10581 (Feb. 19, 2025) (directing agency review, compliance efforts, and enhanced verification systems "to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens").

Federal agencies, including HHS and CDC, have likewise published lists of their priorities. For example, HHS has identified the following priorities: (1) Address the chronic disease epidemic; (2) Empower patients to make informed decisions about health care; (3) Prevent conflicts of interest; (4) Achieve gold standard science; (5) Explore alternative testing models, (6) Further our understanding of autism; (7) Toxins; (8) Investigate and care for those with Long COVID; (9) Advance the scientific understanding of the aging process; (10) Use digital tools and

artificial intelligence to improve health; (11) Data privacy; (12) Usher in a deflationary era in healthcare costs; (13) Strengthen the health care workforce; (14) Promote patient safety; (15) Promote work and self-sufficiency; (16) Foster marriage and family formation; (17) End illegal race discrimination; (18) Combat gender ideology and protect children; (19) End taxpayer subsidies for illegal immigration; (20) Reaffirm parental authority and protect religious liberty and conscience rights; (21) End crime and disorder on America's streets; (22) Enforce the Hyde Amendment; (23) Improve oversight of foreign funded institutions; and (24) Ending dangerous gain-of-function research.  AR at 125-134.

The CDC's stated priorities are: (1) gold-standard science, trust, transparency, and credibility; (2) global leadership; (3) rapid, evidence-based responses to crises; (4) vaccine safety and efficacy research; (5) advancing understanding of ASD, NDDs, and Chronic Disease; (6) modernizing public health infrastructure and health data; (7) avoiding conflicts of interest, (8) immigration; (9) protecting life and the family; (10) ending disorder on America's streets; (11) gender ideology and protecting children, (12) deprioritizing diversity, equity, and inclusion (DEI); and (13) parental rights.  AR at 135-138.

In August 2025, President Trump issued an Executive Order, titled "Improving Oversight of Federal Grantmaking," 90 Fed. Reg. 38,929 (Aug. 7, 2025), that directed agencies "to review discretionary grants to ensure that they are consistent with agency priorities and the national interest" through "coordination with OMB."  *Id.* 90 Fed. Reg. at 38,930, § 3.  On January 20, 2026, OMB issued a budget data request "to collect a detailed spending report on Federal funds provided to entities in a select list of States … to better understand the scope of funding" and "to facilitate efforts to reduce the improper and fraudulent use of those funds through administrative means or legislative proposals to Congress."  AR at 1245.

As part of this process, HHS reviewed the grants principally at issue here, *see* Compl. ¶ 1, using artificial intelligence (AI) to confirm whether there were specific examples of misalignment between language in recipients' grant-related documents and agency priorities. The AI was prompted to "[c]arefully read each grant application," "[i]dentify specific content that contradicts or fails to align with CDC priorities," "[e]xtract direct quotations from the application that demonstrate the contradiction," "[p]rovide precise citations (page number, section) where the contradictory contents appears," and "[a]ssign a confidence score (1-10) for each identified issue," where the higher the score the more "[c]lear and definite contradiction with CDC priorities." AR at 139-47.

For each individual grant, CDC confirmed that the terms and conditions for the grants clearly and unambiguously specify termination provisions, pursuant to 2 C.F.R. § 200.340(b). Specifically, the notices of award include the following two terms: (1) the award is subject to the applicable provisions of 2 C.F.R. part 200 after October 1, 2025; and (2) the award is subject to the termination provisions at 2 C.F.R. 200.340 starting on October 1, 2025 and that the recipient agrees that continued funding for the award is subject to a decision by the agency that the award continues to effectuate program goals or agency priorities. In each case, CDC considered whether a modification or partial termination of these awards could bring them into alignment with agency priorities. But in each case, CDC determined that it was not possible to modify or partially terminate these awards because it was an issue of agency priorities unrelated to the conduct of the recipient. AR at 574-849.

CDC also considered the potential reliance interests of recipients, beneficiaries, and the public, as well as the potential impacts on public health and subrecipients. But the agency determined that the continuation of a program that prioritizes issues not in alignment with HHS or

CDC priorities justifies termination, despite these considerations. In particular, the CDC concluded that reliance interests were outweighed by the agency's substantial interest in being able to effectively advance its current priorities through a small and more focused portfolio that better reflects the agency's current priorities. AR at 574-849.

CDC transmitted notification letters to the recipients of these grants effective February 11, 2026. These letters explained that the agency was invoking its authority pursuant to the terms of the awards in accordance with 2 C.F.R. § 200.340(a)(4), identified the agency's current priorities published on its website, and communicated the agency's decision to adjust its discretionary award portfolio by terminating some of the program awards to better prioritize agency resources towards the agency's stated priorities. The letters acknowledged that, in general, CDC may suspend, rather than immediately terminate, an award to allow the recipient to take appropriate corrective action before the agency makes a termination decision. But the agency determined that no corrective action was possible in these cases since no corrective action could align the award with current agency priorities. AR at 850-1238.

## III.    PROCEDURAL HISTORY

On February 11, 2026, Plaintiffs filed their Complaint, alleging that "[i]n early February, OMB issued a directive (the 'Targeting Directive') commanding agencies to cut funding to Plaintiff States, starting with more than $600 million in CDC public-health funding to Plaintiff States, with further cuts to come." Compl. ¶ 2. Plaintiffs claim that this alleged directive exceeds statutory authority, is arbitrary and capricious, and violates the Tenth Amendment, the Spending Clause, and the separation of powers. *Id.* ¶¶ 70-102.

On February 11, 2026, Plaintiffs moved for a temporary restraining order and 5 U.S.C. § 705 stay on the basis that the directive was arbitrary and capricious and violated the Spending

Clause and the separation of powers. ECF No. 3.  On February 12, 2026, the Court issued an opinion, ECF No. 20, and temporary restraining order. ECF No. 21.  On February 18, 2026, the Court held a status conference and entered a minute entry extending the temporary restraining order until March 12, 2026 and granting the government leave to file this motion.  ECF No. 35. The minute entry stated that "the court expects the government to provide the basis and source for any agency decision that purports to terminate the public-health grants at issue in the operative complaint."  ECF No. 35.

**LEGAL STANDARD**

Under 28 U.S.C. § 1631, when a court "finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action" to any court in which the case could have been filed. *Id*. A court lacks jurisdiction where the federal government has not waived its sovereign immunity for the claims at issue.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature").

Under Rule 12(b)(1), the Court alternatively may dismiss for lack of subject-matter jurisdiction.  "In the context of a motion to dismiss for lack of subject matter jurisdiction, [courts] accept as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff." *Iddir v. Immigr. & Naturalization Serv.,* 301 F.3d 492, 496 (7th Cir. 2002).  "[B]ut a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met."  *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014).  "The plaintiff has the obligation to establish jurisdiction by competent proof."  *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999). "The presumption of correctness that we accord to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question." *Id.* (citation omitted).

Under Rule 12(b)(6), the Court may dismiss for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the Court accepts well-pleaded factual allegations, "mere conclusory statements" and "'legal conclusion[s] couched as . . . factual allegation[s]'" are "disentitled to this presumption of truth." *Id*. (citation omitted). A complaint that is "no more than 'labels and conclusions' . . . 'will not do.'" *Id*. (citation omitted).

## ARGUMENT

The United States may seek transfer of any matter from the federal district courts when jurisdiction lies instead in the COFC. 28 U.S.C § 1631. The Federal Circuit then has exclusive jurisdiction over any resulting interlocutory appeals of the district court's decision on that motion. *Id.* § 1292(d)(4)(A). The reason for this exclusivity is simple. Congress has designated a single tribunal, the COFC, to adjudicate a set of claims seeking money from the United States based upon contracts. And it has set a single appellate tribunal, the Federal Circuit, to ensure that this exclusivity is fairly and comprehensively policed. Moreover, to avoid unnecessary litigation, Congress requires that the district court case be stayed for the pendency of the motion to transfer and then an additional 60 days after any ruling (permitting sufficient time to consider an appeal). *Id.* § 1292(d)(4)(B); *see supra* p. 4.

Under the Federal Circuit's unambiguous precedent, this case belongs in the Court of Federal Claims. Plaintiffs bring claims, restyled a variety of ways, to require the United States to pay them money. And the terms and entitlement to payment are entirely located within contractual agreements between agencies of the United States and these plaintiffs. That is, if no contracts

were ever formed, Plaintiffs could not seek payment. This situation is precisely why the COFC was established. "A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) (citation modified).

Jurisdiction lies in the COFC despite Plaintiffs' attempt to invoke the APA. By the APA's terms, review is foreclosed when precluded by statute or when an adequate remedy is available elsewhere. The Federal Circuit has developed a rich body of law on the latter category. That precedent directs, in all but the rarest circumstances, that money damages is an adequate remedy for violation of the terms of a contract. *Suburban Mortg. Assocs.*, 480 F.3d at 1127-28. While the adequate remedy bar is the most straightforward path, district court jurisdiction is also impliedly precluded under recent Supreme Court precedent and first principles, notwithstanding Plaintiffs' recasting of some of their contract claims as constitutional ones. The Federal Circuit has long held that the COFC is the proper venue for this kind of case, to the exclusion of the district courts. Transfer is therefore warranted.

## I. The Court Of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims

To sue a federal agency or its officials, Plaintiffs must identify an express waiver of sovereign immunity and show that their claims fall within the waiver's scope. *See Cooper*, 566 U.S. at 290. Plaintiffs necessarily rely on the APA's waiver of sovereign immunity. Yet APA review is unavailable where there is an adequate remedy in another court, or if another statute impliedly precludes relief. Both are true here. Thus, the APA and Tucker Act prevent Plaintiffs from circumventing the COFC.

### A. Plaintiffs Have An Adequate Remedy In The Court Of Federal Claims

Congress expressly limited APA review to situations where "there is no other adequate remedy in a court." 5 U.S.C. § 704. This adequate remedy bar is jurisdictional. *Christopher Vill.*, 360 F.3d at 1327; *Consol. Edison Co. of N.Y., Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1383-84 (Fed. Cir. 2001); *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1344 (Fed. Cir. 2011). Since any appeal of a ruling on this motion goes to the Federal Circuit, its law controls. *See* 28 U.S.C. § 1292(d)(4)(A).

The key question is "[C]an the Court of Federal Claims provide an adequate remedy under the Tucker Act for the alleged wrong?" *Suburban Mortg. Assocs.*, 480 F.3d at 1125. Here, the answer is "Yes." The Federal Circuit has long held that "[t]he availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005). As a result, if a litigant can "sue the government for money damages in the Court of Federal Claims," it has "an 'adequate remedy' that precludes an APA waiver of sovereign immunity in other courts." *Christopher Vill.*, 360 F.3d at 1327 (quoting *Consol. Edison*, 247 F.3d at 1384). Put another way, "when the plaintiff's claims, regardless of the form in which the complaint is drafted, are understood to be seeking a monetary reward from the Government," then the only question is whether the litigant can seek money in the COFC. *Suburban Mortg. Assocs.*, 480 F.3d at 1126.

Thus, to determine whether there is an adequate remedy here involves three questions. First, is there a contract between the United States and Plaintiffs? Second, is that contract enforceable for money damages in the Court of Federal Claims? Third, does Plaintiffs' complaint, regardless of how it is framed, ultimately seek a monetary reward from the Government? If the

13

answer to all three questions is yes, then the adequate remedy bar precludes reliance on the APA's waiver of sovereign immunity, as it does here.

### 1. Plaintiffs' grant agreements are contracts with the United States

Plaintiffs' grant agreements are contracts for purposes of the COFC. "[F]ederal grant agreements a[re] contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). The Federal Circuit has a four-part test for such a contract: "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Id.* at 1339. All are met here.

First, the "the language of the agreement[s] . . . speaks in terms of binding obligations." *Id.* These are explicit contracts awarding definite sums of money in exchange for services described in the application, subject to CDC's General Terms and Conditions, which are incorporated by reference. Similarly, regulations may provide additional evidence that the contracting agency has expressed an intent to be bound. *See Columbus Reg'l Hosp.*, 990 F.3d at 1339. Here, for example, the detailed regulations governing this program, promulgated by OMB, make clear that grant-making agencies intend to be bound by their agreements. *See* 2 C.F.R. part 200; *see also id.* § 200.340 (providing detailed procedures for termination when terms and conditions are violated, further evincing an intent to be bound).

Second, the awards were offers from HHS. *See Columbus Reg'l Hosp.*, 990 F.3d at 1339. They "evinced [the agency's] willingness to enter into a bargain and justified [the recipient's] understanding that its assent would consummate the bargain." *See id.* And "[a]cceptance was effected when the parties' authorized agents signed the agreement." *See id.* at 1339-40.

14

Third, consideration "turns on the conditions attached to [the agency's] grants." *Id.* at 1340. So long as the grantee "agreed to comply with an array of requirements" set by the terms of the agreement, consideration is satisfied. *Id.* Here, the terms and conditions of the awards set a variety of terms Plaintiffs are required to abide by. "The conditions attached to the [federal] grants constitute consideration because they imposed a variety of duties on [the grantee] in implementing the [grant] agreement." *See Columbus Reg'l Hosp.*, 990 F.3d at 1340. And whether the bargaining lacked "haggling" is immaterial, as a "standard-form agreement" satisfies consideration as well as any bespoke contract would. *Id.*

Finally, Defendants agree that actual authority is satisfied here, which is sufficient to establish that element. *See id.* Plaintiffs' grant agreements are therefore contracts. They "set the terms of and receive commitments from recipients" of federal grant programs. *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *see also McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155 (1866) ("It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract."). That places them within the scope of the COFC.

## 2. The contracts are enforceable with money damages

Next, the Court must consider whether the contracts are enforceable with money damages. "Normally contracts do not contain provisions specifying the basis for the award of damages in case of breach." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004). But "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001). That Plaintiffs' contracts are "government financial grants does not warrant a different standard." *San Juan City Coll.*, 391 F.3d at 1361. As

a result, "the presumption [is] that damages are available upon the breach" of these grant agreements. *Boaz Hous. Auth.*, 994 F.3d at 1365. This is true even if the statutory scheme authorizing the grants does not expressly contemplate money damages in a subsequent suit. "[C]ontracts impose obligations on parties, for which damages are the default remedy upon breach" regardless of the statutory or regulatory terms underlying the program. *Id.* at 1367.

There are three narrow exceptions to this presumption, all inapplicable. First, "contracts that expressly disavow money damages" are excepted from the presumption. *Id.* at 1365. No such express disavowal is present here. Second, "agreements that are entirely concerned with the conduct of parties in a criminal case" are not enforceable with money damages. *Id.* There is no suggestion that these grant agreements are anything of the sort. That leaves the final category, situations "where a special government cost-sharing agreement" is the contract to be enforced. *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327 (Fed. Cir. 2016). Government grant agreements, pursuant to a statutory program, do not fall within this category. *See Boaz Hous. Auth.*, 994 F.3d at 1366. If the COFC ultimately finds that the Government wrongfully terminated the contract, Plaintiffs will be entitled to money damages for the alleged breach.

### 3. Plaintiffs' claims ultimately seek monetary reward specified in the contracts

Plaintiffs' claims are fundamentally based on the premise that Defendants should have kept paying funds pursuant to the grant agreements. *See, e.g.*, Compl. ¶ 1 (complaining of "devastating funding cuts"); *id.* ¶ 62 ("If the Targeting Directive succeeds in stripping Plaintiff States of these grants, Plaintiff States will be unable to replace the lost federal dollars with their own money"); *id.* at 24 (requesting relief to "[p]rohibit any terminations of grants"). Regardless of how they are styled, the claims "in essence . . . seek[] to obtain the financial benefit of a prior contract-based obligation that allegedly has not been honored by the Government." *Suburban Mortg. Assocs.*,

480 F.3d at 1126. Since, "a money judgment will give . . . plaintiff[s] essentially the remedy [they] seek[,]" this case does not belong in district court. *See id.*

Even if Plaintiffs alleged that statutory obligations required continued contract payments, rather than using the term "breach of contract," the COFC would provide an adequate remedy. In *Boaz Housing Authority*, for example, plaintiffs sought to recover funds that the Department of Housing and Urban Development ("HUD") refused to pay to public housing authorities as part of a mandatory federal grant subsidy program. *See* 994 F.3d at 1362-63. While Congress required the subsidies by statute, HUD effectuated its grants through contracts with the recipients. *Id.* at 1366-67. Those contracts laid out various terms and conditions recipients were required to follow in exchange for HUD's continued payments. Because legislation mandated the subsidies, HUD argued that the plaintiffs' claims really stemmed from the "statutorily mandated subsidy program" rather than any contract enforceable with monetary damages. *Id.* at 1368.

The Federal Circuit rejected HUD's view. It held that the "contracts impose obligations on [the] parties, for which damages are the default remedy upon breach" notwithstanding the background statutory requirement. *Id.* at 1367. Nor did it matter that "contractual provisions [were] required by or incorporate governing regulations." *Id.* "If [a federal agency] chooses to employ contracts to set the terms of and receive commitments from recipients with respect to [federal] subsidies," the United States is generally "subject to suit in the Claims Court for damages relating to an alleged breach." *Id.* at 1368. In sum, even when a statute mandates the grant program, or federal regulations support the contractual relationship, the existence of a contract places the dispute squarely in the jurisdiction of the COFC. *See id.*

Constitutional claims are also barred. When a constitutional claim is merely a vehicle to block the termination of a contract obligating money, an adequate remedy exists in the COFC.

17

*See, e.g., Suburban Mortg. Assocs.*, 480 F.3d at 1128. Here, all the constitutional claims are invoked to require the Government to perform under the parties' contracts. Plaintiffs could seek monetary relief in the COFC by asserting these purported constitutional violations. *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The [COFC], like the Court of Claims before it, has jurisdiction of such" constitutional "claims"). Indeed, the Federal Circuit has repeatedly held the "adequate remedy" provision to bar claims when the result is payment of money under the terms of an agreement, regardless of the self-styled theory of the claims. *Columbus Reg'l Hosp.*, 990 F.3d at 1353 (explaining that when an action is "explicitly one for money" an adequate remedy exists in the COFC); *Consol. Edison*, 247 F.3d at 1385 ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the [COFC]."); *Brazos Elec. Power Coop., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998) ("[COFC] jurisdiction cannot be circumvented by such artful pleading and, accordingly, we customarily look to the substance of the pleadings rather than their form.").

What is more, Plaintiffs' asserted constitutional claims are simply statutory claims dressed up in constitutional language. But as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5. But that is not the case here. Plaintiffs' constitutional

18

claims are therefore untenable under *Dalton.* *See Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026) ("Though Plaintiffs style their claims as constitutional, the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones, and that precedent applies here."); *Glob. Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025) ("Here, the grantees assert a non-statutory right to vindicate separation-of-powers principles but they are foreclosed from doing so by *Dalton v. Specter*." (citation omitted)).

In sum, "[t]he relief sought [here] was to require the Government to perform its contract obligations so that [Plaintiffs] could get the money allegedly due . . . under the [grant] agreement." *Suburban Mortg. Assocs.*, 480 F.3d at 1117. "[D]espite [Plaintiffs'] valiant effort to frame the suit as one for declaratory or injunctive relief, this kind of litigation should be understood for what it is." *Id.* at 1118. And "an adequate remedy . . . precludes an APA waiver of sovereign immunity in other courts." *Christopher Vill.*, 360 F.3d at 1327 (citation omitted). Jurisdiction lies in the COFC and the claims should be transferred.

### B. The Tucker Act Impliedly Precludes Relief

Likewise, the "APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *California*, 604 U.S. at 651 (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). The Supreme Court's recent decisions affirmatively resolve this question.

In *Department of Education v. California*, the district court had "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying [grant] obligations as they accrue."

604 U.S. at 650. But the district court likely lacked jurisdiction because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, such suits must be brought in the Court of Federal Claims, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

That ruling reflects basic jurisdictional principles. Given the federal government's sovereign immunity, federal courts generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 604 U.S. 518, 527 (2025). The APA's waiver does not reach situations where another statute impliedly precludes relief. *See* 5 U.S.C. § 702. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). And in *California*, those principles established that the respondents' claim was just a disguised breach-of-contract claim that belonged in the Court of Federal Claims. *California* "squarely control[s]" this materially identical case. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

*American Public Health Association v. NIH* confirms these basic tenets. There, the plaintiffs brought APA claims alleging that the government's terminations of their DEI-related research grants were arbitrary and capricious, and the district court vacated the terminations on those grounds. 145 F.4th 39, 43-44, 47 (1st Cir. 2025). The First Circuit denied the government's request for a stay, concluding that the district court "likely had jurisdiction to enter the orders . . . to set aside an agency's actions as arbitrary and capricious," and reasoning that "the fact that the

20

orders may result in the disbursement of funds did not divest the court of its jurisdiction." *Id.* at 52 (citation modified).

The Supreme Court disagreed. It stayed the district court's judgment "vacating the Government's termination of various research-related grants." *NIH*, 145 S. Ct. at 2659. The Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants." *Id.* (citation modified). So claims reliant on a grant agreement are impliedly precluded. Moreover, a district court is not just barred from asserting jurisdiction over a claim based on a grant agreement. If the relief sought is "relief designed to enforce any obligation to pay money pursuant to those grants" then that too is barred. *Id.* (internal quotation marks omitted) (quoting *California*, 604 U.S. at 651). Notwithstanding various "objection[s]" that have been raised to adjudication of these claims in the Court of Federal claims, such arguments "to sending the grant-termination claims to the [Court of Federal Claims]" are "already addressed" by *California* and have been conclusively rejected. *NIH,* 145 S. Ct. at 2662 n.1 (Barrett, J., concurring).

\* \* \*

Congress limited the relief available for contractual claims against the Federal Government to money judgments. Plaintiffs cannot circumvent that choice through artful pleading. Because the Tucker Act provides an adequate remedy in the COFC and impliedly precludes reliance on the APA, the Court should transfer this case.

## II.    Plaintiffs Fail To State A Claim Under The APA

To evade COFC jurisdiction, Plaintiffs allege that their harms flow from a purported, procrustean directive that magically fits within the contours of *NIH*. *NIH*, 145 S. Ct. 2658. But in that case, "NIH issued internal guidance documents describing" that "[g]oing forward, the agency

will not fund research related to DEI objectives, gender identity, or COVID-19" or "continue the practice of awarding grants to researchers based on race." *Id.* at 2661 (Barrett, J., concurring). Here, by contrast, Plaintiffs do not identify any HHS guidance documents at all. Rather, they hypothesize that unidentified communications between HHS and OMB could constitute a targeting directive. But it is hardly unusual for HHS and OMB to communicate about funding priorities, or for OMB to collect data from agencies on the allocation of federal funds. Indeed, EO 14332 requires this sort of coordination. 90 Fed. Reg. at 38,929, § 3. Such communications do not give rise to a claim under the APA.

Under the APA, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Court may set aside agency action if the Court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law" or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2). Here, Plaintiffs' claims fail because Plaintiffs do not challenge final agency action or otherwise challenge actions committed to agency discretion by law. Nor were Defendants' actions in excess of statutory authority or arbitrary and capricious.

## A. Plaintiffs Do Not Challenge Final Agency Action

To the extent that Plaintiffs challenge a purported targeting directive under the APA, such claims fail because any such directive would not be final agency action within the meaning of the APA. The APA directs courts to review only "[a]gency action made reviewable by statute and final agency action." 5 U.S.C. § 704. "Agency action" is a defined term of art under the APA and most often manifests in the form of a rule or order. *Id.* § 551(13) (defining "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Agency action that is cognizable and judicially reviewable under

the APA does not include any and all actions that an agency takes. Rather, judicial review under the APA is limited to "circumscribed, discrete" and concrete actions. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

Reviewable final agency action must have two characteristics. "First, the action must mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Plaintiffs' challenge fails on both prongs. First, any purported directive to review agency grants for alignment with administration priorities is not the "consummation" of the agency's decision-making process. *Bennett*, 520 U.S. at 178. At most, it would be the start or an intermediate step in the process. Second, such a purported directive would not determine any "rights or obligations" or carry "legal consequences[.]" *Id.* at 177 (citation omitted). The relevant final agency action here is CDC's termination of grants—as reflected by *CDC's* analysis of the consistency of those grants with its priorities, *CDC's* decision memoranda, *CDC's* notification (through HHS) of Congress, and *CDC's* termination letters to the grantees. It is that final step that marks the consummation of the agency's decision-making process—and only the COFC has jurisdiction over it.

Plaintiffs' creative attempts to plead around this basic jurisdictional fact are barred because, even if the posited OMB directive existed, it would not constitute final agency action within the meaning of the APA. For example, in *Lujan v. National Wildlife Federation*, the Supreme Court

rejected an attempt "to challenge the entirety of petitioners' so-called 'land withdrawal review program'" because it was "not an 'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704." 497 U.S. 871, 890 (1990).  Rather, that purported program was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by" statute. *Id.*  But this was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration."  *Id.* (citation omitted). That was especially true given that the so-called review program encompassed "1250 or so individual classification terminations and withdrawal revocations." *Id.*  Here, Plaintiffs seek to sweep into a so-called targeting directive not just the 66 grant terminations made so far, but potentially innumerable future grant terminations by Defendants or other agencies, *see* Compl. ¶ 2 (describing "Targeting Directive" as commanding "agencies to cut funding to Plaintiff States, *starting with* more than $600 million in CDC public-health funding to Plaintiff States, *with further cuts to come*" (emphasis added)); *id.* ¶ 42 (alleging that "Targeting Directive" was "originated by OMB" and has been "put into effect *so far* by HHS and its CDC component" (emphasis added))—with perhaps more to be added through their forthcoming amended complaint.  But this wide-net approach fails to track the careful statutory framework of the APA and runs afoul of its final agency action requirement.

**B.  Plaintiffs Seek To Challenge Actions Committed To Agency Discretion By Law**

Independently, Plaintiffs' APA claims fail because they challenge agency decisions about how to allocate and expend lump-sum appropriations.  Such decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  In *Lincoln v. Vigil*, plaintiffs challenged the Indian Health

Service's "decision to terminate the Program" that provided health services to children in the southwest. 508 U.S. 182, 190 (1993). The Supreme Court even framed the issue as whether "the Service's decision to terminate the Program [is] reviewable under the APA." *Id*. The Court nonetheless held that the "decision to discontinue the Program" was "unreviewable under § 701(a)(2)." *Id.* at 193. Because the various legal authorities on which the *Lincoln* plaintiffs relied at most spoke "about Indian health only in general terms[,]" the agency was not required to undertake or continue any particular program. *Id.* at 194. Plaintiffs' efforts to subject a funding allocation decision to APA review based on similarly general statutory provisions should meet the same result. To the extent that Plaintiffs challenge other discretionary actions, such as how to prioritize their review of grants, such claims are an impermissible programmatic attack that fail to identify discrete final agency action. To the extent that Plaintiffs broadly challenge Defendants' decisions about how to review grants generally, those decisions are committed to agency discretion by law. *Cf. Heckler v. Chaney*, 470 U.S. 821, 830-35 (1985).

### C. Plaintiffs' Statutory Authority Claim Fails

Plaintiffs complain that "Defendants lack the statutory authority to implement the Targeting Directive." Compl. ¶ 94. But the relevant law here is the terms of the grants, which are contracts between the grant applicant and the agency. Consistent with Federal regulations, these all incorporate the terms of 2 C.F.R. § 200.340, which provides that "The Federal award may be terminated . . . if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). Here, CDC determined that each grant at issue had to be terminated because it failed to align with agency priorities. Plaintiffs identify no particular statutory provision with which this conflicts, and that alone dooms this claim.

### D. Plaintiffs' Arbitrary And Capricious Claim Fails

On APA review, an agency's decision is presumed valid, and a court reviews only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Review is "deferential[,]" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and simply examines whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Moreover, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 43. Because the Defendant agencies' grant and contract terminations were both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), they satisfy this deferential standard.

Here, the relevant agency action is CDC's termination of grants. The agency identified priorities, reviewed grants for alignment with those priorities, and identified with specificity how each grant at issue was misaligned with a specific agency priority. The agency made individualized decisions, memorialized in decision memoranda, explaining the basis for each decision, citing the legal authority invoked, and addressing reliance interests. On arbitrary and capricious review, even "a decision of less than ideal clarity" will be "uph[e]ld . . . if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43. That standard is more than met here.

To the extent that Plaintiffs urge the court to subject a purported OMB directive, rather than CDC's termination decisions, to APA review, any such directive would not constitute final agency action, for the reasons explained above. *See supra* pp. 22-25. But even on its own terms,

the argument would fail. Plaintiffs principally allege that the supposed directive "singles out jurisdictions for disfavor" untethered to "any rational purpose related to the goals of any program." Compl. ¶ 100. But Defendants' explanation of the misalignment between the grants at issue and CDC's priorities flatly refutes that contention. AR at 148-552. And Plaintiffs' backup argument— that Defendants "changed . . . position without explanation" and without sufficient consideration of "serious reliance interests," Compl. ¶ 101—also fails. Here, CDC did not simply depart from a prior decision "sub silentio," *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009); rather, it acknowledged "that it *is* changing position," *id.*, set forth that the reason was changed agency priorities, and explained why any reliance interests were outweighed. *See, e.g.*, AR at 575. The change-in-position doctrine requires no more. *See Fox TV*, 556 U.S. at 515 ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates.").

## III.    Plaintiffs' Constitutional Claims Likewise Fail

Plaintiffs' effort to repackage their contract claims as constitutional ones fares no better. It does not permit them to evade the limitations of the APA, which of course contemplates that constitutional challenges to agency action would proceed through its framework, 5 U.S.C. § 706(2)(B) (authorizing courts to set aside agency action "contrary to constitutional right, power, privilege, or immunity"), and makes review unavailable where adequate remedies exist elsewhere. *See Dalton*, 511 U.S. at 476; *see also Glob. Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025) (The Supreme Court has already "rejected that effort to recast statutory claims as constitutional ones."). Regardless, Plaintiffs' Tenth Amendment, Separation of Powers, and Spending Clause claims fail as a matter of law.

### A. Plaintiffs' Tenth Amendment Claim Fails

Plaintiffs allege that the purported directive somehow intrudes on state sovereignty under the Tenth Amendment. But that amendment merely recognizes that "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." As the Supreme Court has explained, this "is essentially a tautology": "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]" *New York v. United States*, 505 U.S. 144, 156-57 (1992) (citation omitted). To be sure, the Court has interpreted the amendment as recognizing that the Federal Government may not compel States to enact or administer a federal regulatory program. *See id.* at 188; *Printz v. United States*, 521 U.S. 898, 935 (1997). Yet here, no such limitation is implicated by Defendants' decision to terminate public health grants. Plaintiffs fail to allege any Federal command requiring States to enact, administer, or enforce Federal immigration law. And under *New York* and *Printz*, the touchstone is compulsion and commandeering, not a funding dispute. Indeed, Plaintiffs' theory would turn these principles on their head, allowing *states* to dictate the funding priorities of the *federal* government. Their Tenth Amendment claim therefore fails.

### B. Plaintiffs' Separation of Powers Claim Fails

Plaintiffs assert that the purported "Targeting Directive violates the separation of powers because the executive branch has overridden Congress's direction to spend appropriated funds based on defendants' desire to use federal funds as leverage and punishment against Plaintiff States." Compl. ¶ 81. This falls well short of making out a separation of powers claim.

As the Supreme Court has explained, the "basic principle" underlying the separation of powers doctrine is that "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). A branch may not

28

"arrogate power to itself" or "impair another in the performance of its constitutional duties." *Id*. But here, Plaintiffs identify no way core legislative power that the executive has supposedly impaired; at best, their claim is that the executive has exceeded statutory authority, as they elsewhere allege. *See* Compl. ¶¶ 76-82. Such claims, even if established, do not rise to the level of separation of powers violations. *Dalton*, 511 U.S. at 471; *see supra* p. 19.

In any event, Plaintiffs do not identify any obligation, much less a constitutional one, requiring the Executive Branch to provide Plaintiff recipients with these specific funds—which, again, are discretionary grants. As the Supreme Court has explained, "[a] refusal to fund" a particular "activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Libr. Ass'n, Inc*., 539 U.S. 194, 212 (2003) (citation omitted). Here, Defendants have shown that these grants no longer aligned with agency priorities, and that is all that is required under the terms of the agreements—which Plaintiffs accepted and agreed to.

### C. Plaintiffs' Spending Clause Claim Fails

Plaintiffs claim that "[t]hrough the Targeting Directive, defendants have violated the Spending Clause by attempting to impose retroactive conditions on funding." Compl. ¶ 87. But any such purported directive would not violate the Spending Clause. U.S. Const. art. I, § 8, cl. 1. "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citations omitted). "[T]he exercise of the spending power must be in pursuit of 'the general welfare'" and conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (citation omitted).

The Supreme Court has explained that if a state is "unaware of" or "unable to ascertain what is expected of it," there can be no knowing acceptance. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). But here, Plaintiffs agreed to grants that, by their terms, permitted the Federal Government to suspend or terminate them based on a change in priorities. *See* 2 C.F.R. § 200.340. This was bargained-for term that the Federal Government insisted on including, and Plaintiffs accepted those terms. They cannot now claim that they do not wish to be bound by the terms of the agreement. After all, the Federal Government may well not have entered into these contracts at all if it had known that it would not be able to terminate them pursuant to the terms outlined. Plaintiffs' contention that these terminations amount to a retroactive funding condition therefore fails.

## IV.  Plaintiffs' Claims Against The President Must Be Dismissed

At the very least, Plaintiffs' claims against the President should be dismissed. For the reasons described above, this Court lacks jurisdiction over any claims for money damages; to the extent that Plaintiffs seek injunctive relief, that is foreclosed as to the President because courts may not enjoin the President. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866). Even on the merits, the Supreme Court has made clear that the APA does not apply to the President. *Franklin*, 505 U.S. 788. All claims should therefore be dismissed as to the President, and the Court should clarify that the temporary restraining order does not run against the President.

## CONCLUSION

For these reasons, the Court should transfer this case to the COFC and stay all further proceedings, or alternatively, dismiss Plaintiffs' claims for lack of jurisdiction or failure to state a claim, and should clarify that its TRO was not intended to reach the President.

Dated: February 23, 2026                        Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Director

*/s Michael Velchik*
MICHAEL VELCHIK (DC #187249)
Senior Counsel to the Assistant Attorney
General
U.S. Department of Justice
950 Pennsylvania Ave
Washington DC 20530
(202) 860-8388
Email: michael.velchik@usdoj.gov

*Counsel for Defendants*

31