**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS; STATE OF CALIFORNIA; STATE OF COLORADO; and STATE OF MINNESOTA, <br><br>      Plaintiffs, <br><br>      v. <br><br> RUSSELL VOUGHT, *in his official capacity as Director of the Office of Management & Budget*; U.S. OFFICE OF MANAGEMENT AND BUDGET; ROBERT F. KENNEDY JR*., in his official capacity as Secretary of the U.S. Department of Health & Human Services*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY BHATTACHARYA, *in his official capacity as Acting Director of the U.S. Centers for Disease Control & Prevention*; U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION; SEAN DUFFY, *in his official capacity as Secretary of the U.S. Department of Transportation*; U.S. DEPARTMENT OF TRANSPORTATION; KRISTI NOEM, *in her official capacity as Secretary of the Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KAREN S. EVANS, *in her official capacity as Senior Official Performing the Duties of FEMA Administrator*; FEDERAL EMERGENCY MANAGEMENT AGENCY; DONALD J. TRUMP, *in his official capacity as President of the United States*; and the UNITED STATES; <br><br>      Defendants. | Case No. 26-cv-1566 <br><br> Hon. Manish S. Shah |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Defendants have targeted four sovereign States—California, Colorado, Illinois, and Minnesota—with devastating funding cuts to public health infrastructure, transportation improvements, and disaster recovery efforts based on sovereign choices by Plaintiff States, including whether the States choose to lend their scarce law enforcement resources to federal immigration enforcement.

2.      The current administration has made numerous attempts to strip funds from States whose policies it disagrees with. In particular, throughout January of this year, the President repeatedly threatened to stop all federal payments to what he calls "sanctuary" jurisdictions. Defendant the Office of Management and Budget ("OMB") then issued a directive—the "Targeting Directive"—commanding agencies to cut, freeze, or otherwise withhold funding to the four Plaintiff States here. OMB spent the last two weeks of January developing a hit list of funds for potential targeting in disfavored States. The Targeting Directive is now being implemented by defendants the Department of Health and Human Services ("HHS"), the United States Department of Transportation ("USDOT"), and the Department of Homeland Security ("DHS"), including most notably its component the Federal Emergency Management Agency ("FEMA").

3.      The President himself has conceded that, after implementing the Targeting Directive, "they can sue us, and maybe they'll win."

4.      The funding cuts ordered by the Targeting Directive started with more than $600 million in public health funding out of HHS component the Centers for Disease Control and Prevention ("CDC"). On the morning of February 4, the President and OMB ordered HHS to cancel a specified list of grants in Plaintiff States totaling over $600 million. On February 7, HHS and CDC then manufactured post-hoc "reasoning" for the predetermined cuts by asking an artificial intelligence ("AI") tool to generate automated text purporting to summarize why the

grants did not align with CDC's current priorities. Then, on February 9, HHS and CDC began a three-day countdown clock by notifying Congress of their intent to cut the set of more than $600 million in grants to the four Plaintiff States. *See* Consolidated Appropriations Act of 2026, Pub. L. No. 119-75, § 524, 140 Stat. 173 (notification provision).

5.     Alerted to the danger, Plaintiff States quickly filed this lawsuit and sought temporary emergency relief. ECF 1, 3. After Plaintiff States filed suit, CDC purported to effectuate the first round of terminations by making February 11 the last day of the performance periods on the grants in question, but this Court's temporary restraining order stopped the cuts. CDC noticed another round of terminations to Congress on February 11, but those, too, were halted by this Court's entry of temporary injunctive relief to freeze the status quo in place and avert irreparable harm.

6.     The Targeting Directive also commanded USDOT to withhold or terminate over $900 million in transportation funding to Plaintiff States. One large target of withholding by USDOT is the Charging and Fueling Infrastructure ("CFI") program, a grant program established under the Bipartisan Infrastructure Law to help states expand access to electric vehicle charging along major transportation corridors and in underserved communities. 23 U.S.C. § 151(f). USDOT has also placed on an internal list for indefinite pause grants to Plaintiff States under other programs, including the Rural Surface Transportation Grant program, the National Infrastructure Project Assistance program, the Nationally Significant Multimodal Freight and Highway Projects program, and other programs meant to ensure safe, cost-effective, and sustainable transportation, enhance quality of life, and promote economic prosperity.

7.     Most recently, FEMA implemented the Targeting Directive by excluding the same four States—Illinois, California, Colorado, and Minnesota—from the release of over $5 billion in

long-delayed disaster relief and recovery funding, even while Plaintiff States have billions of dollars in pending requests.

8.      At OMB's direction, defendants are implementing the Targeting Directive to slash funding to Plaintiff States based on unrelated immigration-enforcement priorities and arbitrary political animus. This action is lawless. It violates the Administrative Procedure Act's requirement of reasoned decisionmaking, and it exceeds the agencies' statutory authority. Even more fundamentally, it violates basic tenets of our constitutional order: the Tenth Amendment, the Separation of Powers, and the Spending Clause.

9.      For these reasons, the Targeting Directive should be declared unlawful, set aside, and preliminarily and permanently enjoined.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 702, 705, and 706.

11.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. Plaintiff the State of Illinois is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Northern District of Illinois.

## PARTIES

### I.      Plaintiffs

12.      Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State in the United States of America. The Attorney General of Illinois is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

13.     Plaintiff the State of California is a sovereign state of the United States of America. California Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510–12511; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761–62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state[.]").

14.     Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General is the chief legal representative of the State and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action on behalf of the State of Colorado.

15.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of state concern. Minn. Stat. § 8.01.

## II.     Defendants

16.     Defendant Russell Vought is the Director of OMB, and that agency's highest-ranking official. 31 U.S.C. § 502(a). He is responsible for overseeing OMB, providing direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements, and ensuring that its directions are implemented by all federal agencies that provide relevant funding and support. He is sued in his official capacity.

17.     Defendant OMB is a cabinet agency within the executive branch of the United States government. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. § 501.

18.     Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. §§ 3501a, 3502. He is sued in his official capacity.

19.     Defendant HHS is a cabinet agency within the executive branch of the United States government. 42 U.S.C. § 3501, 3501a.

20.     Defendant Jay Bhattacharya is Acting Director of CDC, and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. [1]

21.     Defendant CDC is an executive branch agency within the federal government and a component of HHS, headquartered in Atlanta, Georgia. 44 U.S.C. § 3502(1); 5 U.S.C. § 551(1).

22.     Defendant Sean Duffy is the Secretary of USDOT and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 49 U.S.C. §§ 102(b), 301. He is sued in his official capacity.

23.     Defendant USDOT is a cabinet agency within the executive branch of the United States government. 49 U.S.C. § 102(a).

24.     Defendant Kristi Noem is the Secretary of DHS and that agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 6 U.S.C. § 112.

25.     Defendant DHS is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

---

[1] Jay Battacharya was substituted for the original defendant, Jim O'Neill, by operation of law on February 18, 2026. *See* Fed. R. Civ. P. 25(d).

26.     Defendant Karen S. Evans is the Senior Official Performing the Duties of the Administrator of FEMA. She is sued in her official capacity.

27.     Defendant FEMA is a federal agency within DHS that coordinates operational and logistical disaster response. 6 U.S.C. § 313; 5 U.S.C. § 551(1).

28.     Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

29.     The United States may be named as a defendant in any action seeking relief other than money damages against the United States. *See* 5 U.S.C. § 702.

## ALLEGATIONS

30.     Defendants' Targeting Directive forms part of their ongoing campaign to punish Plaintiff States using the tool of federal funding for partisan political purposes and to undermine the sovereign choices of Plaintiff States. In particular, OMB's Targeting Directive took as its starting point a hit list of grants directed to Plaintiff States—the same States that defendants have repeatedly penalized for their sovereign policy choices—and so far has been implemented by defendants HHS, USDOT, and DHS. The Targeting Directive, if allowed to go into effect, would impose catastrophic irreparable harm on Plaintiff States.

**I.      Defendants Have Repeatedly Attempted To Coerce Plaintiff States into Enforcing Federal Immigration Law.**

31.     The Targeting Directive is part of a long-running pattern of defendants' targeting disfavored jurisdictions for funding terminations and other retaliatory actions, based in large part on defendants' efforts to threaten States and local governments who exercise their sovereign police powers to decline to participate in the federal government's immigration enforcement efforts.

32.     On January 20, 2025, his first day in office of his second term, the President issued an executive order directing the Secretary of Homeland Security to "ensure that so-called

'sanctuary' jurisdictions . . . do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the DHS Secretary deems warranted. Exec. Order No. 14,159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

33.     On February 19, 2025, the President signed a second executive order reiterating the Administration's plans to defund sanctuary jurisdictions. *See Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025). This Order directed "the head of each executive department or agency," in relevant part, to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.* § 2(ii).

34.     On April 28, 2025, the President issued another executive order relating to jurisdictions with policies designed to improve relations between law enforcement and communities. *See* Exec. Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025). The EO requires "the Attorney General, in coordination with [DHS]" to "publish a list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2. Section 3(a) of the April 28 executive order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), expanding to all federal agencies a similar directive in the January 20 executive order that applied only to the Attorney General and DHS. 90 Fed. Reg. at 8446.

35.     In accordance with the April 28 executive order, DHS and the U.S. Department of Justice ("DOJ") have both published their own lists of so-called "sanctuary jurisdictions," which included all Plaintiff States here and many of their political subdivisions. DHS first published its

list on May 29, 2025, but then took it down two days later. In an interview with Fox News on June 1, 2025, however, defendant Secretary of Homeland Security Kristi Noem stated that the "list is absolutely continuing to be used, and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."

36.    DOJ published a new version of the list on August 5, 2025, identifying a total of 35 states, cities, and counties as "having policies, laws, or regulations that impede enforcement of federal immigration laws." Plaintiff States were all designated as "sanctuary" jurisdictions.[2]

37.    In accordance with the President's effort to defund disfavored jurisdictions, the current administration also has sought to require Plaintiff States and others to agree to cooperate with federal immigration enforcement activities as a condition for receiving billions of dollars in federal funding—which Plaintiff States here have challenged in federal court.

38.    USDOT has been one of the most prominent examples. The agency immediately began implementing efforts to condition federal funds on cooperation with federal immigration enforcement mere days after the inauguration. On January 29, 2025, defendant Secretary of Transportation Sean Duffy issued an order to "prioritize projects and goals" that "require local compliance or cooperation with Federal immigration enforcement." USDOT, Order No. DOT 2100.7, § 5(f)(v) (Jan. 29, 2025). Then, on April 24, 2025, Secretary Duffy issued a letter to "all recipients" of DOT funding asserting that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration

---

[2] *See* Press Release, Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

law." Plaintiff States challenged these conditions, and they were vacated and permanently enjoined. *California v. U.S. Dep't of Transp.*, No. 25-cv-00208, 2025 WL 3072541 (D.R.I. Nov. 4, 2025).

39.     Defendant DHS has likewise attempted to condition all funds that it controls on cooperation with federal immigration enforcement. In March and April 2025, DHS promulgated new standard terms and conditions that required recipients and subrecipients of any DHS federal awards to comply with a range of requirements "related to coordination and cooperation with" federal immigration authorities. Plaintiff States challenged these conditions, and they were vacated and enjoined. *See Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025).[3]

40.     Defendants HHS and CDC have also promulgated funding priorities that attempt to tie public health funding to the unrelated topic of federal immigration enforcement.

41.     On September 15, 2025, all HHS component agencies were called to a meeting to discuss follow-up work after a prior meeting with the White House Deputy Chief of Staff for Policy, Stephen Miller, regarding grants.

42.     Then, on September 17, 2025, CDC revised its "About CDC" webpage to contain a "CDC priorities statement." One of the new priorities is that "[c]onsistent with applicable federal law, Federal funds should not be used to encourage or support illegal immigration." The "federal law" in question is not specified. On September 30, HHS similarly released a new set of "HHS Priorities" for its grantmaking activities. One priority is that "HHS programs will not encourage or support illegal immigration."

---

[3] Another case, relating to immigration-cooperation conditions imposed by DOJ, remains pending. *See New Jersey v. U.S. Dep't of Justice*, 25-cv-00404 (D.R.I. filed Aug. 18, 2025).

43.     These generic statements that funds should not "support illegal immigration" come directly from the *Ending Taxpayer Subsidization of Open Borders* executive order. *See* Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. at 10581 ("Federal payments to States and localities" must not "facilitate the subsidization or promotion of illegal immigration"). DHS promulgated similar language in its vacated and enjoined immigration conditions. *See* FY 2025 DHS Standard Terms & Conditions § C.XVII.2.a.iii (Apr. 18, 2025) (prohibiting "any program that benefits illegal immigrants or incentives illegal immigration"). A federal court has already held that such language is unconstitutionally vague under the Spending Clause. *See Illinois v. FEMA*, 801 F. Supp. 3d at 96.

## II.     Defendants Launched a Campaign of Retaliation.

44.     Blocked by federal courts from imposing express immigration-cooperation conditions on federal funds, defendants' strategy has become targeted retaliation against Plaintiff States.

45.     For instance, on September 27, 2025, just days after a court enjoined DHS from imposing immigration-cooperation conditions on federal funds, DHS followed up with a drastic funding cut targeted at Plaintiff States and others. Frustrated in its first attempt to coerce Plaintiff States into enforcing federal civil immigration law, DHS simply cut these same Plaintiff States' fiscal year 2025 awards dramatically, without explanation, reallocating their funds to more favored jurisdictions. This lawless action, too, was vacated and permanently enjoined. *See Illinois v. Noem*, _ F. Supp. 3d _, 2025 WL 3707011 (D.R.I. Dec. 22, 2025). The Court held that the reallocation "fulfilled [defendants'] stated intent," as shown by their public statements and orders, "by blatantly targeting sanctuary jurisdictions for funding cuts." *Id.* at *12.

46.     Next, during the week of December 15, 2025, the administration launched a series of retaliatory attacks against Colorado specifically, including funding cuts at multiple federal

agencies, the closure of a federal agency based in Colorado, a targeted attack on the administration of the Supplemental Nutrition Assistance Program (SNAP) in Colorado, and finally the denial of FEMA disaster declarations. These actions prompted an independent lawsuit that remains pending. *See Colorado v. Trump*, No. 25-cv-3428 (D. Colo.). The court preliminarily enjoined the attack on the SNAP program in Colorado. *See* Order of Jan. 28, 2026, *Colorado v. Trump*, No. 25-cv-3428 (D. Colo.), ECF 63.

47.     Then, on January 5, 2026, the administration arbitrarily targeted the four Plaintiff States here—plus New York—by freezing crucial social-services funding. The President concurrently expressed the motivating animus in crystal-clear terms through press statements and posts on social media: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum [sic], JB Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job."[4] Plaintiff States secured preliminary injunctive relief to halt the freeze. *See New York v. Admin. for Child. & Fams.*, 2026 WL 332555, at *1 (S.D.N.Y. Feb. 6, 2026).

48.     Defendants have even attacked California based on its inability to rebuild quickly after the January 2025 Los Angeles wildfires, while deliberately delaying desperately needed disaster-relief funding—the same delay at issue in this case. On January 23, 2026, the President signed an executive order titled *Addressing State and Local Failures to Rebuild Los Angeles After Wildfire Disasters*. *See* Exec. Order 14377, 91 Fed. Reg. 3989 (Jan. 23, 2026). Therein, the President purported to preempt state permitting requirements, initiated an onerous audit of state agencies, and claimed to "expedit[e]" the federal response, while describing the Los Angeles

---

[4]     Donald     J.     Trump     (@realDonaldTrump),     Truth, https://truthsocial.com/@realDonaldTrump/posts/115844083693194821.

recovery as "one of the greatest failures of elected political leadership in American history." *Id.* at 3989. He did so while DHS and OMB were deliberately blocking months-old requests for funds meant to support expedited permit processes for disaster recovery projects, effectively manufacturing the delays the President derided. *See infra* ¶ 175.

## III. Throughout January 2026, the President Escalated Threats To Cut Funds to Plaintiff States Based on "Sanctuary" Policies.

49. The President and OMB continued to escalate their public statements and actions throughout January and February 2026.

50. In a speech at the Detroit Economic Club on January 13, the President declared:

> Additionally, starting February 1, we're not making any payments to sanctuary cities or States having sanctuary cities because they do everything possible to protect criminals at the expense of American citizens, and it breeds fraud and crime and all of the other problems that come. So we're not making any payment to anybody that supports sanctuary cities.[5]

51. The same day, when asked by reporters what kind of funding would be affected on February 1, he replied: "You'll see. It'll be significant."[6]

52. Also on January 13, White House Deputy Chief of Staff Stephen Miller, in an interview with Fox News, promised that the administration would stop funding sanctuary cities: "We are not going to, as a country, subsidize mass illegal immigration, mass criminal activity, and mass theft of American taxpayer resources by individuals who have no right to be in this country at all in the first place."[7]

---

[5] Donald J. Trump, *Remarks to the Detroit Economic Club* 58:47 (Jan. 13, 2026), https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-detroit-economic-club/.

[6] Geoff Mulvihill, *Trump Threatens to Halt Federal Money Next Month not only to Sanctuary Cities but also Their States*, Assoc. Press (Jan. 13, 2026), https://apnews.com/article/trump-sanctuary-cities-states-federal-funding-f0bb01398d9d955a498170e7334ce14a.

[7] Ingraham Angle: *Dems Promote Lawlessness* (Fox News broadcast, aired Jan. 13, 2026).

53. The next day, the President took to his social media channel to reiterate the same message:[8]



Donald J. Trump
@realDonaldTrump

EFFECTIVE FEBRUARY FIRST, NO MORE PAYMENTS WILL BE
MADE BY THE FEDERAL GOVERNMENT TO STATES FOR THEIR
CORRUPT CRIMINAL PROTECTION CENTERS KNOWN AS
SANCTUARY CITIES. ALL THEY DO IS BREED CRIME AND
VIOLENCE! If States want them, they will have to pay for them!
MAKE AMERICA GREAT AGAIN!!!

**8.79k** ReTruths  **33.1k** Likes          Jan 14, 2026, 5:52 AM

54. On January 20, the President reiterated the same threat to cut off funding "as of the beginning of the month" at a White House press conference:

> You've got to get rid of your sanctuary cities, and I hope our people know that we're not going to pay sanctuary cities. We're not going to pay them anymore. They are sanctuary for criminals. They hold criminals. We're not going to pay. They can sue us, and maybe they'll win, but we're not giving money to sanctuary cities anymore as of the beginning of the month.[9]

55. On February 2, on a podcast, the President proclaimed: "Sanctuary cities are a disaster. So I put out an order, anybody that does a sanctuary city is not getting any money. Let's see what happens, you know, it'll get wiped out by these liberal courts."[10]

**IV.    OMB Promulgated the Targeting Directive.**

56. While the President was promising action against "sanctuary" jurisdictions by the end of the month, OMB issued the Targeting Directive, the agency action challenged in this case, commanding other federal agencies to cut funding to Plaintiff States based on retaliatory animus

---

[8] https://truthsocial.com/@realDonaldTrump/posts/115893309945152200.
[9] *Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026/.
[10] Dan Bongino Show: *I'm Back* (Ep. 2443), at 1:34:13 (Feb. 2, 2026).

and because Plaintiff States choose not to use their own scarce law enforcement resources to enforce federal immigration law.

57.     On January 16, just three days after the President's Detroit Economic Club speech, the Chief of Staff of OMB met with senior HHS officials to ask for a "list." The next day, she thanked the officials for their "willingness to be team players and to support the President's priorities!"

58.     On January 20, OMB sent a "budget data request" to all federal agencies (except for the Departments of Defense and Veterans Affairs) seeking "a detailed report on Federal funds provided to components, agencies, or instrumentalities of *certain States*."

59.     The data request construed "components, agencies, or instrumentalities" to include "localities." It indicated that its "purpose" was "to facilitate efforts to reduce the improper and fraudulent use of those funds," though it sought only data from those "certain States." Those States were California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington. Nearly all of these States either appeared on the "list of sanctuary jurisdictions" published by the Department of Justice on August 5, 2025, or contain localities that appeared on the list.[11]

60.     The next day, January 21, OMB called a meeting of the President's Management Council, which comprises heads of major federal government agencies. At the meeting, OMB informed the agencies regarding actions they would soon be expected to take.

---

[11] *See* Press Release, Dep't of Just., *supra* ¶ 36. The sole exception is Virginia, which elected a new Governor and Attorney General on November 3, 2025.

61.     The next morning, January 22, OMB's Deputy Director for Management emailed agencies asking them to provide OMB with "recommended actions prior to February 1"—the date by which the President had threatened to cut off funding to "sanctuary" jurisdictions. *See supra* ¶¶ 50–54.

62.     By the afternoon of January 22, HHS officials were exchanging internal emails to work on implementation of the Targeting Directive. For instance, at 3:35 PM, one CDC official provided others with the "active awards for Colorado, California, Minnesota, and Illinois" in an Excel spreadsheet.

63.     On January 23, OMB again convened the President's Management Council. In a follow-up message after the meeting, the OMB Chief of Staff thanked the agency heads for their "intriguing ideas." She continued: "We so appreciate your creativity and willingness to dive in to this important action for the President." A list of agencies at the bottom of the email includes "CDC" and "Transpo," among others.

64.     The OMB budget data request set a short deadline of only eight days, to January 28, 2026, for agencies to report to OMB. Thus, the OMB budget data request laid out a timeline that would allow OMB to centralize a purportedly complete inventory of funds flowing to disfavored jurisdictions by the end of January 2026—just before the President's February 1 deadline arrived.

**V.     OMB Began Implementation of the Targeting Directive at CDC, USDOT, and DHS.**

65.     On February 1, the Chief of Staff of OMB sent an email to high-ranking staff at HHS with the subject line, "Re: Grant Awards – Implementation Call follow up." She listed out for HHS staff a long series of items for them to accomplish.

66.     On the morning of February 4, defendant Vought presented to the President a list of grants to be cancelled that HHS had generated at OMB's instruction. The President directed immediate action that same day.

67.     Accordingly, at 12:47 PM in the afternoon on February 4, the OMB Communications Director emailed HHS officials to inform them that OMB had leaked the news to the press, expressly connecting the events of February 4 to the Budget Data Request: "at 2 PM ET today, we have an exclusive going to announce the first cuts we are making in funds that we have been asking agencies to investigat[e] from 14 states and DC." The OMB Communications Director let HHS know that "CDC is part of these cuts."

68.     Right on time, a little after 2 PM, the *New York Post* reported that OMB was directing USDOT and CDC to terminate more than $1.5 billion of grants to "blue" (meaning, Democratic-led) States.[12] The *Post* reported that the terminations were targeted solely at the four Plaintiff States.

69.     OMB "told" USDOT on February 4 to cancel "more than $943 million" in funding to Plaintiff States. OMB ordered CDC to cancel at least $602 million.

70.     The *New York Post* article identified specific CDC grants that would be terminated pursuant to OMB's directive, including, for example, a $7.2 million grant to the American Medical Association in Illinois; a $3 million grant to Colorado to address COVID-19 health disparities; $1.1 million in remaining funding on a $4.3 million grant to Los Angeles County for an HIV behavioral survey; and a $754,000 grant to the City of Minneapolis for racial and ethnic approaches to community health.

---

[12] Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026), https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-green-grants-for-dem-states/.

71.     The article similarly identified specific DOT grants that would be terminated pursuant to OMB's directive, including a $4.9 million grant to Colorado's Boulder County for EV chargers in low and moderate-income neighborhoods, and a $3.6 million grant to Illinois for improvements to the State's Commercial Driver's License program.

72.     An OMB spokesperson told the *Post* that "more grant cancellations were expected."

73.     The next day, an OMB spokesperson likewise confirmed to *The Hill* that "OMB directed the Transportation Department to rescind $943 million from Colorado, Illinois, California and Minnesota, and it directed CDC to rescind $602 million from those states."[13]

74.     On February 26 and 27, 2026, public reporting citing sources familiar with the plans indicated that the Targeting Directive's implementation had expanded to DHS and FEMA. DHS is soon "releasing more than $5 billion in long-delayed disaster aid to states—but not to several Democratic-led states where President Donald Trump has clashed with governors."[14] The only States that will not receive funding are "Minnesota, Illinois, California, [and] Colorado."[15]

75.     This Targeting Directive, originated by OMB and ***so far*** put into effect by HHS, USDOT, DHS, and their components, stems from the President's threats throughout the month of January to stop "making any payments to sanctuary cities or States having sanctuary cities" and OMB's effort to develop a list of grants to be targeted in certain disfavored States.

---

[13] Rachel Frazin, *Trump Administration Directs Rescission of $1.5B from Blue States on Health, Transportation*, The Hill (Feb. 5, 2026), https://thehill.com/policy/energy-environment/5725217-trump-blue-states-funding-minnesota-colorado-evs-hiv/.

[14] Gabe Cohen, *The Trump Administration Is About to Release Billions in Disaster Aid. Several Blue States Won't Be Included*, CNN (Feb. 26, 2026), https://www.cnn.com/2026/02/26/politics/disaster-aid-fema-states-trump-shutdown.

[15] Rachel Frazin, *FEMA Releasing Billions in Disaster Assistance, While Further Funds Await Approval*, The Hill (Feb. 27, 2026), https://thehill.com/policy/energy-environment/5759529-billions-in-fema-funds-awarded/.

VI.    **HHS and CDC Used AI to Manufacture Post-Hoc Reasoning for the $602 Million in Initial Cuts that OMB Ordered at CDC.**

76.    On the days of February 5 to 7, after the CDC cuts had been directed by OMB and leaked to the *New York Post*, HHS officials belatedly sought to substantiate the planned grant terminations with some paper record inside their own agency.

77.    On February 5, at 4:30 PM, senior HHS and CDC officials had a meeting titled "CDC Regroup" where agenda items included "comms plan" and "path forward regarding OMB request."

78.    Hours later, at 12:36 AM on February 6, the HHS Chief of Staff emailed the same official who had convened the "Regroup" meeting, attached the *New York Post* article, and asked the official to "please ensure you incorporate these into the standard process of grants for alignment to agency priorities." In other words, the HHS Chief of Staff asked the official to provide post-hoc "agency priorities" reasoning for the outcome pre-determined by the Targeting Directive.

79.    HHS and CDC ultimately hit upon a plan to have an AI model produce machine-generated text identifying alleged agency-priorities issues.

80.    HHS and CDC staff first assembled grant documents for the targeted grants in Plaintiff States. Specifically, on February 6 at 9:34 PM, the CDC Deputy Chief of Staff who certified CDC's administrative record in this matter emailed other officials with an "URGENT" request to assemble "the work plans and other related documents for the following 66 grants." The list was the same list eventually noticed to Congress for termination on February 9, the same $602 million in awards reported by the *New York Post*.

81.    At 1:22 AM on February 7, CDC then passed these grant documents on to an "advisor" at HHS via a shared folder.

82.     This "advisor" then "us[ed] [AI] to confirm whether there were specific examples of misalignment between language in recipients' grant-related documents and agency priorities." ECF 43-1 at 8. The administrative record that CDC produced includes the prompt given to the AI model, ECF 44-3 at 139–147, and then more than four hundred pages of machine-generated text focused only on the $602 million in CDC grants in the four Plaintiff States, ECF 44-3 at 139 to ECF 44-6 at 2.

83.     At 5:35 PM on February 7, the advisor sent back to CDC officials a spreadsheet titled, "CDC 66 Workplans Analysis."

84.     Defendants have alleged through counsel that these AI reports were generated on February 7, 2026 (ECF 49 at Tr. 4:12–18).

85.     Any "reasoning" generated by AI on February 7 is post-hoc rationalization in the most basic sense. The decisions had already been made by the fiat of the Targeting Directive—indeed, the President himself already approved the terminations. The AI process merely attempted to put a veneer of "reasoned" decisionmaking on top of it—even though no human reasoning seems to have been applied to these AI-generated outputs.

86.     To be specific, defendants queried a large language model, a form of "AI" technology, regarding a specific list of CDC grants in the four Plaintiff States, based on their respective grant applications and other documents. The query predetermined the outcome. It did not instruct the AI to evenhandedly evaluate the documents; rather, the query explicitly instructed the AI to "identify content that contradicts or fails to align with CDC's published priorities" and to "compile the strongest evidence to support termination."

87.     The "priorities" against which the AI was to compare grant documents were bullet-point statements of policy or priority, often making reference to other laws without providing them

20

in the prompts, e.g., "Federal funds should not encourage or support illegal immigration (consistent with applicable federal law)." *See supra* ¶ 42. The query contains no information about federal immigration law and does not instruct the model on what constitutes "applicable federal law."

88.     The prompt also calls for the AI to produce a score "on a scale of 1-100 (1 least aligned, 10 most aligned)," and it is unclear how this contradictory instruction impacted the output. The outputs do not account for how these conflicting directives were parsed and reconciled. Fully half of all the grants reviewed were scored exactly the same: 72/100. The preponderance of a single repeating score suggests fixation or hallucination by the model.

89.     The AI's output, as reflected in the CDC administrative record, consisted of what defendants called "grant reports" and two largely identical spreadsheets containing and summarizing the information from the AI reports. The AI "grant reports" output takes the form of one continuous document covering the full list of the more-than-$600 million in grants in Plaintiff States, confirming that *only* those grants were subjected to this AI query.

90.     Indeed, just two days later on February 9, a Monday, the *New York Times* reported that a spokesman for HHS confirmed the cuts were forthcoming and stated that the reason for slashing funds in Plaintiff States was that "they do not reflect agency priorities."[16]

## VII. Defendants Threatened to Cut More Than $600 Million in CDC Grants to Plaintiff States For Critical Public-Health Programs.

91.     That same day, February 9, HHS notified Congress of its intention to terminate a wide swathe of CDC grants in Plaintiff States (the "First Round Grants"). *See* ECF 44-10 at 239. This notification ("the HHS Notification") was mandated by the current appropriations law, which requires HHS (among other agencies) to "notify the Committees on Appropriations of the House

---

[16] Apoorva Mandavilli, *Trump Administration to Cut $600 Million in Health Funding from Four States*, N.Y. Times (Feb. 9, 2026), https://www.nytimes.com/2026/02/09/health/trump-public-health-cuts-california.html.

of Representatives and the Senate not less than 3 full business days prior to announcing . . . the termination or non-continuation of any grant, including a short description of the reason for the termination or non-continuation." Pub. L. No. 119-75, § 524, 140 Stat. at 173.

92. Although the notification was required to contain "a short description of the reason for the termination," *id.* at § 524(2), the "Reason for Termination" given was merely, "Inconsistent with Agency Priorities – https://www.cdc.gov/about/cdc/index.html," hyperlinked to a page on the CDC's website titled "CDC priorities."

93. Many of the subject grants, however—including the PHIG grants—were not subject to termination for inconsistency with agency priorities.

94. Until October 1, 2025, HHS rules did not permit termination of CDC grants based on changes in "agency priorities." *See* 89 Fed. Reg. 80055 (Oct. 2, 2024) (announcing adoption of OMB regulations as of October 1, 2025); *see also* 45 C.F.R. § 75.372 (2025) (listing grounds for termination that do not include changes in "agency priorities"). Thus, at the time these grants were awarded and accepted, there was no "agency priorities" termination condition.

95. CDC sent notices purporting to unilaterally amend earlier-issued grants with "updated terms and conditions," including an "agency priorities" condition. No grantees among the Plaintiff States accepted these new conditions.

96. Even where grant terms purported to permit termination for inconsistency with agency priorities, defendants' own statements and conduct give the lie to their claims that the targeted grants are "inconsistent with agency priorities."

97. In one example, at least one of the targeted grants was issued by CDC approximately one month before the HHS Notification was sent to Congress. The notification is silent as to any change in agency priorities that could have taken place in those four weeks.

98.     Furthermore, all 50 States receive PHIG grants, and all are utilized by the States in generally the same way[17]—but only the four Plaintiff States' PHIG grants have been chosen for termination. Defendants' notification to Congress is silent as to how forty-six out of fifty substantially identical PHIG grants could be compatible with agency priorities, while the remaining four are not.

99.     More broadly, the threatened grants are clearly aligned with the priorities listed in the "CDC priorities statement" cited by defendants' notification to Congress, which include "modernizing public health infrastructure" and "detect[ing] and respond[ing] to outbreaks in real time." For example, the priorities statement asserts, "Modernizing public health infrastructure is essential," notes the importance of "investing in modern tools, integrated data, and state-of-the-art capabilities," and declares that CDC and HHS "must recognize that the states serve as key partners and must be encouraged to maintain robust and up-do-date [sic] health data systems." But the largest First Round Grants are the CDC's foundational "public health infrastructure" grants, which are awarded to the States as "key partners" and aimed at "modernizing" State and local public health infrastructure. By any measure, Plaintiff States' PHIG funding is an "invest[ment] in modern tools, integrated data, and state-of-the-art capabilities"—which the CDC itself identifies as a major agency priority.

100.     Finally, and most importantly, the statutes that authorize CDC to run these grant programs set out *Congress's* priorities for the grant funds, giving the CDC authority to make grants serving specific purposes, such as, for example, "public information and education programs for . . . the prevention and control of diseases and conditions," 42 U.S.C. § 247b(k); "increas[ing] the

---

[17] Ctrs. for Disease Control & Prevention, *Public Health Infrastructure Grant*, https://www.cdc.gov/infrastructure-phig/media/pdfs/2026/01/CDC-Public-Health-Infrastructure-Grant.pdf

number of individuals in the public health workforce," including "individuals who are from . . . underrepresented racial and ethnic minorities," *id.* § 295; and "providing technical assistance to local and regional entities on the collection, analysis, and reporting of data," *id.* § 294n(c)(1). None of the authorizing statutes mention immigration policy or authorize the executive branch to tie federal funds to immigration policy goals.

## VIII. Defendants Attempted to Carry Out Their Threatened Cuts But This Court's Order Stopped Them.

101.    Before the close of business on February 11, Plaintiff States filed the original complaint in this case and their motion for a temporary restraining order seeking to vacate the Targeting Directive and enjoin its implementation. ECF 1, 3. This filing, however, did not deter Defendants from attempting to carry out their threats.

102.    Overnight on February 11 and on the morning of February 12, Plaintiff States began to receive by email notifications that Defendants were purporting to terminate the First Round Grants.

103.    Defendants' purported terminations came in the form of new notices of award ("NOAs") for each grant. Each NOA justified the purported termination with the same boilerplate references to "agency priorities." And each NOA set February 11 as the final day of performance on the grant, meaning that February 12 would be the first day on which recipients could no longer incur reimbursable expenses.

104.    On that same date, February 12, this Court entered a temporary restraining order ("TRO") voiding "any actions taken to implement or enforce directives to identify and terminate public-health grants awarded to plaintiffs based on undisclosed agency priorities." ECF 21 ¶ 2.

105.    Shortly thereafter, on February 13, defendants issued new NOAs for the First Round Grants, extending the end of the period of performance by fourteen days and citing the

TRO. A subsequent NOA issued on February 27, citing the extension of the TRO, set the end of the period of performance at March 12, 2026.

106. Thus, defendants have so far been unable to carry out their threat to terminate the First Round Grants—but only because this Court issued an order halting them in their tracks.

## IX. Defendants Intend Future Funding Cuts Under the Targeting Directive at CDC.

107. The CDC grant terminations announced to Congress on February 9 were merely the first shot fired under the Targeting Directive. Further retaliatory actions followed—from CDC itself and from other agencies.

108. First, on February 11, CDC sent a notice to Congress of its intent to terminate an additional 41 grants in the four Plaintiff States (the "Second Round Grants"), above and beyond the original $602 million. *See* ECF 44-10 at 242.[18] As with the First Round Grants, *only* grants in the four Plaintiff States were noticed for termination. And as with the First Round Grants, the only reason given for the terminations was "Inconsistent with Agency Priorities – https://www.cdc.gov/about/cdc/index.html," hyperlinked to a page on the CDC's website titled "CDC priorities."

109. Like the First Round Grants, the Second Round Grants also provide vital public health funding for core public health functions including outbreak tracking and control, immunization, HIV testing and treatment, and injury-prevention research.

110. Among the grants targeted in this second round of notices was the Preventative Health and Health Services ("PHHS") Block Grant, which is a non-competitive grant awarded to all 50 States; the exact amount of funds for each grant is based on a statutory formula prescribed by Congress, 42 U.S.C. § 300w-1. Plaintiff States rely on PHHS funding to support the essential

---

[18] The second notice to Congress lists 42 total grants, but one of the Second Round Grants also appeared on the list of First Round Grants.

day-to-day work of their public health agencies, including public health infrastructure, immunization programs, injury and violence prevention, and educational outreach. In each of the Plaintiff States, over the past year and as recently as December 2025, CDC provided feedback to the recipient public health agencies on their plans for the PHHS funds. At no point did CDC convey that those plans were in conflict with agency priorities, or convey any other significant concerns or requests for modification.

111.     The PHHS Block Grant is authorized by 42 U.S.C. § 300w *et seq.*, which lays out the specific purposes for which grant funds may be used, including "preventative health service programs for the control of rodents" and "establishment, expansion, and improvement of [emergency medical services] systems," *id.* § 300w-3. It does not even mention immigration policy, let alone authorize CDC to tie federal funds to immigration policy goals. The statute also makes no provision whatsoever for the termination of PHHS Block Grants. Instead, the exclusive statutory mechanism for withholding grant funds provides for *temporary* withholding, only for substantial or serious failures to comply with statutory requirements, and only after notice and a hearing. 42 U.S.C. § 300w-6.

112.     As noted in the previous paragraph, all 50 States receive PHHS Block Grants, and all serve the same general purpose[19]—but only the four Plaintiff States' PHHS Block Grants have been chosen for termination. Defendants' notification to Congress is silent as to how forty-six out of fifty substantially identical PHHS Block Grants could be compatible with agency priorities, while the remaining four are not.

---

[19] Ctrs. for Disease Control & Prevention, *About the PHHS Block Grant Program*, https://www.cdc.gov/phhs-block-grant/about/index.html.

113.    Shortly after HHS notified Congress of its intent to terminate the Second Round Grants, this Court entered a temporary restraining order prohibiting defendants from terminating public-health grants awarded to plaintiffs based on undisclosed agency priorities. ECF 21 ¶ 1. As of this filing, CDC has not yet acted on its threat to terminate the Second Round Grants. The CDC administrative record, however, contains a set of boilerplate "decision memoranda" which recommend termination of all 41 of the Second Round Grants.

## X.    Defendants Are Withholding USDOT Funds from Plaintiff States Pursuant to the Targeting Directive.

114.    Public reporting has also indicated that OMB has directed USDOT to cut or withhold an even larger sum than at CDC—over $943 million.

115.    The February 4 *New York Post* story reported that OMB ordered USDOT "to cancel more than $943 million" in funds to Plaintiff States, and "[a] DOT spokesman confirmed the cuts were being carried out." Then, on February 10, *E&E News* reported a USDOT statement that "it was moving ahead with executing the OMB plan, pointing to the recent *New York Post* story."[20]

116.    To date, unlike at CDC, USDOT has not sent termination letters to Plaintiff States' transportation agencies in relation to these cuts.

117.    The difference between the notice provided by CDC and USDOT may result in part from differences between how federal grantmaking works at the two agencies. In general, at CDC, the notice of award represents a legal obligation of the federal government. USDOT, on the other hand, typically first "apportions" or "allocates" funding to recipient States as an initial administrative step and only later "obligates" the monies on a phased, project-by-project basis after

---

[20] David Ferris, *Trump Kills EV Charging Programs in Blue States*, E&E News (Feb. 10, 2026), https://www.eenews.net/articles/trump-kills-ev-charging-programs-in-blue-states/.

further review and approval. *See* 23 U.S.C. § 106(a)(3); Fed. Highway Admin., *Funding Federal-Aid Highways*, Pub. No. FHWA-PL-17-011, at 15, 19, 23 (Jan. 2017).

118.    As a result, Plaintiff States have many funding commitments from USDOT of various kinds that are either not obligated or only partially obligated, and simply frozen pursuant to the Targeting Directive.

119.    For instance, the public reporting consistently identifies cuts to awards under the Charging and Fueling Infrastructure ("CFI") program, a grant program established under the 2021 Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117-58, 135 Stat. 429, to help States expand access to electric vehicle charging along major transportation corridors and in underserved communities. 23 U.S.C. § 151(f).

120.    The largest CFI award reportedly targeted for termination is a $100 million award to the Illinois Environmental Protection Agency ("IEPA") to build 14 charging plazas along major freight routes. But IEPA has no executed grant agreement for its $100 million award. Instead, IEPA was notified on January 13, 2025 that it had been "selected" for the award, but defendants have taken no further steps to move forward with the project. The FHWA has not obligated any funds, even for initial administrative costs.

121.    Other public reported awards slated for termination are CFI "community" awards in California, Colorado, and Minnesota to build electric vehicle chargers that serve renters, rural drivers, low- and moderate-income neighborhoods, and other areas where drivers cannot charge vehicles overnight in a home or garage. *See* 23 U.S.C. § 151(f)(8)(F).

122.    For instance, Boulder County, Colorado, was awarded a $4.9 million CFI grant to increase access for communities that have gaps in electric-vehicle charging, including low- and moderate-income neighborhoods, neighborhoods with multifamily housing, and rural areas in

28

Boulder County. Boulder is awaiting a specific obligation for Phase 2 of the project, and it cannot proceed without USDOT approval. After seeing the *New York Post* reporting, Boulder officials reached out to USDOT and were told that the grant was not formally cancelled, but was assigned to a "Not Approved to Proceed" project list.

123. Over $450 million more in CFI awards fund electric vehicle infrastructure in Plaintiff States, including a $60.2 million CFI grant to California for its share of the West Coast Truck Charging and Fueling Corridor Project: a build-out of 20 fast chargers (160 ports total) for heavy-duty EVs and three hydrogen fueling stations along major goods movement routes across the California, Oregon, and Washington goods movement corridor.

124. In addition to CFI awards, USDOT is holding a large set of other awards to Plaintiff States under indefinite review, allegedly for compliance with agency priorities. These awards have not formally been terminated, but USDOT is not processing new obligations under them, imposing an indefinite freeze on the programs. With regard to these awards, too, Plaintiff States do not have contracts with the federal government; on the contrary, they have large amounts of unobligated funds.

125. This second set of awards—indefinitely frozen, not terminated—includes awards under a range of programs: National Infrastructure Project Assistance (also known as "MEGA"), Nationally Significant Multimodal Freight and Highways Projects (also known as "INFRA"), Rural Surface Transportation Grant, Better Utilizing Investments to Leverage Development ("BUILD"), Low or No Emission Bus Grants, and Safe Streets and Roads for All. The above list is not exhaustive and reflects Plaintiff States' current knowledge of the grants that USDOT has placed under this indefinite review.

126. These programs were authorized by the Infrastructure Investment and Jobs Act and have statutory purposes related to transportation efficiency and environmental sustainability. They do not mention immigration enforcement. *See* 49 U.S.C. § 6701(f)(2) (MEGA); 23 U.S.C. § 117(h) (INFRA); *id.* § 173(h) (Rural Surface Transportation Grant); 49 U.S.C. § 6702(d)(3)–(4) (BUILD); *id.* § 5339(c)(5) (Low or No Emission Bus Grants); Pub. L. 117-58, § 24112(d)(3), 135 Stat. at 816 (Safe Streets and Roads for All).

127. An additional program where the Targeting Directive has frozen new obligations is the Commercial Driver's License (CDL) Program Implementation. This program simply provides financial assistance to States to carry out and improve the national CDL program administered by USDOT for all CDL holders and serves the same purpose in every State. *See* 49 U.S.C. § 31313. But it has likely been targeted as part of defendants' ongoing campaign to use the CDL program to carry out the President's immigration-policy goals. *See Rivera Lujan v. Fed. Motor Carrier Safety Admin.*, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) (staying interim final rule excluding certain non-citizens from eligibility for CDLs).

## XI. Defendants Are Withholding FEMA Funds from Plaintiff States Pursuant to the Targeting Directive.

128. The most recent expansion of implementation of the Targeting Directive has taken place at DHS and its component agency FEMA. Public reporting as of February 27 indicates that more than $5 billion in long-delayed disaster aid from FEMA has been or soon will be obligated and released, but four States will be excluded: California, Colorado, Illinois, and Minnesota.

129. FEMA administers grant programs tied to a presidential declaration of a major disaster or an emergency under the Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act"). Congress passed the Stafford Act in 1988 to "provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out

their responsibilities to alleviate the suffering and damage which result from such disasters." 42 U.S.C. § 5121(b).

130.     Congress specifically lists the actions a President may take in any major disaster, including directing any federal agency to utilize its resources for support, coordinating disaster relief, providing technical and advisory assistance, assisting in the distribution of supplies, assisting in inspections for building damage compliance, and providing accelerated federal assistance and support where necessary to save lives, prevent human suffering, and mitigate severe damage. *Id*. § 5170a.

131.     FEMA issues disaster grants under a range of different programs including the Public Assistance Program and the Hazard Mitigation Grant Program. Disaster grants are paid out from the Disaster Relief Fund, a special fund for that purpose to which Congress devotes non-expiring funds in appropriations bills. *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. 118-47, 138 Stat. at 608–09.

132.     The Public Assistance Program provides federal funding to States and other eligible recipients to help communities pay for emergency response measures in a disaster's immediate aftermath. Public Assistance funds are critical for States as they recover from major disasters, funding activities ranging from debris removal, search and rescue, construction of temporary facilities for medical care and shelter, and infrastructure repair, all of which are authorized by the Stafford Act. *See* 42 U.S.C. §§ 5170a, 5170b, 5172–5173, 5185–5186.

133.     The Hazard Mitigation Grant Program ("HMGP") provides federal funding to States to develop hazard mitigation plans and rebuild in a way that reduces future disaster losses in the communities affected by the declared disaster. *See* 42 U.S.C. § 5170c. Projects eligible for HMGP funds include, but are not limited to, structural hazards control or protection projects,

31

construction activities, retrofitting of facilities, or development or improvement of warning systems. 44 C.F.R. § 206.434(d).

134. FEMA also administers hazard mitigation grant programs not tied to specific disasters. For instance, Flood Mitigation Assistance grants provide federal funding to States for planning and carrying out activities designed to reduce the risk of flood damage to structures covered under contracts for flood insurance with the National Flood Insurance Program, with a focus on eliminating the risk of repetitive flood damage. Flood Mitigation Assistance was created by the National Flood Insurance Reform Act of 1994 and is codified at 42 U.S.C. § 4104c.

135. Neither the Stafford Act nor the Flood Insurance Reform Act even mention immigration policy, let alone authorize FEMA to tie federal funds to immigration policy goals.

136. Billions of dollars of disaster aid have been stalled at DHS and FEMA over the past year. The causes include additional layers of review implemented by defendants Vought, OMB, Noem, and DHS. By agency practice, OMB reviews FEMA obligations of over $1 million, and OMB has slowed approvals. In addition, in June 2025, Secretary Noem instituted a policy of personally reviewing all DHS expenditures greater than $100,000, which has caused indefinite delays in obligating funds to recipients.

137. Under the Stafford Act funding process, the disaster declaration makes recipient and sub-applicants potentially eligible for funding, but FEMA does not incur any obligation until all reviews are complete. So the delays at issue are failures by DHS and FEMA to obligate funds in the first instance, not failures to pay out monies under executed award agreements.

138.     For instance, due to defendants' policies, as of December 31, $1.3 billion in HMGP projects were approved at the regional level but waiting authorization at the DHS Secretary level.[21] The total backlog for all disaster aid obligations is much greater: as high as $17 billion by the end of January 2026.[22]

139.     Plaintiff States have billions of dollars in outstanding requests to obligate funds under FEMA disaster relief, recovery, and mitigation grant programs. California alone has over $1.3 billion in disaster relief funding languishing in Secretary Noem and OMB's purported review process. Minnesota has nearly $180 million.

140.     On February 26 and 27, however, reports emerged that the logjam was finally breaking. A FEMA spokesperson told CNN that FEMA had "released over $5 billion in recovery funding for projects."[23]

141.     But the news reports, citing sources familiar with the matter, explain that four States will receive none of this $5 billion in new obligations: California, Colorado, Illinois, and Minnesota.[24]

142.     Multiple States who are not plaintiffs here have received new obligations of HMGP and Public Assistance funds over the past week, and have been told that they will receive more soon, but Plaintiff States have received none.

143.     Defendants DHS and FEMA processed these additional HMGP awards referenced in the previous paragraph even though DHS and FEMA are currently in a partial shutdown due to

---

[21] Anna Kramer & Torrence Banks, *Kristi Noem Is Holding up More than $1 Billion in Hazard Mitigation Funds*, NOTUS (Jan. 28, 2026), https://www.notus.org/trump-white-house/kristi-noem-hazard-mitigation-funds-hold-fema.

[22] Scott Dance, *Extra Scrutiny of FEMA Aid to States Has Created a $17 Billion Bottleneck*, N.Y. Times (Jan. 27, 2026), https://www.nytimes.com/2026/01/27/climate/fema-aid-kristi-noem.html.

[23] Cohen, *supra* n. 14.

[24] Frazin, *supra* n. 15.

the lapse in appropriations. *See* Press Release, Dep't of Homeland Security, *1 Week into Democrats' Shutdown, DHS Implements Emergency Measures to Conserve Resources and Manpower Impacting Travelers and FEMA Responses to Non-Disaster Areas* (Feb. 22, 2026).

144. OMB promulgates guidance on what agency operations can continue during a shutdown consistent with the Antideficiency Act. *See* Off. of Mgmt. & Budget, Circular No. A-11: Preparation, Submission, and Execution of the Budget § 124 (Aug. 2025). OMB coordinates shutdown activities by requiring agencies to have "an up-to-date lapse plan on file with OMB." *Id.* § 124.2. "[A]ll changes to the plans must be submitted to OMB for review in advance of implementing the plan." *Id.* § 124.3.

145. On information and belief, OMB authorized DHS and FEMA to process Stafford Act disaster relief obligations during the shutdown—to everyone except Plaintiff States.

146. This latest development reflects that the Targeting Directive from OMB has commanded not only CDC and USDOT but now also DHS to single out the same four States for disfavor, suspending new obligations to them.

## XII. If Implemented, the Targeting Directive Would Irreparably Harm Plaintiff States.

147. Defendants will continue to punish Plaintiff States with further funding cuts and freezes in fulfillment of the Targeting Directive at HHS, USDOT, DHS, and likely other federal agencies—unless they are stopped. The Targeting Directive will inflict irreparable harm on Plaintiff States if it is allowed to be implemented.

### A. The loss of public health funding irreparably harms Plaintiff States.

148. The first round of funding cuts implemented under the Targeting Directive would deprive Plaintiff States of more than $600 million in public health funding. The vast majority would be cut directly from Plaintiff States, including their instrumentalities and political subdivisions.

149. The targeted grants fund essential public health infrastructure, as well as testing and treatment for lethal diseases.

150. None of the targeted programs is related in any way to enforcement of federal immigration law.

151. The largest grant program targeted for termination is the Public Health Infrastructure Grant ("PHIG"), which is a five-year award that accounts for the majority of the announced cuts. This program has operated in all 50 States since 2022, and funds both short-term critical infrastructure and workforce needs as well as long-lasting strategic investments.

152. In Plaintiff States, hundreds of State employees' positions are funded by this grant. These essential public health workers would lose their jobs—and Plaintiff States would lose their services, expertise, and institutional knowledge—if the Targeting Directive is carried out.

153. The PHIG is the backbone of federal public health funding, providing critical financial support, not only to Plaintiff States directly, but to hundreds of local public health agencies through pass-through funding.

154. For example, in Illinois, the PHIG funds Lead Poisoning Prevention grants to 25 local health departments, as well as Local Health Department Workforce Development Support Grants that support 674 public health jobs at 96 local agencies. Loss of PHIG funds would force Illinois to cancel 55 contracts supporting strategic planning, data modernization, emergency preparedness, workforce training, and community engagement—halting multi-year initiatives that are foundational to a modern public health system. Most damaging of all, it would force Illinois to terminate 99 Illinois Department of Public Health employees (78 full-time and 21 contractual), which would directly reduce the agency's capacity to perform core public health functions including disease surveillance, data analysis, workforce management, and regulatory

compliance—and lead to an irreparable loss of institutional knowledge. Once lost, these capabilities will take years of hard work and additional funding to regain.

155.    California also uses PHIG grant funding for critical public health needs. For instance, it uses PHIG funds to hire interns and fellows for a training program for future healthcare professionals, to pay experienced epidemiologists to mentor less experienced public health staff, to pay a nurse to work in areas lacking healthcare professionals, to update the State's ability to send and receive electronic laboratory data, and to provide urgent dental care to underserved children.   More broadly, PHIG funds support over 400 positions in the State and over 85 operations.   These positions and operations improve and save lives.   The loss of the PHIG grant funding would undermine these efforts, reducing the State's public health capacity to perform vital public health functions, disrupting workforce development programs that are critical to building the State's future public health workforce, disrupting the State's ability to train public health staff and to prepare for public health emergencies, and requiring widespread layoffs of public health employees.   The result would be worsened patient outcomes, including greater risk of death, through the loss of effective public health programs addressing community need.

156.    In Colorado, loss of PHIG funding will significantly degrade public health infrastructure and capabilities across the State, ranging from reduced diabetes care for low-income residents, to elimination of resources for rural Coloradans who lack access to local care providers, to harming the State's ability to respond to immediate public health needs and future public health emergencies. PHIG funding supports 53 local public health agencies (LPHAs) and two tribal partners. This funding bolsters various LPHA capabilities, including data management, community health assessment and planning, organizational performance management, and strategic planning, while also providing full or partial support for approximately 160-199

36

positions. Terminations of PHIG funding will disproportionately impact small, rural health departments. Further, PHIG funding supports 48 full-time CDPHE employees. Losing these employees would degrade important functions across CDPHE, including health outreach efforts to rural Colorado communities, public health data infrastructure modernization, and public health emergency response. Losing these skilled public health workers will deprive CDPHE of crucial subject matter expertise that would be difficult to replace, even if funding is later restored.

157.    In Minnesota, the PHIG fully or partially funds positions for approximately 57 employees (equating to approximately 50 full-time equivalents), who support critical public health services like detecting and monitoring health threats, responding to disease outbreaks, and planning for and responding to public health emergencies. Minnesota Department of Health ("MDH") staff also provide support to local public health and Tribal public health agencies, and MDH distributes PHIG funding to 45 Community Health Boards and nine Tribes across the state. The termination of PHIG funds would have immediate, adverse impacts on Minnesota's highly skilled and trained public health force as well as the critical services they provide, and these adverse impacts will be most acutely felt in rural and underserved areas.

158.    In addition to the PHIG grants, the Targeting Directive would also cut more than 60 other First Round Grants and 41 Second Round Grants, including more than 60 grants directly to the States, including their instrumentalities and political subdivisions, causing further irreparable harm.

159.    For example, in Illinois, one of the grants slated for termination funds the collection of basic survey data about Illinoisans' health, including health behaviors, demographics, chronic disease, screening, and health care access—which is used by stakeholders to make data-driven decisions about allocation of public health resources, and which CDC itself uses for its national

Behavioral Research dataset. Another Illinois grant on the chopping block funds the collection and publication of state injury data, which State and local health departments need to track trends in preventable injuries and accurately target prevention efforts. Another targeted grant funds Illinois' implementation of the CDC's own Medical Monitoring Project for patients living with HIV, which gathers data that the State needs to evaluate the effectiveness of HIV care programs, and to focus interventions on the populations most at risk. Yet another data-focused grant slated to be cut funds Illinois' HIV surveillance system; without that system, Illinois would have no reliable way of tracking the spread of HIV within the State, and the State's capacity to detect and respond to HIV outbreaks would collapse.

160.    In addition, in California, one of the grants set for termination funds a four-year project to provide rigorous evidence on the effects of multiple state-level policies on preventing sexual and dating violence among youth, including sexual minority youth. Another grant set for termination supports building capacity for extreme heat events.

161.    In Colorado, one of the grants targeted for termination is a comprehensive data collection system focused on populations disproportionately affected by HIV. This data helps CDPHE better understand behavioral risk factors for HIV as well as testing behaviors and use of prevention strategies. Two others slated for termination focus on sexually transmitted infection (STI) prevention and control efforts, including programs to promote testing best practices as well as one to provide enhanced surveillance of STIs in clinical settings. Loss of these grants will degrade CDPHE's ability to analyze and report on county-level STI rates and risk reversing progress in reducing rates of congenital syphilis and other STIs.

162.    Another Minnesota grant listed for termination funds the collection and publication of state injury data, which State and local health departments use to inform injury prevention

efforts, including reducing violence, abuse, or neglect experienced by children, improving traffic safety, and supporting Minnesotans impacted by traumatic brain injury.

163.    As all Americans were reminded during the COVID-19 pandemic, public health is a matter of life and death. And a pandemic "does not respect the differences between citizens and noncitizens." *Cook County v. Wolf*, 962 F.3d 208, 231 (7th Cir. 2020). If the Targeting Directive succeeds in stripping Plaintiff States of these grants, Plaintiff States will be unable to replace the lost federal dollars with their own money, especially because the cuts are immediate, made without warning or time to plan, and in the middle of funding cycles.

164.    The result will be preventable deaths, injuries, and needless suffering due to HIV and other disease outbreaks the States can no longer track, lead exposure that the States can no longer mitigate, public health emergencies to which the States are less prepared and equipped to respond, and other core public health dangers that any developed public health system should easily quell.

### B.    The loss of transportation funding irreparably harms Plaintiff States.

165.    If implemented by USDOT, the Targeting Directive would also deprive Plaintiff States of $943 million in transportation infrastructure funds, including under the CFI program for electric vehicle infrastructure, a wide range of other IIJA programs for improving and expanding their surface transportation infrastructure, and administering commercial driver's licensing.

166.    The Plaintiff States' CFI programs are important to the success of state climate and environmental policies to reduce climate-changing greenhouse gas emissions and smog, as well as state economic and transportation policies to modernize freight movement and improve access to electric vehicles. The widespread adoption of electric passenger cars and freight trucks—which depends on an accessible and comprehensive network of fast chargers—is critical to achieving legislatively set greenhouse gas reduction targets and federal ambient air quality standards.

167.    The electrification of freight and drayage trucks is also a critical plank of the States' transportation policies, such as California's Sustainable Freight Action Plan and Freight Mobility Plan and the Illinois Electric Vehicle Infrastructure Deployment Plan. Fast-charging an electric 18-wheeler truck requires significant power, such that constructing these en route chargers entails unique financing, engineering, and permitting challenges.

168.    The loss of CFI awards—including some on which the States have spent years conducting planning and other pre-construction activities—delays and increases the cost of the States' completing their charging infrastructure build-outs and achieving their transportation and economic policies. Delayed construction of electric vehicle charging infrastructure will increase emissions of greenhouse gases, smog precursors, and other harmful air pollution. Cost increases have the same effect, as they reduce the total amount of charging infrastructure that can be built with available funds under a given award.

169.    Those emission increases will exacerbate climate change and nonattainment of federal air quality standards and jeopardize the States' climate targets and other environmental and public health policies. In particular, harmful ozone, particulate matter, and air toxics (like benzene and aldehydes) from tailpipe pollution increases public health risks to Plaintiff States' residents for respiratory and cardiovascular diseases and cancers.

170.    Additional programs have been impacted in California. The Electric Vehicle Charger Reliability and Accessibility Accelerator ("EVC RAA") is a program funded through the 10 percent set-aside of National Electric Vehicle Infrastructure ("NEVI") program. These funds ($63.7 million in total for California) were set aside to fix or replace non-functional charging stations and bring older stations into compliance with NEVI minimum standards. California has awarded three companies under EVC RAA to replace or add 60 ports across 15 existing charging

stations for $4.6 million. Loss of EVC RAA will result in less deployment of electric vehicle infrastructure, increased costs, and increased emissions of greenhouse gases, smog precursors, and other air pollution.

171.    The arbitrary funding cuts will also halt numerous efforts to make roads safer in locations throughout Plaintiff States. For example, the Illinois Department of Transportation was awarded over $95 million in a MEGA grant to reconstruct portions of interstate I-290 at its interchange with Illinois Route 171 to protect pedestrian and bicyclist safety. It also received a $52 million Rural Surface Transportation grant to improve Illinois Route 9 in Bloomington with bike lanes and shared bike/pedestrian paths, traffic signal upgrades, and drainage improvements.

**C.    The loss of disaster recovery funding irreparably harms Plaintiff States.**

172.    Plaintiff States have massive reliance interests in the federal government's assistance in disaster recovery and long-term disaster resilience.

173.    Indeed, the legal standard for declaring a major disaster under the Stafford Act includes "a finding that the disaster is of such severity and magnitude that effective response is beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary." 42 U.S.C. § 5170. So the federal executive branch has already concluded, in declaring past disasters, that States cannot meet their needs alone.

174.    Plaintiff States rely on Public Assistance funds for a wide range of essential recovery expenses. For example, Illinois has used its Public Assistance funding to conduct search and rescue operations in the immediate aftermath of a disaster, provide food aid, debris removal, and permanent work including the repair of roads, bridges, water control facilities, buildings and equipment, utilities, ports, recreational areas, and other physical infrastructure.

175.    California has had no approved HMGP obligations since at least June 2025, with over $800 million in requested obligations, largely connected to the January 2025 Los Angeles

wildfires, still awaiting approval. California has an additional $500 million in Individual Assistance funds that are also awaiting approval. These delays threaten long-term recovery efforts from the devastating wildfires and delay improvements to prevent or mitigate the next fire.

176.   Colorado has an HMPG award following the Cameron Peak Fire to prevent further losses in the area due to wildfire. This project is meant reduce hazardous fuels along 47 miles of critical road infrastructure and adjacent private properties to provide a safer environment for thousands of residents and businesses. It will also protect critical community infrastructure, including: 41 dams, 35 schools, 15 fire and EMS stations, 4 hospitals, 4 power plants, 3 wastewater treatment plants, and a water treatment plant. Although FEMA obligated Phase I of the project and Colorado submitted its Phase I deliverables, no further progress has been made to advance the project to Phase II, threatening these long-term risk reduction efforts.

177.   Minnesota suffered broad and catastrophic flooding in the spring and summer of 2024. The State has 29 projects awaiting nearly $15 million in estimated awards yet to be obligated by FEMA under the ensuing disaster declaration. The lengthy delay has impeded local recovery efforts, and continued delay risks exacerbating future flood-related disasters in the region.

178.   Plaintiff States have routinely applied for, and intend to continue to apply for, Public Assistance and Hazard Mitigation funds whenever they suffer from an eligible major disaster, which could happen at any time.

179.   Plaintiff States also collectively receive millions of dollars per year in Flood Mitigation Assistance grants. They use these funds to reduce flood risk through infrastructure improvements. Loss of these funds will put life and property at risk.

## FIRST CAUSE OF ACTION
### Violation of the Tenth Amendment and State Sovereignty

180.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

181.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

182.    The President's actions may be reviewed for constitutionality. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

183.    The Tenth Amendment exists to "preserve[] the integrity, dignity, and residual sovereignty of the States." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)). An "essential attribute of the States' retained sovereignty" is "that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997).

184.    States thus "retain broad autonomy in structuring their governments and pursuing legislative objectives," *Shelby County*, 570 U.S. at 543, including especially through setting policies to effectively enforce state and local laws, keep public order, and provide public safety services. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

185.    The Targeting Directive punishes Plaintiff States based on their sovereign choices about how to allocate their own limited law enforcement resources. It attempts to coerce them into adopting the current presidential administration's preferred policies by cutting off critical funding.

The Targeting Directive violates the Constitution by singling out Plaintiff States for harmful executive action based on how they choose to exercise their sovereign powers.

186.     Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Targeting Directive and its implementation are unconstitutional and that the executive branch may not retaliate against Plaintiff States based on their exercise of sovereign authority reserved for the States by the Constitution. Plaintiff States are also entitled to injunctive relief preventing defendants from implementing or effectuating the Targeting Directive.

### SECOND CAUSE OF ACTION
### Violation of the Separation of Powers

187.     Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

188.     Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

189.     The President's actions may be reviewed for constitutionality. *Franklin*, 505 at 801; *Youngstown Sheet & Tube Co.*, 343 U.S. 579; *Panama Refining Co.*, 293 U.S. 388.

190.     The Constitution "grants the power of the purse to Congress, not the President." *San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

191.     Similarly, Congress possesses the exclusive power to legislate. Article I, Section 1 of the U.S. Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, §1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

192. The executive branch must "take Care that the laws be faithfully executed." U.S. Const. Art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them.").

193. Consistent with these principles, the executive branch acts at the lowest ebb of its constitutional authority and power when it acts contrary to the will of Congress by attempting to unilaterally condition or decline to spend appropriated funds. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring); *see also Learning Res., Inc. v. Trump*, 607 U.S. _, 2026 WL 477534, at *8 (Feb. 20, 2026) (Congress must speak clearly to delegate its "core congressional power of the purse"). The President has no legislative authority, *Clinton*, 524 U.S. at 438, and further has "none of 'his own constitutional powers' to 'rely' upon when it comes to spending." *San Francisco*, 897 F.3d at 1233–34 (quoting *Youngstown*, 343 U.S. at 637).

194. The Targeting Directive violates the separation of powers because the executive branch has overridden Congress's instructions by imposing unauthorized conditions on federal funds.

195. The Targeting Directive violates the separation of powers because the executive branch has overridden Congress's direction to spend all appropriated funds. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

196. Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Targeting Directive and its implementation are unconstitutional. Plaintiff States are also entitled to injunctive relief preventing defendants from implementing or effectuating the Targeting Directive.

## THIRD CAUSE OF ACTION
### Violation of the Spending Clause

197.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

198.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

199.    The President's actions may be reviewed for constitutionality. *Franklin*, 505 U.S. at 801; *Youngstown Sheet & Tube Co.*, 343 U.S. 579; *Panama Refining Co.*, 293 U.S. 388.

200.    The Spending Clause provides that "[t]he Congress shall have Power To . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Under this Clause, Congress may "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207.

201.    As relevant here, the Spending Clause prohibits retroactive conditions, unrelated conditions, and vague conditions. First, it requires "clear notice" of conditions and prohibits "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Second, the Constitution prohibits imposing condition on federal grant programs that are wholly unrelated to the purpose of the programs. *Dole*, 483 U.S. at 207–08. Finally, the Constitution permits only unambiguous federal funding conditions. *Id.* at 207.

202.    The Targeting Directive and actions that defendants have taken to implement it violate the Spending Clause by attempting to impose retroactive, unrelated, and vague conditions on funding.

203.    Defendants have targeted Plaintiff States because they are purportedly "sanctuary jurisdictions" and due to other political animus. Plaintiff States were not put on notice of

retroactive conditions based on "sanctuary" restrictions, political animus, or any other condition not related to the purpose of the award at the time of acceptance.

204.     Defendants have similarly attempted to retroactively allow termination for "agency priorities" when no such condition existed at the time of acceptance for many of the grants. For grants awarded before October 1, 2025, an "agency priorities" termination condition did not exist at the time of acceptance. But defendants purported to unilaterally impose new post-acceptance conditions on such grants in November 2025.

205.     Defendants have targeted federal funding to Plaintiff States for termination, freezing, and withholding based on immigration-policy priorities unrelated to the purposes of the funds at issue.

206.     Defendants have imposed funding conditions that are hopelessly vague.

207.     The Targeting Directive and actions that defendants have taken to implement it are therefore unconstitutional.

208.     Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Targeting Directive and its implementation are unconstitutional. Plaintiff States are also entitled to injunctive relief preventing defendants from implementing or effectuating the Targeting Directive.

## FOURTH CAUSE OF ACTION
### Violation of Administrative Procedure Act
### Agency Action in Excess of Statutory Authority

209.     Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

210.     Defendants OMB, HHS, CDC, USDOT, DHS, and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Targeting Directive is an "agency action" under the APA, *id.* § 551(13).

211.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

212.    Defendants lack the statutory authority to implement the Targeting Directive. The substantive statutes and appropriations laws that created and funded the grant programs at issue did not evince a purpose to condition funds on the President's political whims or federal immigration priorities.

213.    An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "An agency may not confer power upon itself." *Id.* So, a federal agency lacks any inherent power to attach any conditions to federal funds unless Congress has granted it such power. *See City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020); *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985).

214.    The statutes at issue in this case authorize federal spending for a wide range of purposes, but none of them have anything to do with enforcing federal immigration law—let alone authorize conditioning funds on sheer whim or animus. *See, e.g.*, 23 U.S.C. § 151(f) (Charging and Fueling Infrastructure); 42 U.S.C. §§ 247b, 294n, 295, 300w (authority for many different public-health grants); 42 U.S.C. §§ 5170a, 5170b, 5170c, 5172–5173, 5185–5186 (disaster recovery and hazard mitigation); 49 U.S.C. §§ 6701–6702 (surface transportation infrastructure improvements).

215.    Defendants also lack the statutory authority to refuse to spend funds that Congress has appropriated through numerous appropriations bills. *See Train v. City of New York*, 420 U.S. 35, 43–44 (1975).

216.    Pursuant to 5 U.S.C. §§ 705 and 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Targeting

Directive violate the APA because they are contrary to law, a stay of the Targeting Directive, vacatur of the Targeting Directive, and a preliminary and permanent injunction preventing defendants from putting the Targeting Directive into effect.

**FIFTH CAUSE OF ACTION**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

217.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

218.    Defendants OMB, HHS, CDC, USDOT, DHS, and FEMA are "agencies" under the APA, 5 U.S.C. § 551(1), and the Targeting Directive is an "agency action" under the APA, *id.* § 551(13).

219.    The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made" (quotation omitted)); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"). Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

220.    Defendants failed to comply with these bedrock requirements in making the Targeting Directive.

221.    First, the Targeting Directive singles out jurisdictions for disfavor based not on any rational purpose related to the goals of any program but rather based on partisan animus.

"[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that . . . work a violation of the arbitrary-and-capricious standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted).

222.    Second, the Targeting Directive changed agency position without explanation. But, when changing positions, an agency "must show that there are good reasons for the new policy," *Fox Television Stations, Inc.*, 556 U.S. at 515, and consider any "serious reliance interests" engendered by the status quo, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (quotation omitted).

223.    Third, defendants attempted to justify the Targeting Directive's effects at CDC by asking an AI model on February 7, 2026, to generate hundreds of pages of post-hoc rationalization after defendants had already decided which CDC grants to terminate earlier in February. Agency action cannot be "upheld on the basis of impermissible *post hoc* rationalization." *Regents of the Univ. of Calif.*, 140 S. Ct. at 1908 (quotation omitted).

224.    Pursuant to 5 U.S.C. §§ 705 and 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that defendants' actions in implementing and maintaining the Targeting Directive violate the APA because they are contrary to law, a stay of the Targeting Directive, vacatur of the Targeting Directive, and a preliminary and permanent injunction preventing defendants from putting the Targeting Directive into effect.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.    Enter judgment for Plaintiff States and against defendants;

b.    Declare that the Targeting Directive and all implementation of it by defendants is unlawful;

c.    Set aside the Targeting Directive pursuant to 5 U.S.C. § 706(2);

50

d.  Prohibit any implementation or enforcement of the Targeting Directive by any defendant against Plaintiff States, including their instrumentalities, subdivisions, and any bona fide fiscal agents of Plaintiff States or their instrumentalities and subdivisions;

e.  Prohibit any termination or withholding of federal funds based on the Targeting Directive by defendants to Plaintiff States, including their instrumentalities, subdivisions, and any bona fide fiscal agents of Plaintiff States or their instrumentalities and subdivisions;

f.  Declare that the United States may not retaliate against Plaintiff States by withdrawing, conditioning, or impairing Plaintiff States' federal funding or other participation in federal programs based on Plaintiff States' lawful exercise of their sovereign authority;

g.  Enjoin defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct regarding federal funding or other participation in federal programs based on Plaintiff States' lawful exercise of their sovereign authority;

h.  Retain jurisdiction to monitor defendants' compliance with this Court's judgment;

i.  Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

j.  Award such additional relief as this Court may deem just and proper.

Dated: March 3, 2026

**ROB BONTA**
*Attorney General of California*

By: */s/ Harald H. Kirn*
R. MATTHEW WISE*
KATHLEEN BOERGERS
*Supervising Deputy Attorneys General*
HARALD H. KIRN
CHRISTOPHER KISSEL*
CARTER JANSEN*
DAVID GREEN*
*Deputy Attorneys General*
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-210-6111
Harald.Kirn@doj.ca.gov
Christopher.Kissel@doj.ca.gov
Carter.Jansen@doj.ca.gov
David.Green@doj.ca.gov

*Counsel for the State of California*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ R. Henry Weaver*
CARA HENDRICKSON
*Executive Deputy Attorney General*
KATHARINE ROLLER
*Complex Litigation Counsel*
SARAH HUNGER
*Deputy Solicitor General*
SHERIEF GABER
MOLLY MAUCK
AKANKSHA SHAH
R. HENRY WEAVER
BRIANNA YANG
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov
Sarah.Hunger@ilag.gov
Sherief.Gaber@ilag.gov
Molly.Mauck@ilag.gov
Robert.Weaver@ilag.gov

*Counsel for the State of Illinois*

**PHILIP J. WEISER**
*Attorney General of Colorado*

By: */s/ David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
SARAH H. WEISS
*Senior Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**\* Pro Hac Vice Forthcoming**

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/ Katherine Bies*
KATHERINE BIES
ED STOCKMEYER
*Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
Ed.Stockmeyer@ag.state.mn.us

*Counsel for the State of Minnesota*