**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STATE OF ILLINOIS *et al.*,

      Plaintiffs,

      v.

RUSSELL VOUGHT, *in his official capacity as Director of the Office of Management & Budget*, *et al.,*

      Defendants.

Case No. 26-cv-1566

Hon. Manish S. Shah

**PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I. Introduction .................................................................................................... 1

II. Background ................................................................................................... 2

    A. Congress's reliance on the States to accomplish its purposes for public health, infrastructure, and disaster recovery ................................................... 2

    B. Defendants' history of targeting "sanctuary" jurisdictions, especially Plaintiff States ............................................................................................................. 4

    C. OMB's Targeting Directive and its initial implementation at CDC ................... 6

    D. The Targeting Directive's future threats at HHS, DOT, and FEMA ............... 10

III. Legal Standard ........................................................................................... 13

IV. Argument ................................................................................................... 13

    A. Plaintiff States are likely to succeed on the merits. .................................... 14

        1. The Court likely has jurisdiction over Plaintiff States' claims. ................... 14

            a. The Tucker Act does not apply to this challenge to an agency policy. ............... 14

            b. This case is not a statutory challenge to enforce past-due grant obligations. ..... 17

        2. The Targeting Directive is arbitrary and capricious. .................................. 19

        3. The Targeting Directive exceeds defendants' statutory authority. ............... 22

        4. Defendants' actions violate the Constitution. ........................................... 24

            a. Defendants' actions violate the separation of powers. .......................... 24

            b. Defendants' actions violate the Spending Clause. ................................ 25

    B. The equities compel preliminary injunctive relief. ....................................... 27

    C. If relief is denied, the Court should grant a short-duration injunction pending appeal. ........................................................................................................ 29

V. Conclusion ................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am. Acad. of Pediatrics v. HHS,*
  2026 WL 80796 (D.D.C. Jan. 11, 2026) ................................................................ 18

*Amerijet Int'l, Inc. v. Pistole,*
  753 F.3d 1343 (D.C. Cir. 2014) ........................................................................... 19

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ............................................................................................. 24

*Ass'n for Educ. Fin. & Policy, Inc. v. McMahon,*
  2026 WL 523023 (D.D.C. Feb. 25, 2026) ............................................................ 17

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................................... 19, 20

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ............................................................................................. 25

*Biden v. Texas,*
  597 U.S. 785 (2022) ............................................................................................. 20

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ............................................................................................. 16

*Bush v. United States,*
  100 F.4th 807 (7th Cir. 2024) .............................................................................. 18

*California v. DOT,*
  808 F. Supp. 3d 291 (D.R.I. 2025) ......................................................................... 5

*Camelot Banquet Rooms, Inc. v. SBA,*
  24 F.4th 640 (7th Cir. 2022) ................................................................................ 29

*Cavel Int'l, Inc. v. Madigan,*
  500 F.3d 544 (7th Cir. 2007) ............................................................................... 30

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd,*
  601 U.S. 416 (2024) ............................................................................................. 22

*Chi. Typographical Union v. Chi. Sun-Times, Inc.,*
  935 F.2d 1501 (7th Cir. 1991) ............................................................................. 19

*Chi. Women in Trades v. Trump,*
  778 F. Supp. 3d 959 (N.D. Ill. 2025) ................................................................... 17

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................................. 25

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ............................................................................................. 22

*City of Chi. v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ..................................................................... 5, 23, 25

*City of Chi. v. DHS*,
  2025 WL 3043528 (N.D. Ill. Oct. 31, 2025)........................................................ 19

*City of St. Paul v. Wright*,
  2026 WL 88193 (D.D.C. Jan. 12, 2026) ............................................................. 18

*Clinton v. City of New York*,
  524 U.S. 417 (1998)........................................................................................... 22

*Colorado v. HHS*,
  788 F. Supp. 3d 277 (D.R.I. 2025)..................................................................... 15

*Columbus Reg'l Hosp. v. FEMA*,
  708 F.3d 893 (7th Cir. 2013) ....................................................................... 14, 15

*Cook Cnty. v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) ....................................................................... 13, 27

*Council for Opportunity in Educ. v. DOE*,
  2026 WL 120984 (D.D.C. Jan. 16, 2026) ......................................................... 17

*Crowley Gov't Servs., Inc. v. GSA*,
  143 F.4th 518 (D.C. Cir. 2025)......................................................................... 17

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)............................................................................... 19, 21, 22

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)......................................................................................... 19, 20

*Evers v. Astrue*,
  536 F.3d 651 (7th Cir. 2008) ............................................................................ 15

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)........................................................................................... 24

*GEFT Outdoors, LLC v. City of Westfield*,
  922 F.3d 357 (7th Cir. 2019) ............................................................................ 13

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)........................................................................................... 18

*Illinois v. FEMA*,
  801 F. Supp. 3d 75 (D.R.I. 2025) ........................................................... 5, 26, 29

*Illinois v. Noem*,
  2025 WL 3707011 (D.R.I. Dec. 22, 2025) ................................................... 6, 21

*Indiana Right to Life Victory Fund v. Morales*,
  112 F.4th 466 (7th Cir. 2024) ........................................................................... 13

*Kidwell v. Dep't of Army*,
  56 F.3d 279 (D.C. Cir. 1995)............................................................................ 16

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)............................................................................... 29

iv

*Learning Resources v. Trump*, 607 U.S. \_,
 2026 WL 477534 (2026) .......................................................................... 22

*Level the Playing Field v. FEC*,
 961 F.3d 462 (D.C. Cir. 2020) ........................................................ 19, 21

*Massachusetts v. NIH*,
 164 F.4th 1 (1st Cir. 2026) ..................................................................... 17

*Megapulse, Inc. v. Lewis*,
 672 F.2d 959 (D.C. Cir. 1982) ............................................................... 15

*MTA v. Duffy*,
 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026) ........................................... 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012) ............................................................................... 26

*New York v. Admin. for Child. & Fams.*,
 2026 WL 332555 (S.D.N.Y. Feb. 6, 2026) ............................................... 6

*New York v. United States*,
 505 U.S. 144 (1992) ............................................................................... 26

*NIH v. Am. Pub. Health Ass'n*,
 145 S. Ct. 2658 (2025) ............................................................. 14, 15, 16

*Ohio v. EPA*,
 603 U.S. 279 (2024) ............................................................................... 27

*Pennhurst State Sch. & Hosp. v. Halderman*,
 451 U.S. 1 (1981) ................................................................................... 26

*Perry Cap. LLC v. Mnuchin*,
 864 F.3d 591 (D.C. Cir. 2017) ............................................................... 16

*Pres. & Fellows of Harvard Coll. v. HHS*,
 798 F. Supp. 3d 77 (D. Mass. 2025) ...................................................... 18

*Printz v. United States*,
 521 U.S. 898 (1997) ................................................................................. 4

*Robbins v. Reagan*,
 780 F.2d 37 (D.C. Cir. 1985) .......................................................... 20, 23

*Rodriguez v. Robbins*,
 715 F.3d 1127 (9th Cir. 2013) ............................................................... 27

*S.F. Unified Sch. Dist. v. AmeriCorps*,
 784 F. Supp. 3d 1280 (N.D. Cal. 2025) ................................................. 17

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947) ............................................................................... 20

*Sierra Club v. Trump*,
 929 F.3d 670 (9th Cir. 2019) ................................................................. 24

*Simic v. City of Chi.*,
    851 F.3d 734 (7th Cir. 2017) ............................................................. 14

*State Hwy. Comm'n v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ........................................................... 24

*Stephens v. United States*,
    165 Fed. Cl. 341 (Ct. Cl. 2023) ........................................................ 17

*Tasby v. United States*,
    91 Fed. Cl. 344 (Ct. Cl. 2010) .......................................................... 17

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ........................................................... 27

*Train v. City of New York*,
    420 U.S. 35 (1975) ............................................................................ 24

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) .......................................................................... 19

*Velesaca v. Decker*,
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) .............................................. 19

*Wild v. Subscription Plus, Inc.*,
    292 F.3d 526 (7th Cir. 2002) ............................................................ 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .......................................................................... 25

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) .............................................................................. 25

**Constitutional Provisions**

U.S. Const. art. I, § 1 ................................................................................ 25

U.S. Const. art. I, § 7 ................................................................................ 25

U.S. Const. art. II, § 3 ............................................................................... 25

**Statutes**

Pub. L. No. 117-58, 135 Stat. 429 (2021) ................................................. 3

Pub. L. No. 118-47, 138 Stat. 460 (2024) ............................................ 4, 24

Pub. L. No. 64-156, 39 Stat. 355 (1916) ................................................... 3

Pub. L. No. 81-875, 64 Stat. 1109 (1950) ................................................. 3

Pub. L. No. 87-868, 76 Stat. 1155 (1962) ................................................. 2

5 U.S.C.
    § 704 ........................................................................................... 17, 19
    § 705 ................................................................................. 2, 13, 16, 30
    § 706 ........................................................................................... 15, 19

23 U.S.C.
  § 117 ............................................................................................................ 3
  § 118 .......................................................................................................... 24
  § 151 ...................................................................................................... 3, 12
  § 173 ............................................................................................................ 3

26 U.S.C.
  § 9503 .......................................................................................................... 4
  § 1346 ........................................................................................................ 14
  § 1491 ........................................................................................................ 14

42 U.S.C.
  § 247b ..................................................................................................... 2, 23
  § 247b-9 ...................................................................................................... 3
  § 247c .......................................................................................................... 3
  § 280b-1 ....................................................................................................... 3
  § 280b-1c ..................................................................................................... 3
  § 280b-1f ...................................................................................................... 3
  § 280c-3 ....................................................................................................... 3
  § 280g-6 ....................................................................................................... 3
  § 300hh-33 ................................................................................................... 2
  § 300u-11 ..................................................................................................... 4
  § 300w-1 .................................................................................................. 3, 23
  § 300w-3 ...................................................................................................... 3
  § 5121 *et seq.* ............................................................................................ 4
  § 5170a ......................................................................................................... 4
  § 5170b ......................................................................................................... 4
  § 5170c .................................................................................................... 4, 23
  § 5172 ........................................................................................................... 4
  § 5173 ........................................................................................................... 4
  § 5185 ........................................................................................................... 4
  § 5186 ........................................................................................................... 4

49 U.S.C.
  § 31313 ....................................................................................................... 12
  § 5539 ........................................................................................................... 3
  § 6701 ...................................................................................................... 3, 23
  § 6702 ........................................................................................................... 3

5 ILCS 805/1 *et seq.* ...................................................................................... 4

## Rules

Fed. R. App. P. 8 ............................................................................................ 30

Fed. R. Civ. P. 62 .......................................................................................... 30

## Regulations

45 C.F.R. § 75.372 (2025) .............................................................................. 27

89 Fed. Reg. 80055 (Oct. 2, 2024) ................................................................................... 26

**Other Authorities**

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ............................................ 5

Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) ......................................... 5

Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) ........................................ 5

David Ferris, *Trump Kills EV Charging Programs in Blue States*, E&E News (Feb. 10, 2026),
    https://www.eenews.net/articles/trump-kills-ev-charging-programs-in-blue-states/ ................ 11

Donald J. Trump, *Remarks to the Detroit Economic Club* 58:47 (Jan. 13, 2026),
    https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-detroit-
    economic-club/ .................................................................................................................. 6

Fed. Highway Admin., *Funding Federal-Aid Highways*, Pub. No. FHWA-PL-17-011
    (Jan. 2017) ........................................................................................................................ 11

Gabe Cohen, *The Trump administration is about to release billions in disaster aid. Several blue
    states won't be included*, CNN (Feb. 26, 2026),
    https://www.cnn.com/2026/02/26/politics/disaster-aid-fema-states-trump-shutdown ............ 12

Ingraham Angle: *Dems Promote Lawlessness* (Fox News broadcast, aired Jan. 13, 2026) ........... 6

Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States,
    Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026),
    https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-
    green-grants-for-dem-states/ ........................................................................................... 8

Press Release, Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions*
    (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-
    jurisdictions ................................................................................................................ 5, 7

*Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026),
    https://www.youtube.com/watch?v=oNQoMMo8hYw/ ........................................................ 6

Rachel Frazin, *FEMA releasing billions in disaster assistance, while further funds await
    approval*, The Hill (Feb. 27, 2026), https://thehill.com/policy/energy-environment/5759529-
    billions-in-fema-funds-awarded/ ....................................................................................... 12

## I. INTRODUCTION

For more than a year, the Trump Administration has sought, through the actions of individual agencies, to punish sovereign States and other jurisdictions who have chosen not to surrender their law enforcement resources to federal immigration enforcement. For more than a year, those actions have been rebuffed by the courts as illegal and unconstitutional executive overreach. Now, the President and his instrument, the Office of Management and Budget ("OMB"), have escalated their campaign, conscripting numerous federal agencies at once into their effort to punish the four Plaintiff States for the exercise of their sovereign authority. OMB's directive targeting Plaintiff States for funding cuts and freezes (the "Targeting Directive") has been implemented at three agencies so far—the Centers for Disease Control and Prevention ("CDC"), Department of Transportation ("DOT"), and Federal Emergency Management Agency ("FEMA")—but it was issued to many more. Without a preliminary injunction, defendants will resume implementation of the lawless Targeting Directive, which has already placed $3.4 billion of critical public health, infrastructure, and disaster-recovery funding at risk, causing irreparable harm to the sovereignty of Plaintiff States and the health and safety of their people.

In issuing and implementing the Targeting Directive, defendants have demonstrated a total disregard for the statutory and constitutional strictures that protect against arbitrary and overreaching conduct by the executive branch. The Targeting Directive offends the guardrails on agency decisionmaking imposed by the Administrative Procedure Act ("APA"), as it was promulgated without explanation, based on partisan animus and immigration-policy disagreements unmoored from the subjects of the funding programs it threatens. The Targeting Directive is also contrary to law and violates the separation of powers because it orders government-wide funding cuts and freezes for reasons not contemplated by the authorizing and appropriating statutes, and it further results in an unlawful impoundment of funds that Congress ordered the executive branch

to spend. Last, the Targeting Directive flouts the limitations imposed by the Spending Clause by placing retroactive and unrelated immigration conditions on all funding to Plaintiff States and their subdivisions and instrumentalities. For these reasons and those detailed below, the Court should stay the Targeting Directive under 5 U.S.C. § 705 and enjoin its implementation.

## II. BACKGROUND

### A.  Congress's reliance on the States to accomplish its purposes for public health, infrastructure, and disaster recovery

For decades, Congress has enacted laws providing federal funds to the States to staff state and local health departments, build transportation infrastructure, and rebuild after catastrophic natural disasters. The States, in turn, have come to pervasively rely on that federal support to keep their residents safe and to promote economic prosperity.

Start with public health. The Vaccination Assistance Act of 1962 created the first major public-health grants to States, funding state and local childhood vaccination programs. *See* Pub. L. No. 87-868, 76 Stat. 1155 (codified as amended at 42 U.S.C. § 247b). Congress has repeatedly expanded that statutory authority, and § 247b now broadly authorizes grants "to assist [States] in meeting the costs of establishing and maintaining preventive health service programs." *Id.* § 247b(a). In December 2020, at the height of the COVID-19 pandemic, Congress mandated that the HHS Secretary "shall" award grants to States "for the expansion and modernization of public health data systems." *Id.* § 300hh-33(a)(1)(B). These provisions, and others, require CDC to operate the Public Health Infrastructure Grant ("PHIG"), which funds the employment of hundreds of public health professionals in Plaintiff States.[1]

Congress also created the Preventive Health and Health Services Block Grant, awarded to

---

[1] Ex. 5 (Thoele Decl.), ¶ 35; Ex. 6 (Ige Decl.), ¶ 22; Ex. 7 (Calonge Decl.), ¶ 57; Ex. 8 (McGowan Decl.), ¶ 14; Ex. 9 (Underwood Decl.), ¶ 63; Ex. 10 (Fanelli Decl.), ¶ 10; Ex. 11 (Ferrer Decl.), ¶ 10.

all 50 States to support essential public-health services. *See, e.g.*, Ex. 5 (Thoele Decl.), ¶¶ 23–25. It implemented a strict statutory formula dictating the allocation to each State, as well as a specific set of permitted and prohibited use of the funds. 42 U.S.C. §§ 300w-1, -3. Through dozens of other statutory programs, Congress has authorized programs to prevent injuries like drug overdoses, traumatic brain injuries, and elderly falls, *id.* §§ 280b-1, 280b-1c, 280b-1f; to prevent, treat, and monitor HIV infection, *id.* § 247c; and to ameliorate a wide range of chronic diseases and cancers, *e.g. id.* §§ 247b-9, 280c-3, 280g-6. CDC summarized its numerous statutory authorities for the grant programs it administers in a spreadsheet sent to OMB and produced in this litigation. *See* Ex. 3 (Krajewski Decl.) & Ex. A (CDC_001297).

Congress has likewise long directed federal funding to States to support the development of transportation infrastructure to knit this nation's communities together. *E.g.*, Federal Aid Road Act of 1916, Pub. L. No. 64-156, 39 Stat. 355. In the century since the 1916 Act, Congress has passed dozens of statutes to that end. Recent infrastructure laws have paid special attention to long-overdue improvements of the transportation system to promote modern, sustainable growth; to expand access to electric vehicle charging along major transportation corridors and in underserved communities; and to improve infrastructure in both urban and rural areas for economic activity, transportation safety, and environmental sustainability. *E.g.*, Pub. L. No. 117-58, 135 Stat. 429 (2021); 23 U.S.C. § 151(f); 49 U.S.C. §§ 5539, 6701, 6702; 23 U.S.C. §§ 117, 173.

And, for over 70 years, Congress has addressed the threat of unpredictable disasters and emergencies by providing robust and unflagging financial support—today totaling tens of billions of dollars annually—for a complex infrastructure of emergency preparedness and response, anchored by FEMA but administered in the first instance by the States. *See, e.g.*, Disaster Relief Act of 1950, Pub. L. No. 81-875, § 1, 64 Stat. 1109. The Stafford Act of 1988 sets out the

framework for responding to natural disasters that governs today, directing federal funds to flow to States and their residents following a presidential disaster declaration. *See* 42 U.S.C. § 5121 *et seq*. After a major disaster, the Stafford Act authorizes federal aid both for immediate recovery, *id.* §§ 5170a, 5170b, 5172–5173, 5185–5186, and for long-term hazard mitigation under the Hazard Mitigation Grant Program, *id.* § 5170c.

Congress also *funds* these programs, both through annual appropriations bills and dedicated accounts. *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 653–54 (CDC); *id.* 608–09 (Disaster Relief Fund); 26 U.S.C. § 9503 (Highway Trust Fund); 42 U.S.C. § 300u-11 (Prevention and Public Health Fund). Congress thus not only authorized the creation of these programs but also directed the executive branch to spend the money appropriated—no more and no less. As defendant CDC wrote in its spreadsheet response to OMB, on line after line of its grant-by-grant analysis: "FY 2024 [appropriation] bill sets a cap and a floor." *See* Ex. 3 (Krajewski Decl.) & Ex. A (CDC_001297).

## B. Defendants' history of targeting "sanctuary" jurisdictions, especially Plaintiff States

Under their police powers, Plaintiff States and their subdivisions enact statutes and establish policies that prioritize the time and energy of state and local law enforcement to ensure that States' residents are protected from crime and violence. One critical choice that Plaintiff States must make in doing so is whether, when, and how to task their law-enforcement officers with assisting the federal government in enforcing federal civil immigration law. Plaintiff States have varied policies and laws on that question, *e.g.*, 5 ILCS 805/1 *et seq.*, but the core fact is that *all* are consistent with the fundamental rule that the States "remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997).

The current administration sees things differently. In his first term, the President tried and failed to attach immigration-enforcement conditions to law enforcement funding. *E.g.*, *City of Chi.*

*v. Barr*, 961 F.3d 882 (7th Cir. 2020). On the first day of his second term, the President again directed the Attorney General and DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443 (Jan. 20, 2025). On February 19, 2025, the President signed a second order reiterating the administration's plan to defund sanctuary jurisdictions. *See* Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025). This order directed "the head of each executive department or agency" to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.* § 2(ii). On April 28, 2025, a third order required "the Attorney General, in coordination with [DHS]" to "publish a list" of "sanctuary jurisdictions" and instructed federal agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." Exec. Order No. 14287, § 2, 90 Fed. Reg. 18761 (Apr. 28, 2025). DOJ published the "sanctuary" list on August 5, 2025, identifying 35 states, cities, and counties. Plaintiff States were all designated.[2]

To implement these executive orders, federal agencies began imposing immigration-enforcement conditions on grant programs and federal awards, threatening to withhold billions of dollars in funding unless States and local jurisdictions agreed to divert their resources to federal immigration functions. Plaintiff States and others have successfully challenged these unlawful efforts. *E.g.*, *California v. DOT*, 808 F. Supp. 3d 291 (D.R.I. 2025); *Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025). The administration, pivoting from its losses, has responded with retaliatory funding cuts and freezes at particular agencies, actions that Plaintiff States have yet again successfully enjoined in federal court. *E.g.*, *New York v. Admin. for Child. & Fams.*, 2026 WL

---

[2] *See* Press Release, Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

332555 (S.D.N.Y. Feb. 6, 2026); *Illinois v. Noem*, 2025 WL 3707011 (D.R.I. Dec. 22, 2025).

**C.    OMB's Targeting Directive and its initial implementation at CDC**

Against that backdrop, in January 2026, defendants launched an even broader campaign to target Plaintiff States. On January 13, speaking to the Detroit Economic Club, the President said that he would cut off "any payments" starting on February 1, "to sanctuary cities or states having sanctuary cities because they do everything possible to protect criminals at the expense of American citizens."[3] These threats were reiterated in an interview by White House Deputy Chief of Staff for Policy Stephen Miller,[4] and again by the President on Truth Social.[5] Then on January 20, at a White House press conference, the President again set a February 1, 2026 deadline for these cuts, stating:

> You've got to get rid of your sanctuary cities, and I hope our people know that we're not going to pay sanctuary cities. . . . They can sue us and maybe they'll win but we're not giving money to sanctuary cities anymore as of the beginning of the month.[6]

On January 16, just three days after the President's Detroit Economic Club speech, the Chief of Staff of OMB met with senior HHS officials to ask for a "list." She thanked the officials for their "willingness to be team players and to support the President's priorities!" OMB_000021; CDC_001344–45.[7]

Meanwhile, OMB sent a "Budget Data Request" on January 20, to nearly all federal agencies seeking "a detailed report on Federal funds provided to components, agencies, or

---

[3]    Donald J. Trump, *Remarks to the Detroit Economic Club* 58:47 (Jan. 13, 2026), https://www.whitehouse.gov/videos/president-trump-delivers-remarks-to-the-detroit-economic-club/.

[4] Ingraham Angle: *Dems Promote Lawlessness* (Fox News broadcast, aired Jan. 13, 2026).

[5] Donald J. Trump (@realDonaldTrump), https://truthsocial.com/@realDonaldTrump/posts/115893309945152200.

[6]    *Press Secretary Karoline Leavitt Briefs Members of the Media* 1:38:26 (Jan. 20, 2026), https://www.youtube.com/watch?v=oNQoMMo8hYw/.

[7] Where Plaintiff States' factual statements omit certain details, it is due to defendants' unjustified invocations of deliberative-process privilege and other redactions on their production. *See* ECF 55. The Court may make reasonable findings of fact based on the circumstantial evidence about what lies beneath defendants' black boxes. The production referenced in this filing is excerpted as Exhibit 1 (OMB production) and Exhibit 2 (CDC production).

instrumentalities of *certain States*." ECF 44-10 at 245–63 (CDC_001245–63). Those States were California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington. Nearly all of these States either appeared on the "list of sanctuary jurisdictions" published by the Department of Justice on August 5, 2025, or contain localities that appeared on the list.[8]

On January 21, OMB called a meeting of the President's Management Council, which comprises heads of major federal government agencies. High-level officials of almost every major federal agency were invited, including all the defendants in this case: HHS, DOT, and DHS. *See* Ex. 4 (Gaber Decl.). At the meeting, OMB informed the agencies regarding actions they would soon be expected to take. OMB_000023.

Two emails were sent in quick succession the next morning. At 8:12 AM, on January 22, a budgetary official at HHS circulated the Budget Data Request across the agency. CDC_001404. At 8:16 AM, OMB's Deputy Director for Management emailed agencies asking them to provide OMB with "recommended actions prior to February 1." CDC_001390. Notably, the Budget Data Request itself lacks a demand for "recommended actions" and purports to just be a request for information. *See* ECF 44-10 at 245 (CDC_001245). By the afternoon of January 22, HHS officials were exchanging internal emails to work on implementation of the Targeting Directive against Plaintiff States. *See, e.g.*, CDC_001330, 001267–68, CDC_001310–11. For instance, at 3:35 PM, one CDC official provided others with the "active awards for Colorado, California, Minnesota, and Illinois" in an Excel spreadsheet. CDC_001267–68.

On Friday, January 23, OMB again convened the President's Management Council. *See* OMB_000023–25. After the meeting, OMB's Chief of Staff thanked the agency heads for their

---

[8] *See* Press Release, Dep't of Just., *supra* n.2. The sole exception is Virginia, which elected a new Governor and Attorney General on November 3, 2025.

"intriguing ideas," and assured them that "[w]e so appreciate your creativity and willingness to dive in to this important action for the President." OMB_000024–25.

On February 1, OMB's Chief of Staff sent an email to high-ranking staff at HHS with the subject line, "Re: Grant Awards – Implementation Call follow up." She listed out for HHS staff a long series of items for them to accomplish. OMB_000027; CDC_001343–44. Another HHS official replied to OMB's Chief of Staff thanking her for "the list." CDC_001335.

On the morning of February 4, defendant Vought presented to the President a list of grants to be cancelled that HHS had generated at OMB's instruction. The President directed immediate action that day. CDC_001351. Thus at 12:47 PM that same afternoon, the OMB Communications Director emailed HHS officials with the subject "CDC CUTS SOON ANNOUNCEMENT," expressly connecting the events of February 4 to the Budget Data Request: "at 2 PM ET today, we have an exclusive going to announce the first cuts we are making in funds that we have been asking agencies to investigat[e] from 14 states and DC." CDC_001332. The OMB Communications Director let HHS know that "CDC is part of these cuts." CDC_001331–32.

A little after 2 PM, the *New York Post* reported that OMB was directing DOT and CDC to terminate more than $1.5 billion of grants, targeted solely at the four Plaintiff States.[9] OMB ordered CDC to cancel at least $602 million. The *New York Post* article identified specific CDC and DOT grants that would be terminated under OMB's directive. The documents so far produced show that the *New York Post* had information provided by OMB.

From February 5 to 7, following OMB's press leak, HHS officials scrambled to substantiate the OMB-directed cuts with some record inside their own agency. On February 5, at 4:30 PM,

---

[9] Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026), https://nypost.com/2026/02/04/us-news/white-house-instructs-dot-cdc-to-cut-1-5b-in-woke-green-grants-for-dem-states/.

senior HHS and CDC officials had a meeting titled "CDC Regroup" where the agenda included "path forward regarding OMB request." CDC_001328. Working past midnight that night, at 12:36 AM on February 6, the HHS Chief of Staff emailed the same official who had convened the "Regroup" meeting, attached the *New York Post* article, and asked the official to "please ensure you incorporate these into the standard process of grants for alignment to agency priorities." CDC_001269–71. In other words, the HHS Chief of Staff asked the official to provide post-hoc "agency priorities" reasoning for the outcome pre-determined by the Targeting Directive.

HHS ultimately hit upon a plan to have an AI model produce machine-generated text identifying alleged contradictions with HHS and CDC agency priorities. Starting on February 6 at 9:34 PM, CDC began an "URGENT" task to assemble "the work plans and other related documents for the following 66 grants," CDC_001427–28, and then an "advisor" in another part of HHS ran them through an AI model on February 7, CDC_001264, 001314.[10] These post-hoc, AI-generated outputs can be found in what defendants call the administrative record. *See* ECF 44-3 at 139 to ECF 44-6 at 573 (CDC_000139–573).

On February 9, HHS notified Congress of its intention to terminate a wide swathe of CDC grants in Plaintiff States (the "First Round Grants"). The only explanation given to Congress was that the grants were purportedly "Inconsistent with Agency Priorities." *See* ECF 44-10 at 239–41 (CDC_001239–241). Before the close of business on February 11, Plaintiff States filed the original complaint in this case and their motion for a temporary restraining order seeking to vacate the Targeting Directive and enjoin its implementation. ECF 1, 3.

Later that same day, defendants attempted to execute their threats. Overnight on February 11 and on the morning of February 12, Plaintiff States began receiving new notices of award

---

[10] The list was the same list eventually noticed to Congress for termination on February 9, the same $602 million in awards reported by the *New York Post*.

("NOAs") purporting to terminate each First Round Grant and setting February 11 as the final day of performance.[11] On February 12, this Court entered a temporary restraining order voiding "any actions taken to implement or enforce directives to identify and terminate public-health grants awarded to plaintiffs based on undisclosed agency priorities." ECF 21 ¶ 2.

Shortly thereafter, defendants issued new NOAs, dated February 13, for the First Round Grants, extending the end of the period of performance by fourteen days and citing the TRO.[12] A subsequent NOA issued on February 27, citing the extension of the TRO, set the end of the period of performance at March 12, 2026. *See e.g.*, Ex. 5 (Thoele Decl.), ¶ 55, Ex. D. Without a preliminary injunction, the First Round Grants will be terminated after that date.

## D. The Targeting Directive's future threats at HHS, DOT, and FEMA

*HHS/CDC:* On February 11, CDC sent a notice to Congress of its intent to terminate an additional 41 grants in the four Plaintiff States (the "Second Round Grants"). *See* ECF 44-10 at 242 (CDC_001242).[13] As with the First Round Grants, *only* grants in the four Plaintiff States were noticed for termination, and the only reason given was that the grants were "Inconsistent with Agency Priorities." Also like the First Round Grants, these Grants provide vital funding for core public health functions including outbreak tracking and control, immunization, HIV testing and treatment, and injury-prevention research. *See, e.g.*, Ex. 5 (Thoele Decl.), ¶¶ 11–12, 47–49; Ex. 7 (Calonge Decl.), ¶¶ 7, 63–69; Ex. 9 (Underwood Decl.), ¶¶ 6, 67–71.

Shortly after HHS notified Congress of its intent to terminate the Second Round Grants, this Court entered a TRO prohibiting defendants from terminating public-health grants awarded to

---

[11] *See* Ex. 5 (Thoele Decl.), ¶¶ 51–52, Ex. B; Ex. 6 (Ige Decl.), ¶6, Ex A; Ex. 7 (Calonge Decl.), ¶ 9, Ex. A; Ex. 8 (McGowan Decl.), ¶ 11, Ex. 2; Ex. 9 (Underwood Decl.), ¶ 7, Ex. A; Ex. 10 (Fanelli Decl.), ¶ 8, Ex. A.
[12] *See* Ex. 5 (Thoele Decl.), ¶ 54, Ex. C; Ex. 7 (Calonge Decl.), ¶ 9; Ex. 9 (Underwood Decl.), ¶ 9.
[13] The second notice to Congress lists 42 total grants, but one of the Second Round Grants also appeared on the list of First Round Grants.

plaintiffs based on undisclosed agency priorities. ECF 21 ¶ 1. As of this filing, CDC has not yet acted on its threat to terminate the Second Round Grants. The CDC administrative record, however, contains a set of boilerplate "decision memoranda" which recommend termination of all 41 of the Second Round Grants. ECF 44-6 at 24 to ECF 44-9 at 49 (CDC_00000574–849). An internal HHS email also suggests that the Court's order prevented additional similarly baseless grant terminations throughout HHS: on February 9, an HHS Department official emailed a group of HHS employees about the First Round Grants to ensure that the "messaging [about the grant terminations] remains tightly aligned." CDC_001347–48. He continued: "Assuming heightened visibility through this process will ensure we are successful as other OpDivs [i.e., sub-agencies of HHS] begin *this same disciplined process*." *Id.* (emphasis added).

**DOT:** Public reporting has also indicated that OMB has directed DOT to cut or withhold an even larger sum than at CDC—over $943 million. The February 4 *New York Post* story reported that OMB ordered DOT "to cancel more than $943 million" in funds to Plaintiff States, and "[a] DOT spokesman confirmed the cuts were being carried out." Then, on February 10, *E&E News* reported a DOT statement that "it was moving ahead with executing the OMB plan, pointing to the recent *New York Post* story."[14]

Rather than sending termination letters to Plaintiffs States' transportation agencies communicating these cuts, DOT has simply failed to obligate funds for their projects. DOT funding, unlike CDC notices of award, is typically obligated in a series of phases after an extensive planning process under the project. *See* Fed. Highway Admin., *Funding Federal-Aid Highways*, Pub. No. FHWA-PL-17-011, at 23 (Jan. 2017). As a result, Plaintiff States have many funding commitments from DOT of various kinds that are either not obligated or only partially obligated,

---

[14] David Ferris, *Trump Kills EV Charging Programs in Blue States*, E&E News (Feb. 10, 2026), https://www.eenews.net/articles/trump-kills-ev-charging-programs-in-blue-states/.

and simply frozen.[15] Public reporting indicates that these frozen grants include programs as varied as the Charging and Fueling Infrastructure program, a grant program established to help States expand access to electric vehicle charging along major transportation corridors and in underserved communities, 23 U.S.C. § 151(f), and the Commercial Driver's License Program Implementation, which provides financial assistance to States to carry out and improve the national commercial driver's license program administered by DOT, 49 U.S.C. § 31313.

**DHS/FEMA:** The most recent expansion of implementation of the Targeting Directive has taken place at DHS and its component agency FEMA. Billions of dollars of disaster aid have been stalled at DHS and FEMA over the past year. The causes for this delay include additional layers of review implemented by defendants Vought, OMB, Noem, and DHS.[16] On February 26 and 27, reports emerged that the logjam was finally breaking. A FEMA spokesperson told CNN that FEMA had "released over $5 billion in recovery funding for projects."[17] But the news reports, citing sources familiar with the matter, explain that four States will receive none of this $5 billion in new obligations: California, Colorado, Illinois, and Minnesota.[18] Data available on FEMA's public website confirms that, since February 27, hundreds of millions of dollars of hazard mitigation funds have been obligated to many States—but not Plaintiff States. Ex. 3 (Krajewski Decl.), ¶¶ 5–15. This latest development reflects that the Targeting Directive has commanded not only CDC and DOT but now also DHS—a recipient of the key emails, *see* Ex. 4 (Gaber Decl.)— to single out the same four States for disfavor, suspending new obligations to them.

---

[15] *See generally, e.g.*, Ex. 17 (Solberg Decl.); Ex. 18 (Duncan Decl.); Ex. 14 (Brockway Decl.); Ex. 19 (O'Dea Decl.); Ex. 13 (McMahon Decl.); Ex. 15 (Lakhchaura Decl.); Ex. 16 (Strife Decl.).

[16] Under the FEMA funding process, the disaster declaration makes recipient and sub-applicants potentially eligible for funding, but FEMA does not incur any obligation until all reviews are complete. Ex. 20 (Kuetemeyer Decl.), ¶ 7.

[17] Gabe Cohen, *The Trump administration is about to release billions in disaster aid. Several blue states won't be included*, CNN (Feb. 26, 2026), https://www.cnn.com/2026/02/26/politics/disaster-aid-fema-states-trump-shutdown.

[18] Rachel Frazin, *FEMA releasing billions in disaster assistance, while further funds await approval*, The Hill (Feb. 27, 2026), https://thehill.com/policy/energy-environment/5759529-billions-in-fema-funds-awarded/.

### III. LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must "demonstrat[e] a likelihood of success on the merits and a likelihood of irreparable harm in the absence of preliminary relief." *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 471 (7th Cir. 2024) (cleaned up). The plaintiff must also show "that the balance of equitable interests tips in favor of injunctive relief." *Id.* This inquiry requires a court to "consider both the public interest as well as the competing harms that would flow to the parties from a grant or denial of the requested injunction." *Id.* (cleaned up). The Seventh Circuit employs a "sliding scale" approach to this balancing: "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up). The APA also allows courts to stay agency action to "prevent irreparable injury." 5 U.S.C. § 705. This standard mirrors the preliminary injunction standard. *See Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

### IV. ARGUMENT

Preliminary injunctive relief is warranted and necessary here to protect Plaintiff States against the devastating effects of more than $3 billion in unlawful and unjustified funding terminations and freezes, imposed in retaliation for Plaintiff States' sovereign policy choices regarding cooperation with federal immigration enforcement. As a threshold matter, the Court has jurisdiction to adjudicate Plaintiff States' claims against OMB's cross-agency Targeting Directive, as the Tucker Act applies only to statutory claims against completed grant terminations—which describes none of the claims here. On the merits, Plaintiff States are likely to succeed in showing that the Targeting Directive is arbitrary and capricious, exceeds defendants' statutory authority, violates the separation of powers by arrogating to the executive branch the power of the purse, and violates the Spending Clause by imposing retroactive and unrelated conditions on grant funds. The

balance of harms and the equities also favor an immediate injunction to protect Plaintiff States, their residents, and the constitutional order.

**A.      Plaintiff States are likely to succeed on the merits.**

**1.      The Court likely has jurisdiction over Plaintiff States' claims.**

At the threshold, the Court likely has jurisdiction over this statutory and constitutional challenge to an internal agency policy. *See NIH v. Am. Pub. Health Ass'n* ("*APHA*"), 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (district court "likely" correct in holding it had "jurisdiction to entertain an APA challenge" to internal agency guidance); *see also Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017) (district court may resolve a motion for a preliminary injunction "without making a conclusive decision about whether it has subject matter jurisdiction"). In addition, the Tucker Act does not apply for multiple other reasons: Plaintiff States bring non-APA constitutional claims; much of this case does not even concern grant terminations; and even the CDC grant terminations were not effectuated until after the complaint was filed.

**a.      The Tucker Act does not apply to this challenge to an agency policy.**

The Tucker Act does not apply here. The Tucker Act gives the Court of Federal Claims exclusive jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States" exceeding ten thousand dollars. 28 U.S.C. §§ 1491(a)(1), 1346(a)(2). There is a jurisdictionally dispositive distinction between contract claims governed by the Tucker Act and challenges to internal agency policies like this one, which remain subject to this Court's review. *See APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring); *Columbus Reg'l Hosp. v. FEMA*, 708 F.3d 893, 896 (7th Cir. 2013). Relevant here, the fact that the challenged policy "relate[s] to grants does not transform a challenge to that [policy] into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear." *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). Indeed, in *APHA*, the Court concluded that the lower

14

court could exercise jurisdiction over claims challenging guidance documents outlining a policy that the National Institutes of Health would no longer fund research grants on certain topics. *Id.*

Here, Plaintiff States' claims track the challenges to general agency policies that the Court in *APHA* allowed to proceed in district court. The Targeting Directive issued by OMB established an across-the-board, prospective policy that strips funding from disfavored States as retaliation for unrelated policies. *See, e.g.*, OMB_000021 (OMB Chief of Staff ordering HHS to "send a list" and offering "further instruction"); OMB_000023 (OMB Deputy Director order to "each agency" to "outline" actions it will take); CDC_001419 (HHS to OMB promising that "[w]e are ready to execute once direction, and approval is given"). Plaintiff States' claims are focused on that Directive, a final agency action, not on the individual terminations resulting from the Directive.

That result also follows longstanding Tucker Act precedent, which the Seventh Circuit has cited favorably, explaining that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see Evers v. Astrue*, 536 F.3d 651, 657–58 (7th Cir. 2008).

First, the sources of Plaintiff States' rights are statutory and constitutional; they allege no breach of contract or right to sue based on any contract. Indeed, Plaintiff States invoke their rights under the APA to challenge "arbitrary and capricious action," "action in excess of statutory authority," action violating "separation of powers principles," and action violating "the Constitution's Spending Clause," which are "precisely the type[s] of claims that belong" in this Court. *See Colorado v. HHS*, 788 F. Supp. 3d 277, 296 (D.R.I. 2025); 5 U.S.C. § 706; *Columbus Reg'l Hosp.*, 708 F.3d at 896–97 (APA and constitutional claims seeking prospective relief "may proceed in a district court" rather than the "Court of Federal Claims"). Even the limited record

produced so far confirms that Plaintiff States' claims do not depend on "what [a] contract requires or forbids." *MTA v. Duffy*, 2026 WL 588117, at *31 (S.D.N.Y. Mar. 3, 2026). Only *after* defendants compiled a list of grants to terminate did they use AI to backfill justifications based on grant documents. CDC_001264, 1314, 1427. Plaintiff States' challenge to the Targeting Directive requires analyzing the process that led to that selection, not the grants themselves.

That the Targeting Directive might affect some contracts between Plaintiff States and the federal government does not change this conclusion. The relevant question is whether Plaintiff States have filed suit *on* a contract, not whether the case *involves* contracts. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) ("[W]e do not think that any case requiring some reference to . . . a contract is necessarily on the contract and therefore directly within the Tucker Act.") (cleaned up). Indeed, in *APHA*, the Court allowed challenges to agency guidance, notwithstanding that those policies would have affected the plaintiffs' contracts by, for example, terminating funding for certain research areas. *See* 145 S. Ct. at 2661 (Barrett, J., concurring).

Second, Plaintiff States do not seek a contract remedy, such as money damages. Instead, they seek equitable and statutory remedies: a § 705 stay of the Targeting Directive and declaratory and injunctive relief prohibiting its implementation. *See infra* p. 30. And the possibility that such relief would have downstream consequences for certain contracts in Plaintiff States does not transform this case into one for money damages. *See APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring); *see also Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"); *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (a claim does not become one for money damages merely because it "may obligate the United States to pay the complainant"). When an agency issues an unlawful funding policy, a district court may

16

enjoin the agency from taking "steps to implement, apply, or enforce" that policy. *Massachusetts v. NIH*, 164 F.4th 1, 6 (1st Cir. 2026). Here, forbidding defendants from implementing the Targeting Directive would be "injunctive relief," not "monetary relief from the federal government." *See Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 981 (N.D. Ill. 2025).

For that reason, retrospective monetary relief in the Court of Federal Claims would not offer Plaintiff States an "adequate remedy" under § 704 of the APA, contrary to defendants' assertion. ECF 43-1 at 3. For one thing, the APA's "adequate remedy bar" under § 704 only "determine[s] whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction." *Crowley Gov't Servs., Inc. v. GSA*, 143 F.4th 518, 527 (D.C. Cir. 2025) (cleaned up). So this is not even a jurisdictional argument. In any event, because Plaintiff States "do not seek contractual relief, . . . APA review is an appropriate remedy for [their] claims." *Ass'n for Educ. Fin. & Policy, Inc. v. McMahon*, 2026 WL 523023, at *10 (D.D.C. Feb. 25, 2026); *Council for Opportunity in Educ. v. DOE*, 2026 WL 120984, at *9 (D.D.C. Jan. 16, 2026) (rejecting agency's attempt to "repackage[ ] its Tucker Act challenge" as argument that "adequate alternative remedies" existed).

### b. This case is not a statutory challenge to enforce past-due grant obligations.

But even setting all of the above to one side, this Court has jurisdiction for multiple other reasons as well. First, Plaintiff States' constitutional claims in the Court's equitable jurisdiction, ECF 51 at 43–47, do not implicate the Tucker Act at all. The Court of Federal Claims cannot grant prospective relief and generally cannot adjudicate constitutional claims.[19] *Chi. Women in Trades*,

---

[19] None of Plaintiff States' constitutional claims fall within the narrow category of "money-mandating constitutional claims," such as Takings Clause claims, over which the Court of Federal Claims has jurisdiction. *See Stephens v. United States*, 165 Fed. Cl. 341, 348 (Ct. Cl. 2023) (Tenth Amendment not money mandating); *Tasby v. United States*, 91 Fed. Cl. 344, 346 (Ct. Cl. 2010) (same as to separation of powers); *S.F. Unified Sch. Dist. v. AmeriCorps*, 784 F. Supp. 3d 1280, 1294 (N.D. Cal. 2025) (same as to Spending Clause).

778 F. Supp. 3d at 982. Thus, because Plaintiff States "seek prospective relief" requiring defendants to comply with the Constitution, "the Court of Federal Claims, if confronted with" Plaintiff States' constitutional claims, "could not 'fully adjudicate'" them. *Pres. & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 106–07 (D. Mass. 2025) (quoting *APHA*, 145 S. Ct. at 2661 n.1 (Barrett, J., concurring)). This Court has "jurisdiction over constitutional claims" regardless of whether they "arise from a contractual relationship with the government." *City of St. Paul v. Wright*, 2026 WL 88193, at *4 (D.D.C. Jan. 12, 2026).

Second, the record already shows that the Targeting Directive extends far beyond grant terminations. The attempted CDC terminations were just the first stage of the Targeting Directive's implementation. *Supra* pp. 10–12. For example, delayed FEMA disaster aid is being released to all States except Plaintiff States. *Supra* p. 12. And, due to the nature of DOT funding processes, *see supra* p. 11, Plaintiff States have no obligated grant agreements for the funds at risk there, meaning they would have no cause of action in the Court of Federal Claims. Plaintiff States' requested relief thus would not "compensate" them for grant cancellations but rather restore the status quo, "clarify future obligations as to [their] rights," and protect them from "future harm." *Am. Acad. of Pediatrics v. HHS*, 2026 WL 80796, at *11 (D.D.C. Jan. 11, 2026). Such relief "provides value independent of any funds paid," specifically the ability for Plaintiff States to carry out federally funded programs "without fear of arbitrary and abrupt termination." *See id.*

Third, no grant terminations had even occurred when this case was filed on February 11. So none of Plaintiff States' claims, constitutional or statutory, seek "to compel the payment of money past due under a contract." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002). "[J]udicial authority depends on the state of affairs when a case begins," not "how things turn out." *Bush v. United States*, 100 F.4th 807, 812 (7th Cir. 2024); *see Wild v. Subscription*

18

*Plus, Inc.*, 292 F.3d 526, 528 (7th Cir. 2002) (jurisdiction determined "as of the date of the filing of the suit"). Once a district court gains jurisdiction, that jurisdiction "is not defeated by subsequent events." *Chi. Typographical Union v. Chi. Sun-Times, Inc.*, 935 F.2d 1501, 1508 (7th Cir. 1991). Otherwise, parties could never be certain they are "before a tribunal" capable of "render[ing] judgment in their case." *Id.* Because Plaintiff States brought this action on February 11, the day before any grant terminations took effect, this suit does not challenge "grant terminations" that "already happened." *City of Chi. v. DHS*, 2025 WL 3043528, at *11 (N.D. Ill. Oct. 31, 2025).

### 2. The Targeting Directive is arbitrary and capricious.

The APA directs that "arbitrary" or "capricious" agency action be "[held] unlawful and set aside." 5 U.S.C. § 706(2)(A). An action can be arbitrary and capricious for many different reasons, including if the agency fails to "set forth its reasons for decision," *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up); changes course without considering reliance interests, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); relies on "contrived" explanations, *Dep't of Com. v. New York*, 588 U.S. 752, 784 (2019); or bases its decision in bias or partisanship, *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020). Each of these flaws is present here, and so the Targeting Directive is unlawful multiple times over.

At the threshold, the Targeting Directive is final agency action subject to challenge under the APA. 5 U.S.C. § 704. The core requirements for final agency action are that the action "mark the consummation of the agency's decisionmaking process" and be one "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation omitted). The Supreme Court takes a "pragmatic approach . . . to finality," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016), and courts may "infer[] from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 237 n.7 (S.D.N.Y. 2020). Plaintiff States have, rapidly

and in exigent circumstances, developed an ample record that OMB implemented a policy to target them with punishing funding cuts. In one particularly telling email, the OMB Chief of Staff described the coming funding cuts, which obviously constitute legal consequences, as "implementation" work for some prior (redacted) decision. OMB_000026–27. The decision has been made; both elements of the *Bennett* test are thus met. And the Targeting Directive is no less final merely because it will be implemented in various ways at the many agencies to which it was directed—through grant terminations, funding freezes, and other punishments yet to be revealed. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (memorandum directing agency employees to "take all appropriate steps" to terminate program was final agency action).

Perhaps most obviously, this final agency action is unlawful because it was undertaken with no legitimate or public explanation. Indeed, defendants have made no attempt to offer *any* explanation for the Targeting Directive or the States selected for retaliatory cuts; they have declined to admit that it even exists. *See, e.g.*, ECF 43-1 at 1 (questioning "the existence of a so-called 'Targeting Directive'"). This failure to articulate any rationale whatsoever renders the Targeting Directive per se arbitrary and capricious. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) (action is arbitrary and capricious where party is "compelled to guess at the theory").

Further, and related to this failure of transparency, defendants have changed course without satisfactory reasoning and without demonstrating that they considered Plaintiff States' "serious reliance interests." *Regents of the Univ. of Cal.*, 591 U.S. at 30, 33; *see also Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (holding that, where an agency "determined that [a] grant was the best way to fulfill the purposes of" a program, then "[i]n rescinding that determination, the [agency is] clearly compelled to give adequate reasoning for the dramatic change of course").

CDC's post-hoc, AI-generated "agency priorities" explanation for grant terminations made

20

pursuant to the OMB Targeting Directive is yet another reason the Targeting Directive is arbitrary and capricious, because such after-the-fact "contrived" explanations cannot be reasoned decisionmaking. *Dep't of Com.*, 588 U.S. at 784. In *Department of Commerce*, the Supreme Court held that the APA had been violated where agency decisionmakers "saw it as [their] task to 'find the best rationale'" for a decision that had already been made—but at least there, the task of cooking up an *ex post* excuse was assigned to a human being. *Id.* at 783. In this case, defendants fed a pre-set list of Plaintiff States' grants into an AI model with outcome-determinative instructions to "compile the strongest evidence to support termination." ECF 44-3 at 147 (CDC_000147). The flawed prompt led, unsurprisingly, to absurd results, such as month-old grants deemed no longer compatible with priorities they presumably served just weeks before. *E.g.*, Ex. 7 (Calonge Decl.), ¶ 28; Ex. 10 (Fanelli Decl.), ¶ 13, Ex. A.

In any event, the reason why there is no legitimate basis for the Targeting Directive in any document produced by defendants is because there is none. Instead, defendants' public statements and course of conduct reveal that the Targeting Directive was either motivated by partisan prejudice or animus toward Plaintiff States' policies regarding civil immigration enforcement. When the President says that he will cut off funding to sanctuary jurisdictions, and then such funding cuts follow, and internal emails are citing "the President's priorities," OMB_000021, the Court can draw the obvious inference. *E.g.*, *Illinois v. Noem*, 2025 WL 3707011, at *12 (at summary judgment, rejecting DHS's argument that it did not consider "sanctuary designation policy considerations" in cutting funds). "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that . . . work a violation of the arbitrary-and-capricious standard." *Level the Playing Field*, 961 F.3d at 464 (quotation marks omitted). Defendants have articulated no "rational connection between" Plaintiff States' policies around cooperation with

federal immigration enforcement, on the one hand, and public health, disaster relief, or electric vehicle charging and traffic safety on the other—nor could they. *See Dep't of Com.*, 588 U.S. at 773 (stating an agency must articulate "a rational connection between the facts found and the choice made" (quoting *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, OMB's Targeting Directive to cut funds to Plaintiff States based either on partisanship or those unrelated immigration policies is arbitrary and capricious agency action, in violation of the APA.

**3.      The Targeting Directive exceeds defendants' statutory authority.**

The administration is either conditioning billions of dollars of funding on compliance with its unrelated immigration-policy preferences, or depriving States of the same based on nothing more than arbitrary animus. Either possibility exceeds defendants' statutory authority. Further, defendants have no statutory authority to force the impoundment of appropriated funds through the mass cancellation or freezing of awards.

Federal agencies are "charged with administering congressional statutes," meaning "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). This requirement applies with special force to appropriations statutes. *See Learning Resources v. Trump*, 607 U.S. _, 2026 WL 477534, at *8 (2026) (explaining that the requirement for Congress to delegate clearly "appl[ies] with particular force where . . . the purported delegation involves the core congressional power of the purse"); *Clinton v. City of New York*, 524 U.S. 417, 448 (1998) (line-item veto of budget lines held unconstitutional). Congress, not the President, has the authority to dictate how the funds it appropriates are spent. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd*, 601 U.S. 416, 431 (2024).

In this case, Congress has directed that money be spent on public health, transportation, and disaster recovery. "When Congress limits the purpose for which a grant can be made, it can

be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, *rather than taking irrelevant or impermissible factors into account*." *Robbins*, 780 F.2d at 48 (emphasis added). Some of the statutes at issue command the agency to allocate specific funds to each State. *See, e.g.*, 42 U.S.C. § 300w-1 (Preventative Health and Health Services Block Grant). It is especially clear that defendants lack authority to condition or withhold federal funds under such "formula" programs. *City of Chi. v. Barr*, 961 F.3d at 906. Other programs confer some discretion about where to direct the funds, but Congress has still specified purposes for them. *E.g.*, 42 U.S.C. § 247b ("establishing and maintaining preventive health service programs"); *id.* § 5170c ("reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster"); 49 U.S.C. § 6701(d), (f) (eligible transportation projects selected by statutory criteria). So, even though the agencies retain some discretion in allocating funds, they must exercise that authority within the parameters set by Congress.

Even at this preliminary stage, the factual record shows, for one, that the Targeting Directive exists. *See supra* pp. 6–8. And it shows that the Directive has imposed cross-agency cuts and freezes based on Plaintiff States' refusal to cooperate with federal immigration enforcement, general political animus, or both. *See, e.g.*, ECF 44-3 at 132, 137 (CDC_0000132, 137) (HHS and CDC funding priorities related to immigration); *supra* p. 6 (the President's repeated statements in January 2026 that "sanctuary" jurisdictions were about to be targeted). Neither immigration enforcement nor political animus is remotely related to the goals set forth by Congress in the authorization statutes, so cancelling or freezing access to funds based on those unrelated interests is unlawful. *See Robbins*, 780 F.2d at 48 ("It would clearly be impermissible, for example, for the agency to rescind a commitment because it develops personal animus toward the original recipient

23

. . . ."); *State Hwy. Comm'n v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (an agency could not withhold federal highway funds in furtherance of an unrelated goal—combating inflation).

In addition, defendants may not cancel portions of congressional appropriations by terminating or freezing awards. Congress set the amount of money to be spent per program in the relevant appropriations laws when it omitted any discretionary language from the text of those laws. *See* Pub. L. No. 118-47, 138 Stat. at 653–54; *Train v. City of New York*, 420 U.S. 35, 43–44 (1975). At the agency level, even CDC agrees, reminding OMB in its Budget Data Request submission that the FY 2024 appropriation "set[] a cap *and a floor*" for its budget on each program it administers. *See* Ex. 3 (Krajewski Decl.) ¶ 4, Ex. A (CDC_001297) (emphasis added). Yet defendants' cuts and freezes include monies that already have or will soon expire, impossible to re-obligate to new recipients. *See* 31 U.S.C. § 1301(c)(2) (default is that appropriation is available for one fiscal year); 23 U.S.C. § 118(b) (three years for highway-aid funds). By cancelling or indefinitely holding Plaintiff States' awards, defendants would wipe away funding Congress intended to be spent on public health and infrastructure and thereby violate the appropriation statutes setting the required funding levels.

### 4. Defendants' actions violate the Constitution.

Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). The President's actions may be reviewed for their constitutionality. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). So "the availability of an APA cause of action" does not "foreclose[] other causes of action," such as constitutional claims in equity. *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019).

### a. Defendants' actions violate the separation of powers.

The Targeting Directive and defendants' implementing actions to withhold funding to

24

Plaintiff States due to their so-called status as "sanctuary jurisdictions" violate the separation of powers because, as explained, *supra* pp. 2–4, 22–23, Congress has not delegated the authority to spend less than what was appropriated—for any reason let alone those reasons. The Constitution delineates a separation of powers between the executive and legislative branches. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). It vests in Congress all legislative powers and prescribes a specific procedure by which laws may be enacted, U.S. Const. art. I, §§ 1, 7, cls. 2, 3, and similarly gives Congress "control of the purse," *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). And the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

The Targeting Directive transgresses all these limits on executive branch power by terminating grants, rewriting authorization statutes, and ultimately withholding appropriations to "pursue the policy objectives of the executive branch through the power of the purse." *City of Chi. v. Barr*, 961 F.3d at 887. None of the statutes that dictate the objectives and requirements of these grant programs authorize executive action based on disagreement with the President's immigration policies or partisan leanings. *See supra* pp. 2–4. Nor does the President have "'exclusive' and 'conclusive'" power on this issue. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)). On the contrary, the President has "none of his own constitutional powers to rely upon when it comes to spending." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) (cleaned up). So the Targeting Directive violates the separation of powers.

**b.** **Defendants' actions violate the Spending Clause.**

Plaintiff States are also likely to succeed on their Spending Clause claims. The Spending Clause requires "clear notice" of conditions and prohibits "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1,

25 (1981). "Respecting this limitation" that a "State voluntarily and knowingly accepts" conditions on federal funds is critical to protecting "the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (quoting *Pennhurst*, 451 U.S. at 17). Funding conditions must similarly be germane—i.e., "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992).

Defendants violated the Spending Clause by surreptitiously imposing post-acceptance, non-germane immigration conditions on all funding via the Targeting Directive. As explained, *supra* p. 8, the decision to cut funding was made by the President and OMB to punish four States based on their sovereign choices, in particular regarding the use of state resources for immigration enforcement. Non-targeted States continue to receive the same grants for materially identical purposes, *see e.g.*, Ex. 7 (Calonge Decl.), ¶¶ 34, 40; Ex. 9 (Underwood Decl.), ¶ 13; making clear that the real reason for the action was to make an example of Plaintiff States for failing to accede to the President's demands regarding immigration enforcement. Even if such an "immigration cooperation" condition were lawful (which it is not, *see Illinois v. FEMA*, 801 F. Supp. 3d 75), defendants provided no notice at the time of acceptance that funding could be terminated for this reason. That violates the Spending Clause's prohibition on retroactive conditions.

Defendants may argue, as they have before, that the applicable spending conditions here are the "agency priorities" conditions that Plaintiff States purportedly accepted with regard to a subset of the targeted grants at CDC. *See* ECF 43-1 at 30. But those conditions are irrelevant, because the challenged action here is not that subset of CDC grant terminations, but rather the overarching Targeting Directive. Moreover, even if the CDC "agency priorities" condition were at issue here—which it is not—it, too, is an unlawful retroactive condition that did not apply to most CDC awards when they were issued. *Compare* 89 Fed. Reg. 80055 (Oct. 2, 2024) (new OMB

regulations adopted as of October 1, 2025), *with* 45 C.F.R. § 75.372 (2025) (listing grounds for termination that do not include changes in "agency priorities"). Neither did any Plaintiff State accept the "agency priorities" condition after the fact.[20] So any attempt to apply it to this case would be an independent Spending Clause violation. *See* ECF 51 ¶ 204.

Finally, the administration's demand for state submission to federal immigration enforcement goals is also wholly unrelated to the purposes of the expenditures the Targeting Directive threatens, and unlawful for that independent reason. The cuts announced thus far relate to public health, transportation infrastructure, and disaster relief, not immigration enforcement. By foisting this impermissible retroactive and non-germane funding demand on Plaintiff States—to give up their sovereignty or risk devastating cuts—defendants have violated the Spending Clause.

## B.    The equities compel preliminary injunctive relief.

Absent preliminary relief, the Targeting Directive would inflict irreparable harm on Plaintiff States' independent role in our system of dual sovereignty. The invasion of state sovereignty "cannot be economically quantified" and thus constitutes irreparable harm. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quotation omitted); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). Irreparable harm would also redound to Plaintiff States' public health systems, critical transportation infrastructure, and disaster recovery efforts. *See, e.g.*, *Wolf*, 962 F.3d at 234 ("potentially dire public health consequences" constitute irreparable harm). In contrast, defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Accordingly, the balance of harms tips decisively in Plaintiff States' favor.

---

[20] Ex. 5 (Thoele Decl.), ¶ 29, Ex. A; Ex. 7 (Calonge Decl.), ¶ 71, Ex. B–D; Ex. 9 (Underwood Decl.), ¶¶ 15 (Ex. B–C), 41 (Ex. J–K); Ex. 10 (Fanelli Decl.), ¶¶ 16, 53.

At the outset, Plaintiff States' public health infrastructure will be devastated if CDC implements the Targeting Directive as planned. Plaintiff States cannot replace more than $600 million in critical public health funding; thus, the announced cuts would leave their public health systems with less staff and poorer equipment, putting patients' health and lives at risk. The loss of PHIG funding alone, which funds public health infrastructure and hundreds of public health jobs in Plaintiff States, *see supra* n.1, demonstrates this irreparable harm. Illinois, for instance, uses PHIG funds to pay disease surveillance teams and support emergency preparedness work. *See* Ex. 5 (Thoele Decl.), ¶¶ 34–36. Similarly, California uses PHIG funds to address dangerous cyanobacteria blooms, and to pay experienced epidemiologists to mentor junior staff. *See* Ex. 10 (Fanelli Decl.), ¶¶ 14, 62. The loss of PHIG funding would undermine similar critical efforts in all Plaintiff States,[21] and the same is true for the other threatened public health grants.[22]

The Targeting Directive's $943 million in transportation cuts would also inflict lasting harm by upending projects in which Plaintiff States have already heavily invested. Infrastructure projects like highways, bridges, and EV charging sites take years of planning and coordination once funding has been allocated. *See, e.g.*, Ex. 17 (Solberg Decl.), ¶ 22; Ex. 15 (Lakhchaura Decl.), ¶ 5; Ex. 18 (Duncan Decl.), ¶ 13. Plaintiff States, in reliance on DOT awards, have expended significant resources in planning and constructing these projects—work that would be delayed or cease altogether if funding is withheld. *See, e.g.*, Ex. 16 (Strife Decl.), ¶¶ 5–17; Ex. 13 (McMahon Decl.), ¶¶ 13–14, 22–23; Ex. 19 (O'Dea Decl.), ¶¶ 12, 25. Even if funding is later provided or

---

[21] *See* Ex. 5 (Thoele Decl.), ¶¶ 34–42; Ex. 7 (Calonge Decl.), ¶¶ 58–61; Ex. 9 (Underwood Decl.), ¶¶ 63–65; Ex. 10 (Fanelli Decl.), ¶¶ 14–15, 58–68; Ex. 6 (Ige Decl.), ¶¶ 15–19, 22–23; Ex. 8 (McGowan Decl.), ¶ 14–16; Ex. 11 (Ferrer Decl.), ¶¶ 22–23.

[22] *E.g.*, Ex. 5 (Thoele Decl.), ¶ 49 (termination of Viral Hepatitis Prevention blinds efforts to track epidemic impacting over 50,000 Illinoisans); Ex. 7 (Calonge Decl.), ¶ 67–69 (termination of High Impact HIV disrupts ability to prevent, detect, and treat HIV); Ex. 9 (Underwood Decl.), ¶ 67 (termination of PHHS eliminates support to 50 rural local public health departments); Ex. 10 (Fanelli Decl.), ¶ 70 (termination of CalBRACE impacts support to California Tribes to protect members against heat waves, wildfires, and floods).

restored, abandoned projects cannot simply pick up where they left off—and in the meantime, unsafe traffic conditions will persist, threatening public safety. *See, e.g.*, Ex. 14 (Brockway Decl.), ¶¶ 14, 17; Ex. 13 (McMahon Decl.), ¶¶ 14, 20–21; Ex. 18 (Duncan Decl.), ¶¶ 5–6, 12–13.

Additionally, the harm caused by FEMA's refusal to issue disaster recovery funds to Plaintiff States pursuant to the Targeting Directive is "real and not compensable." *See Illinois v. FEMA*, 801 F. Supp. 3d at 97–98. After a presidentially declared major disaster, Plaintiff States depend on FEMA funds for immediate search-and-rescue efforts and, later, the repair of damaged or dangerous infrastructure. *See, e.g.*, Ex. 20 (Kuetemeyer Decl.), ¶¶ 10, 17–21. The Plaintiff States together have more than 20 active or pending disaster awards totaling billions of dollars,[23] and Plaintiff States' need for these funds is particularly acute and time-sensitive: new disasters could strike at any time, and under-funded responses could lead directly to loss of human life. *See, e.g.*, Ex. 22 (Farole Decl.) ¶¶ 16–17, 22; Ex. 23 (Fennig Decl.) ¶¶ 17, 20.

Finally, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up). And the public has a strong reliance interest in preserving federal funds that support life-saving public health programs, infrastructure projects, and disaster recovery. *See Camelot Banquet Rooms, Inc. v. SBA*, 24 F.4th 640, 644 (7th Cir. 2022) (public interest "takes into account the effects of a decision on non-parties.").

**C.    If relief is denied, the Court should grant a short-duration injunction pending appeal.**

If relief is denied, Plaintiff States request a limited 14-day injunction pending appeal to afford them a chance to seek relief from the sudden and irreparable harm that will befall them upon

---

[23] California has 22 active or pending disaster awards totaling over $2.8 billion, Ex. 23 (Fennig Decl.), ¶¶ 8-9, Colorado has 5 active or pending disaster awards totaling nearly $2.3 billion, Ex. 21 (Haney Decl.), ¶¶ 8–9, Illinois has 7 active or pending disaster awards totaling over $2.4 billion, Ex. 20 (Kuetemeyer Decl.), ¶¶ 8-9, and Minnesota has 9 active or pending disaster awards totaling over $175 million, Ex. 22 (Farole Decl.), ¶¶ 7–8.

dissolution of the TRO. *See* Fed. R. Civ. P. 62(d); Fed. R. App. P. 8(a)(1)(C). Plaintiff States have "a good enough case on the merits for the balance of harms to entitle [them] to an injunction pending an expedited appeal that will enable the merits to be fully briefed and argued." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 549 (7th Cir. 2007).

## V. CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court:

1.      Preliminarily enjoin and enter a 5 U.S.C. § 705 stay of the Targeting Directive;

2.      Enjoin defendants (except for the President) against implementing the Targeting Directive by suspending, canceling, or terminating the CDC grants noticed to Congress on February 9, the CDC grants noticed to Congress on February 11, the $943 million in DOT grants identified by defendants for suspension or termination, and all requested obligations under Stafford Act programs and the Flood Mitigation Assistance program, as to plaintiffs, including their instrumentalities, subdivisions, and bona fide fiscal agents of the same;

3.      Enjoin defendants (except for the President) against implementing the Targeting Directive or any other materially similar order, memorandum, or practice under which Vought, OMB, or the President directs federal agencies to subject plaintiffs to targeted action by suspending, canceling, terminating, or otherwise impeding access to federal funds by plaintiffs, including their instrumentalities, subdivisions, and bona fide fiscal agents of the same; and

4.      Require written notice of the Court's order to defendants, their officers, agents, employees, and any other persons in active concert or participation with them in the award and disbursement of federal funds to plaintiffs; and

5.      Direct defendants to file a notice within seven days of the Court's order of their compliance with the order.

Dated: March 6, 2026

**ROB BONTA**
*Attorney General of California*

By: */s/ Harald H. Kirn*
R. MATTHEW WISE*
KATHLEEN BOERGERS
*Supervising Deputy Attorneys General*
HARALD H. KIRN
CHRISTOPHER KISSEL*
CARTER JANSEN*
DAVID GREEN*
*Deputy Attorneys General*
California Office of the Attorney General
1300 I Street
Sacramento, CA 95814
916-210-6111
Harald.Kirn@doj.ca.gov
Christopher.Kissel@doj.ca.gov
Carter.Jansen@doj.ca.gov
David.Green@doj.ca.gov

*Counsel for the State of California*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ R. Henry Weaver*
CARA HENDRICKSON
*Executive Deputy Attorney General*
KATHARINE ROLLER
*Complex Litigation Counsel*
SARAH HUNGER
*Deputy Solicitor General*
MATTHEW FREILICH
SHERIEF GABER
MOLLY MAUCK
AKANKSHA SHAH
R. HENRY WEAVER
BRIANNA YANG
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov
Sarah.Hunger@ilag.gov
Sherief.Gaber@ilag.gov
Molly.Mauck@ilag.gov
Robert.Weaver@ilag.gov

*Counsel for the State of Illinois*

**PHILIP J. WEISER**
*Attorney General of Colorado*

By: */s/ David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
SARAH H. WEISS
*Senior Assistant Attorney General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**\* Pro Hac Vice Forthcoming**

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/ Katherine Bies*
KATHERINE BIES
ED STOCKMEYER
*Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
Ed.Stockmeyer@ag.state.mn.us

*Counsel for the State of Minnesota*