**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*, | |
| Plaintiffs, | |
| v. | No. 26-cv-1566 |
| RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget, *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 2

Legal Standard ................................................................................................................. 7

Argument .......................................................................................................................... 7

I.     The Court Of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims ........... 8

     A.     Plaintiffs Have An Adequate Remedy In The Court Of Federal Claims ............... 8

          1.     Plaintiffs' grant agreements are contracts with the United States ............. 9

          2.     The contracts are enforceable with money damages ............................... 11

          3.     Plaintiffs' claims ultimately seek monetary reward specified in the contracts ...................................................................................................... 11

     B.     The Tucker Act Impliedly Precludes Relief ....................................................... 14

II.     Plaintiffs Are Unlikely To Succeed On The Merits ........................................................ 17

     A.     Plaintiffs Do Not Challenge Final Agency Action ............................................. 18

     B.     Plaintiffs Seek To Challenge Actions Committed To Agency Discretion By Law ............................................................................................................... 20

     C.     Plaintiffs' Statutory Authority Claim Fails ........................................................ 22

     D.     Plaintiffs' Arbitrary And Capricious Claim Fails ............................................... 23

     E.     Plaintiffs' Constitutional Claims Likewise Fail .................................................. 25

          1.     Plaintiffs' Separation of Powers Claim Fails ......................................... 26

          2.     Plaintiffs' Spending Clause Claim Fails ................................................ 26

III.     Plaintiffs' Cannot Show Irreparable Harm .................................................................... 27

IV.     The Public Interest And Balance Of The Equities Weigh Against Injunctive Relief ....... 28

V.     The Court Must Order Security And Should Not Grant Any Further Relief .................... 29

Conclusion ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Am.Pub. Health Ass'n v. NIH*,
No.1:25-CV-10787-WGY, 2025 WL 1747128 (D. Mass. June 23, 2025) ................................ 3

*Am. Pub. Health Ass'n v. NIH* ,
145 F.4th 39 (1st Cir. 2025) ............................................................................................ 15, 16

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967),
*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977) ...................... 23

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................................... 18, 19

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) .............................................................................. 10, 11, 12, 13

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ................................................................................................................. 28

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.*,
419 U.S. 281 (1974) ................................................................................................................. 24

*Brazos Elec. Power Coop., Inc. v. United States*,
144 F.3d 784 (Fed. Cir. 1998) ................................................................................................. 13

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................................. 29

*California v. U.S. Dep't of Educ.*,
769 F. Supp. 3d 72 (D. Mass. 2025) .......................................................................................... 3

*Castanon-Nava v. U.S. Dep't of Homeland Sec.*,
161 F.4th 1048 (7th Cir. 2025) ................................................................................................ 25

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ................................................................................................. 20

*Christopher Vill., L.P. v. United States*,
360 F.3d 1319 (Fed. Cir. 2004) ............................................................................................. 8, 9

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971),
*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977) ...................... 23

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...................................................................................................... 23

*Cmty. Action of Laramie Cnty., Inc. v. Bowen,*
866 F.2d 347 (10th Cir. 1989) ...................................................................................... 22

*Columbus Reg'l Hosp. v. United States,*
990 F.3d 1330 (Fed. Cir. 2021)........................................................................... 9, 10, 13

*Consol. Edison Co. of New York v. U.S. Dep't of Energy,*
247 F.3d 1378 (Fed. Cir. 2001)................................................................................. 9, 13

*Dalton v. Specter,*
511 U.S. 462 (1994) ................................................................................ 13, 14, 25, 26

*Dep't of Com. v. New York,*
588 U.S. 752 (2019)................................................................................... 23, 24, 25

*Dep't of Educ. v. California,*
604 U.S. 650 (2025) ............................................................................................ *passim*

*FAA v. Cooper,*
566 U.S. 284 (2012).......................................................................................................... 8

*FCC v. Fox TV Stations, Inc.,*
556 U.S. 502 (2009)...................................................................................................... 24

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021)...................................................................................................... 23

*Franklin v. Massachusetts,*
505 U.S. 788 (1992).................................................................................................. 19, 20

*Glob. Health Coun. v. Trump,*
153 F.4th 1 (D.C. Cir. 2025)..................................................................................... 14, 25

*Great-West Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002)...................................................................................................... 15

*Heckler v. Chaney,*
470 U.S. 821 (1985)...................................................................................................... 21

iii

*Holley v. United States*,
    124 F.3d 1462 (Fed. Cir. 1997) ............................................................................... 13

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ..................................................................................... 20, 21

*Loving v. United States*,
    517 U.S. 748 (1996) ......................................................................................... 26

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................... 19, 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ......................................................................................... 14

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ......................................................................................... 28

*McGee v. Mathis*,
    71 U.S. (4 Wall.) 143 (1866) ............................................................................ 10

*Mobil Oil Expl. & Producing Se., Inc. v. United Distrib. Cos.*,
    498 U.S. 211 (1991) ......................................................................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................... 23, 24

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) ............................................................................... *passim*

*Nat'l Kidney Patients Ass'n v. Sullivan*,
    958 F.2d 1127 (D.C. Cir. 1992) ........................................................................ 29

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................... 7

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................... 20

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ............................................................................................. 27

*Rocky Mountain Helium, LLC v. United States*,
    841 F.3d 1320 (Fed. Cir. 2016) ........................................................................ 11

*Sampson v. Murray,*
    415 U.S. 61 *n.68 (1974) ................................................................ 28

*San Juan City Coll. v. United States,*
    391 F.3d 1357 (Fed. Cir. 2004) ..................................................... 11

*Sanders v. United States,*
    252 F.3d 1329 (Fed. Cir. 2001) ..................................................... 11

*Sols. in Hometown Connections v. Noem,*
    165 F.4th 835 (4th Cir. 2026) ......................................... 16, 17, 25

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ....................................................................... 27

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
    480 F.3d 1116 (Fed. Cir. 2007) ...................................... 8, 12, 13, 14

*Sustainability Inst. v. Trump,*
    165 F.4th 817 (4th Cir. 2026) ....................................................... 14

*Telecare Corp. v. Leavitt,*
    409 F.3d 1345 (Fed. Cir. 2005) ....................................................... 9

*Thakur v. Trump,*
    163 F.4th 1198 (9th Cir. 2025) ..................................................... 28

*Trump v. Boyle,*
    145 S. Ct. 2653 (2025) ................................................................... 15

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ....................................................................... 29

*United States v. Am. Libr. Ass'n, Inc.,*
    539 U.S. 194 (2003) ....................................................................... 26

*United States v. Goodwin,*
    457 U.S. 368 (1982) ....................................................................... 22

*United States v. Miller,*
    604 U.S. 518 (2025) ....................................................................... 15

*Wayte v. United States,*
    470 U.S. 598 (1985) ....................................................................... 21

v

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................................... 7

**U.S. Constitution**

U.S. Const. art. I, § 8, cl. 1 ................................................................................... 26

**Statutes**

5 U.S.C. § 551(13) ................................................................................................ 18

5 U.S.C. § 701(a)(2) ............................................................................................. 20

5 U.S.C. § 702 ................................................................................................. 14, 15

5 U.S.C. § 704 ................................................................................... 8, 17, 18, 19

5 U.S.C. § 706(2) .................................................................................................. 17

5 U.S.C. § 706(2)(B) ............................................................................................ 25

28 U.S.C. § 1292(d)(4)(B) ..................................................................................... 7

28 U.S.C. § 1491 ..................................................................................................... 1

28 U.S.C. § 1491(a)(1) .................................................................................... 3, 15

28 U.S.C. § 1631 ..................................................................................................... 1

42 U.S.C. § 5170 ..................................................................................................... 6

42 U.S.C. § 5191 ..................................................................................................... 6

**Rules**

Fed. R. Civ. Proc. 15(d) ........................................................................................ 8

Fed. R. Civ. Proc. 65 ............................................................................................ 29

**Regulations**

2 C.F.R. part 200 ................................................................................................................ 5, 10

2 C.F.R. § 200.340 ................................................................................................ 5, 10, 22, 27

2 C.F.R. § 200.340(a) ................................................................................................. 1, 2, 5, 22

2 C.F.R. § 200.340(a)(4) .................................................................................................... 22

2 C.F.R. § 200.340(b) .......................................................................................................... 5

**Executive Authorities**

Improving Oversight of Federal Grantmaking, Exec. Order No. 14332, Fed. Reg. 38,929 (Aug. 7, 2025) ............................................................................................................... 4, 17

Protecting the American People Against Invasion, Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ................................................................................................................ 16

## INTRODUCTION

On February 9, the Department of Health and Human Services ("HHS") notified Congress of the Centers for Disease Control and Prevention's ("CDC") intention to terminate various public health grants. Per their terms and conditions, these grants could "be terminated . . . if an award no longer effectuates . . . agency priorities." 2 C.F.R. § 200.340(a). Defendants notified Plaintiffs that this was the basis for the terminations three business days later, as Congress contemplated. Because Plaintiffs' claims sound in contract, the Court of Federal Claims ("COFC") has exclusive jurisdiction over this case under the Tucker Act. *See* 28 U.S.C. § 1491; *Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025); *Dep't of Educ. v. California*, 604 U.S. 650 (2025). Defendants therefore moved the Court to transfer this case to the COFC pursuant to 28 U.S.C. § 1631. ECF No. 43. Plaintiffs try to plead around these bedrock requirements by positing the existence of a so-called "Targeting Directive" allegedly issued by the Office of Management and Budget ("OMB"). Am. Compl., ECF No. 51 ¶ 2. But the Court should reject Plaintiffs' attempt to circumvent the requirements of the Tucker Act by pleading contract claims under another name.

Even if the Court had jurisdiction, Plaintiffs fall well short of their heavy burden to establish a right to the extraordinary relief of a preliminary injunction. Despite the production of a certified administrative record ("AR") and expedited jurisdictional discovery, they fail to identify any document setting out the so-called "Targeting Directive" they ask the Court to enjoin. Instead, they simply gesture at a smattering of emails that are entirely consistent with the unsurprising notion that OMB would coordinate with other agencies about grant terminations. Further, there is no logical connection between the hypothesized directive and the relief requested. Conspicuously absent from Plaintiffs' papers is any theory under which OMB could require CDC to terminate the

1

grants at issue. And they disregard that CDC conducted its own independent review of the grants at issue—the latest step in an agency-wide grants-review process begun months ago.

What is more, Plaintiffs fail to identify *any* final agency action, beyond CDC's decision to terminate CDC grants for inconsistency with CDC priorities, as reasonably explained in CDC's termination notices. Their addition of several new Defendants proves the point, as none is alleged to have taken a final agency action affecting Plaintiffs in the now month-plus that the "Targeting Directive" has supposedly existed. That is a clear sign that, at its core, this case is the sort of programmatic challenge—here, to inchoate and iterative conversations between OMB and grantmaking agencies—that the Supreme Court has made clear is not cognizable. In any event, decisions about how to allocate lump-sum appropriations are committed to agency discretion.

Even if Plaintiffs' claims were reviewable, they would fail. Defendants' decisions to terminate these awards were reasonable and reasonably explained—and, notably, Plaintiffs nowhere dispute that CDC rightly identified the terminated grants as inconsistent with agency priorities. Plaintiffs' attempts to dress up this contract dispute as a constitutional case fail at each turn. Finally, Plaintiffs fail to allege any cognizable irreparable harm, and the public interest and balance of the equities weigh against injunctive relief. Therefore, the Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

A "Federal award may be terminated. . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). These terms are typically incorporated into grants, which are in effect contracts.

This Administration has placed an increased focus on ensuring that Federal spending on discretionary grants is consistent with its priorities. In *Department of Education v. California*, 604 U.S. 650 (2025), the Department of Education issued termination letters explaining that "[i]t is a priority of the Department of Education to eliminate discrimination in all forms of education through the United States" and "this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in [DEI] initiatives." 769 F. Supp. 3d 72, 77 (D. Mass. 2025) (quoting Termination Letter). On appeal, the Supreme Court issued a stay explaining that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" 604 U.S. at 651 (quoting 28 U.S.C. § 1491(a)(1)).

Similarly, in *National Institutes of Health ("NIH") v. American Public Health Ass'n*, the NIH, which like CDC is a component of HHS, conducted a review of grants in light of the new Administration's goals and terminated various awards. No. 1:25-CV-10787-WGY, 2025 WL 1747128, at *1 (D. Mass. June 23, 2025). On appeal, the Supreme Court granted a stay "as to the District Court's judgments vacating the Government's termination of various research-related grants." *NIH*, 145 S. Ct. 2658. On remand, the Supreme Court explained that the district court would retain jurisdiction only over NIH's own "internal guidance documents" for how "the agency will not fund research related to DEI objectives, gender identity, or COVID-19" or "based on race." *Id.* at 2661 (Barrett, J., concurring); *see also id.* (describing documents as "internal agency guidance" and "internal policies related to grants"). The Court acknowledged but did not adjudicate "claims about the guidance," such as whether "NIH's guidance is final agency action." *Id.* at 2662.

3

HHS has published its 24 priorities. These include: ending illegal race discrimination; combatting gender ideology and protecting children; and ending taxpayer subsidies for illegal immigration. AR at 125-134. CDC's priorities are: (1) gold-standard science, trust, transparency, and credibility; (2) global leadership; (3) rapid, evidence-based responses to crises; (4) vaccine safety and efficacy research; (5) advancing understanding of Autism Spectrum Disorder, Neuro-Divergent Disorders, and Chronic Disease; (6) modernizing public health infrastructure and health data; (7) avoiding conflicts of interest; (8) immigration; (9) protecting life and the family; (10) ending disorder on America's streets; (11) gender ideology and protecting children; (12) deprioritizing diversity, equity, and inclusion (DEI); and (13) parental rights. AR at 135-138.

In August 2025, President Trump issued an Executive Order, titled "Improving Oversight of Federal Grantmaking," 90 Fed. Reg. 38,929 (Aug. 7, 2025), that directed agencies "to review discretionary grants to ensure that they are consistent with agency priorities and the national interest" through "coordination with OMB." *Id.* at 38,930, § 3. On January 20, 2026, OMB issued a budget data request "to collect a detailed spending report on Federal funds provided to entities in a select list of States . . . to better understand the scope of funding" and "to facilitate efforts to reduce the improper and fraudulent use of those funds through administrative means or legislative proposals to Congress." AR at 1245. Notably, this was merely a request for information and was not limited to the four Plaintiff States. AR at 1263.

As part of this process, HHS reviewed the grants principally at issue here, *see* Am. Compl. ¶ 1, using artificial intelligence (AI) to confirm whether there were specific examples of misalignment between language in recipients' grant-related documents and agency priorities. The AI was prompted to "[c]arefully read each grant application," "[i]dentify specific content that contradicts or fails to align with CDC priorities," "[e]xtract direct quotations from the application

that demonstrate the contradiction," and "[p]rovide precise citations (page number, section) where the contradictory contents appears."  AR at 139-47.

For each grant, CDC confirmed that the terms and conditions clearly specified termination provisions, consistent with 2 C.F.R. § 200.340(b).  The notices of award include the following two terms: (1) the award is subject to the applicable provisions of 2 C.F.R. part 200 after October 1, 2025; and (2) the award is subject to the termination provisions at 2 C.F.R. 200.340 starting on October 1, 2025 and that the recipient agrees that continued funding for the award is subject to a decision by the agency that the award continues to effectuate program goals or agency priorities. In each case, CDC considered whether a modification or partial termination of these awards could bring them into alignment with agency priorities.  But in each case, CDC determined that was not possible because it was an issue of agency priorities unrelated to the conduct of the recipient.  AR at 574-849.

CDC also considered the potential reliance interests of recipients, beneficiaries, and the public, as well as the potential impacts on public health and subrecipients.  But the agency determined that the continuation of a program not in alignment with HHS or CDC priorities justifies termination, despite these considerations.  In particular, the CDC concluded that reliance interests were outweighed by the agency's substantial interest in being able to effectively advance its current priorities through a smaller and more focused portfolio.  AR at 574-849.

CDC transmitted notification letters to the recipients of these grants effective February 11, 2026.  These letters explained that the agency was invoking its authority pursuant to the terms of the awards in accordance with 2 C.F.R. § 200.340(a)(4), identified the agency's current priorities published on its website, and communicated the agency's decision to adjust its discretionary award portfolio by terminating some of the program awards to better prioritize agency resources.  The

letters acknowledged that CDC may suspend, rather than immediately terminate, an award to allow the recipient to take appropriate corrective action before the agency makes a termination decision. But the agency determined that no corrective action was possible in these cases since no corrective action could align the awards with current agency priorities. AR at 850-1238.

In their amended complaint, Plaintiffs include claims against the Department of Transportation ("DOT"). Am. Compl. ¶ 6. Significantly, Plaintiffs do not challenge any final agency action but simply note that "DOT has simply failed to obligate funds" according to Plaintiffs' preferences. ECF No. 56 at 19; *see also id*. at 20 (speculating that affected programs may be "as varied as the Charging and Fueling Infrastructure program" and "Commercial Driver's License Program Implementation"). All relevant programs are discretionary.

As for DHS-FEMA, Plaintiffs vaguely allege that some funds have been obligated to certain States "but not Plaintiff States" as evidence that the so-called "Targeted Directive has commanded not only CDC and DOT but now also DHS . . . to single out the same four States for disfavor." ECF No. 56 at 20. But these threadbare allegations ignore the fact that FEMA Public Assistance, Hazard Mitigation Assistance Grants, and Flood Mitigation Assistance Grants are discretionary grant programs and any challenge is premature. To the extent Plaintiffs challenge denial of disaster declarations, those decisions rest solely with the President. 42 U.S.C. §§ 5170, 5191; *cf. Colorado v. Trump*, No. 1:25-cv-3428-RBJ, ECF No. 26 at 33 (D. Colo.) (suit by State of Colorado). As to the Building Resilient Infrastructure and Communities (BRIC) program, Plaintiffs brought a separate lawsuit challenging FEMA's alleged termination of BRIC. In that case, Plaintiffs contended the alleged termination of BRIC was a violation of the separation of powers, acknowledged that the alleged termination applied to all states and was unrelated to a

recipient's status as a sanctuary jurisdiction.  *Washington v. FEMA*, No. 1:25-cv-12006, ECF No. 1 at 19-23 (D. Mass.).

On February 11, 2026, Plaintiffs filed their Complaint, alleging that "[i]n early February, OMB issued a directive (the 'Targeting Directive') commanding agencies to cut funding to Plaintiff States, starting with more than $600 million in CDC public-health funding to Plaintiff States, with further cuts to come."  Compl. ¶ 2.  On February 12, the Court issued an opinion, ECF No. 20, and temporary restraining order ("TRO"), ECF No. 21, which it later extended through March 12.  ECF No. 35.  On February 23, Defendants produced a certified AR and moved to transfer.  ECF Nos. 43, 44.  On February 25, the Court instead granted expedited jurisdictional discovery and permitted Plaintiffs to amend their complaint.  ECF No. 50.  Plaintiffs have now amended their complaint, ECF No. 51, and, after waiting three weeks following entry of the TRO, moved for a preliminary injunction.  ECF No. 56.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The last two "factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

As a threshold matter, Plaintiffs' request for preliminary relief as to the new Defendants is improper.  Given Defendants' motion to transfer, the automatic stay should have remained in place and precluded amendment.  28 U.S.C. § 1292(d)(4)(B).  Further, Plaintiffs' amended complaint was improperly filed without leave, because it relies on new allegations postdating those in the

original complaint. Fed. R. Civ. P. 15(d). As such, any preliminary relief should not extend to new Defendants or post-dated claims.

Regardless, all Plaintiffs are unlikely to succeed on the merits, because this Court lacks jurisdiction. Even if this Court could hear Plaintiffs' claims, their APA challenge fails because they cannot identify any final agency action beyond CDC grant terminations (which are subject to COFC jurisdiction), any other alleged actions are committed to agency discretion by law, and the terminations were not arbitrary and capricious nor in excess of statutory authority. Plaintiffs' constitutional claims also fail because they fail to identify a waiver of sovereign immunity or any cause of action; they also fail under blackletter law. Finally, Plaintiffs cannot show irreparable harm, or that the public interest or balance of equities support injunctive relief.

## I.     The Court Of Federal Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims

To sue a federal agency or its officials, Plaintiffs must identify an express waiver of sovereign immunity and show that their claims fall within the waiver's scope. *FAA v. Cooper*, 566 U.S. 284, 290 (2012). Plaintiffs necessarily rely on the APA's waiver of sovereign immunity. Yet APA review is unavailable where there is an adequate remedy in another court, or if another statute impliedly precludes relief. Both are true here.

### A.   Plaintiffs Have An Adequate Remedy In The Court Of Federal Claims

Congress expressly limited APA review to situations where "there is no other adequate remedy in a court." 5 U.S.C. § 704. This bar is jurisdictional. *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1327 (Fed. Cir. 2004). The key question is "can the [COFC] provide an adequate remedy under the Tucker Act for the alleged wrong?" *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1125 (Fed. Cir. 2007). Here, the answer is "Yes." The Federal Circuit has long held that "[t]he availability of an action for money damages under

8

the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005). As a result, if a litigant can "sue the government for money damages in the Court of Federal Claims," it has "an 'adequate remedy' that precludes an APA waiver of sovereign immunity in other courts." *Christopher Vill.*, 360 F.3d at 1327 (quoting *Consol. Edison Co. of New York v. U.S. Dep't of Energy*, 247 F.3d 1378,1384 (Fed. Cir. 2001)).

In making this determination, courts ask three questions. First, is there a contract between the United States and Plaintiffs? Second, is that contract enforceable for money damages in the COFC? Third, does Plaintiffs' complaint, regardless of how it is framed, ultimately seek a monetary reward from the Government? If the answer to all three questions is yes, then the adequate remedy bar precludes reliance on the APA's waiver of sovereign immunity, and the COFC possesses jurisdiction.

### 1. Plaintiffs' grant agreements are contracts with the United States

Plaintiffs' grant agreements are contracts for purposes of the COFC. "[F]ederal grant agreements a[re] contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). The Federal Circuit has a four-part test for such a contract: "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Id.* at 1339. All are met here.

First, the "the language of the agreement[s] . . . speaks in terms of binding obligations." *Id.* These are explicit contracts awarding definite sums of money in exchange for services described in the application, subject to CDC's General Terms and Conditions, which are incorporated by reference. Similarly, regulations may provide additional evidence that the

contracting agency has expressed an intent to be bound. *See id.* Here, for example, the detailed regulations governing this program, promulgated by OMB, make clear that grant-making agencies intend to be bound by their agreements. *See* 2 C.F.R. part 200; *see also id.* § 200.340 (providing detailed procedures for termination when terms and conditions are violated, further evincing an intent to be bound).

Second, the awards were offers from HHS. *See Columbus Reg'l Hosp.*, 990 F.3d at 1339. They "evinced [the agency's] willingness to enter into a bargain and justified [the recipient's] understanding that its assent would consummate the bargain." *Id.* And "[a]cceptance was effected when the parties' authorized agents signed the agreement." *Id.* at 1339-40.

Third, consideration "turns on the conditions attached to [the agency's] grants." *Id.* at 1340. So long as the grantee "agreed to comply with an array of requirements" set by the terms of the agreement, consideration is satisfied. *Id.* Here, the terms and conditions of the awards set a variety of terms Plaintiffs are required to abide by. "The conditions attached to the [federal] grants constitute consideration because they imposed a variety of duties on [the grantee] in implementing the [grant] agreement." *Id.* And whether the bargaining lacked "haggling" is immaterial, as a "standard-form agreement" satisfies consideration as well as any bespoke contract would. *Id.*

Finally, Defendants agree that actual authority is satisfied here, which is sufficient to establish that element. *See id.* Plaintiffs' grant agreements are therefore contracts. They "set the terms of and receive commitments from recipients" of federal grant programs. *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *see also McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155 (1866) ("It is not doubted that the grant by the United States to the State upon

10

conditions, and the acceptance of the grant by the State, constituted a contract."). That places them within the jurisdiction of the COFC.

### 2. The contracts are enforceable with money damages

Next, the Court considers whether the contracts are enforceable with money damages. "[I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001). That Plaintiffs' contracts are "government financial grants does not warrant a different standard." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004). As a result, "the presumption [is] that damages are available upon the breach" of these grant agreements. *Boaz Hous. Auth.*, 994 F.3d at 1365. This is true even if the statutory scheme does not expressly contemplate money damages in a subsequent suit. "[C]ontracts impose obligations on parties, for which damages are the default remedy upon breach" regardless of the statutory or regulatory terms underlying the program. *Id.* at 1367.[1]

### 3. Plaintiffs' claims ultimately seek monetary reward specified in the contracts

Plaintiffs' claims are fundamentally based on the premise that Defendants should have kept paying funds pursuant to the grant agreements. *See, e.g.*, Am. Compl. ¶ 1 (complaining of "devastating funding cuts"); *id.* ¶ 163 ("If the Targeting Directive succeeds in stripping Plaintiff States of these grants, Plaintiff States will be unable to replace the lost federal dollars with their own money"); *id.* at 51 (requesting relief to "[p]rohibit any termination or withholding of

---

[1] There are three narrow exceptions to this presumption, all of which are inapplicable, and Plaintiffs do not allege otherwise. *See Boaz Hous. Auth.*, 994 F.3d at 1365 (holding that "contracts that expressly disavow money damages" are excepted from the presumption); *id.* ("agreements that are entirely concerned with the conduct of parties in a criminal case" are not enforceable with money damages); *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327 (Fed. Cir. 2016) (the third exception is situations "where a special government cost-sharing agreement" is the contract to be enforced).

[grants]"). Regardless of how they are styled, the claims "in essence . . . seek[] to obtain the financial benefit of a prior contract-based obligation that allegedly has not been honored by the Government." *Suburban Mortg. Assocs.*, 480 F.3d at 1126. Since "a money judgment will give . . . plaintiff[s] essentially the remedy [they] seek[,]" this Court lacks jurisdiction. *See id.*

Even if Plaintiffs alleged that statutory obligations required continued contract payments, the COFC would provide an adequate remedy. In *Boaz Housing Authority*, for example, plaintiffs sought to recover funds that the Department of Housing and Urban Development ("HUD") refused to pay to public housing authorities as part of a mandatory federal grant subsidy program. *See* 994 F.3d at 1362-63. While Congress required the subsidies by statute, HUD effectuated its grants through contracts with the recipients. *Id.* at 1366-67. Those contracts laid out various terms and conditions recipients were required to follow in exchange for HUD's continued payments. Because legislation mandated the subsidies, HUD argued that the plaintiffs' claims really stemmed from the "statutorily mandated subsidy program" rather than any contract enforceable with monetary damages. *Id.* at 1368.

The Federal Circuit rejected HUD's argument. It held that the "contracts impose obligations on [the] parties, for which damages are the default remedy upon breach" notwithstanding the background statutory requirement. *Id.* at 1367. Nor did it matter that "contractual provisions . . . [were] required by or incorporate governing regulations." *Id.* "If [a federal agency] chooses to employ contracts to set the terms of and receive commitments from recipients with respect to [federal] subsidies," the United States is generally "subject to suit in the Claims Court for damages relating to an alleged breach." *Id.* at 1368. In sum, even when a statute mandates the grant program, or federal regulations support the contractual relationship, the existence of a contract places the dispute squarely in the COFC's jurisdiction. *See id.*

12

Constitutional claims are also barred. When a constitutional claim is merely a vehicle to block the termination of a contract obligating money, an adequate remedy exists in the COFC. *See, e.g.*, *Suburban Mortg. Assocs.*, 480 F.3d at 1128. Here, all the constitutional claims are invoked to require the Government to perform under the parties' contracts. Plaintiffs could seek monetary relief in the COFC by asserting these purported constitutional violations. *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The [COFC], like the Court of Claims before it, has jurisdiction of such" constitutional "claims"). Indeed, the Federal Circuit has repeatedly held the "adequate remedy" provision to bar claims when the result is payment of money under the terms of an agreement, regardless of the self-styled theory of the claims. *Columbus Reg'l Hosp.*, 990 F.3d at 1353 (explaining that when an action is "explicitly one for money" an adequate remedy exists in the COFC); *Consol. Edison*, 247 F.3d at 1385 ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the [COFC]."); *Brazos Elec. Power Coop., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998) ("[COFC] jurisdiction cannot be circumvented by such artful pleading and, accordingly, we customarily look to the substance of the pleadings rather than their form.").

What is more, Plaintiffs' asserted constitutional claims are simply statutory claims dressed up in constitutional language. But as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id*. at 471. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472 (collecting cases). The Constitution is

13

implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5. But that is not the case here. Plaintiffs' constitutional claims are therefore untenable under *Dalton*. *See Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026) ("Though Plaintiffs style their claims as constitutional, the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones, and that precedent applies here."); *Glob. Health Coun. v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025) ("Here, the grantees assert a non-statutory right to vindicate separation-of-powers principles but they are foreclosed from doing so by *Dalton v. Specter*." (citation omitted)).

In sum, "[t]he relief sought [here] was to require the Government to perform its contract obligations so that [Plaintiffs] could get the money allegedly due . . . under the [grant] agreement." *Suburban Mortg. Assocs.*, 480 F.3d at 1117. "[D]espite [Plaintiffs'] valiant effort to frame the suit as one for declaratory or injunctive relief, this kind of litigation should be understood for what it is." *Id.* at 1118. Jurisdiction therefore lies in the COFC.

## B. The Tucker Act Impliedly Precludes Relief

Likewise, the "APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *California*, 604 U.S. at 651 (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). The Supreme Court's recent decisions affirmatively resolve this question.

In *Department of Education v. California*, the district court had "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying [grant] obligations as they accrue."

14

604 U.S. at 650. But the district court likely lacked jurisdiction because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, such suits must be brought in the COFC, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

That ruling reflects basic jurisdictional principles. Given the federal government's sovereign immunity, federal courts generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 604 U.S. 518, 527 (2025). The APA's waiver does not reach situations where another statute impliedly precludes relief. *See* 5 U.S.C. § 702. The Tucker Act provides that the "[COFC] shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). And in *California*, those principles established that the respondents' claim was just a disguised breach-of-contract claim that belonged in the COFC. *California* "squarely control[s]" this materially identical case. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

*NIH* confirms these basic tenets. There, the plaintiffs brought APA claims alleging that the government's terminations of their DEI-related research grants were arbitrary and capricious, and the district court vacated the terminations on those grounds. 145 F.4th 39, 43-44, 47 (1st Cir. 2025). The First Circuit denied the Government's request for a stay, concluding that the district court "likely had jurisdiction to enter the orders . . . to set aside an agency's actions as arbitrary and capricious," and reasoning that "the fact that the orders may result in the disbursement of funds did not divest the court of its jurisdiction." *Id.* at 52 (citation modified). The Supreme Court

15

disagreed. It stayed the district court's judgment "vacating the Government's termination of various research-related grants." *NIH*, 145 S. Ct. at 2659. The Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants," *id.* (citation modified), meaning that claims reliant on a grant agreement are impliedly precluded. Moreover, a district court is not just barred from asserting jurisdiction over a claim based on a grant agreement. If the relief sought is "relief designed to enforce any obligation to pay money pursuant to those grants" then that too is barred. *Id.* (internal quotation marks omitted) (quoting *California*, 604 U.S. at 651). Notwithstanding various "objection[s]" that have been raised to adjudication of these claims in the Court of Federal claims, such arguments "to sending the grant-termination claims to the [Court of Federal Claims]" are "already addressed" by *California* and have been conclusively rejected. *Id.* at 2662 n.1 (Barrett, J., concurring).

Recently, the Fourth Circuit applied this logic to the President's directive to DHS "to review all grants providing funding" to organizations providing services to illegal aliens. *Sols. in Hometown Connections v. Noem*, 165 F.4th 835, 837 (4th Cir. 2026) (citing Exec. Order, 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443 (Jan. 20, 2025)). There, the Secretary issued a memorandum to put on hold pending review all such grants and applications. *Id.* at 837-38. Yet notwithstanding the existence of a clear presidential directive (the President's EO) and clear agency directive (the Secretary's memorandum), the court rejected the plaintiffs' APA and constitutional claims on the theory that such challenges were barred by the Tucker Act under *California* and *NIH*. *Id.* at 844. All the more so here, where Plaintiffs have not identified any OMB guidance document—much less a "directive"—amenable to APA review.

16

## II. Plaintiffs Are Unlikely To Succeed On The Merits

To avoid COFC jurisdiction, Plaintiffs allege that their harms flow from a purported OMB "directive" that somehow fits within the narrow contours of *NIH*. Their theory is fundamentally mistaken. In that case, "NIH issued internal guidance documents describing" that "[g]oing forward, the agency will not fund research related to DEI objectives, gender identity, or COVID-19" or "continue the practice of awarding grants to researchers based on race." 145 S. Ct. at 2661 (Barrett, J., concurring). Here, by contrast, Plaintiffs do not identify any HHS guidance documents at all. Rather, they hypothesize that unidentified communications between HHS and OMB *could* constitute a targeting directive. But it is hardly unusual for HHS and OMB to communicate about funding priorities or for OMB to collect data from agencies on the allocation of federal funds. Indeed, EO 14332 requires such coordination. Improving Oversight of Federal Grantmaking, Exec. Order No. 14332, § 3, 90 Fed. Reg. 38,929, 38,390 (Aug. 7, 2025). Such communications do not give rise to APA claims.

Under the APA, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Court may set aside agency action if the Court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law" or "without observance of procedure required by law[.]" *Id.* § 706(2). Here, Plaintiffs' claims fail because they do not challenge final agency action or otherwise challenge actions committed to agency discretion by law. Nor were Defendants' actions in excess of statutory authority or arbitrary and capricious.

Critically, despite having had the benefit of a certified AR and expedited discovery, Plaintiffs still identify no CDC guidance amenable to challenge under the APA. And contrary to their rhetoric, the record does not advance their case, but instead reveals its many holes. First and

foremost, they have not identified or articulated the contours of the supposed "Targeting Directive."  Second, to the extent that they focus on OMB's budget data request, that is only a solicitation of information, not any sort of directive; further, the request itself solicited information concerning 14 States and the District of Columbia, which is in tension with Plaintiffs' theory that the four Plaintiff States alone have been targeted for special treatment.  Third, Plaintiffs nowhere explain how OMB could have "directed" the termination of agency grants as a matter of law; and as a matter of fact, here CDC conducted its own independent review of grants.  *See, e.g.*, CDC_001338, ECF No. 55-3 at 106 (HHS Chief of Staff stating, in response to OMB emails, that "We can't review and cancel grants/funding based on this criteria from OMB.  Please follow previous guidance Cristina sent out from OGC regarding review of funding off the agency priorities instead."); *id.* (HHS Counselor to the Secretary replying, "Agreed.  Our direction will not change.").  Finally, Plaintiffs do not meaningfully contest that the terminated grants are in fact misaligned with CDC priorities.

### A.  Plaintiffs Do Not Challenge Final Agency Action

To the extent that Plaintiffs challenge a purported targeting directive under the APA, such claims fail because any such directive would not be final agency action.  The APA directs courts to review only "[a]gency action made reviewable by statute and final agency action." 5 U.S.C. § 704.  "Agency action" is a defined term of art and most often manifests in the form of a rule or order.  *Id.* § 551(13) (defining "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act").  Agency action that is cognizable and judicially reviewable under the APA does not include any and all actions that an agency takes.

18

Reviewable final agency action must have two characteristics. "First, the action must mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Plaintiffs' challenge fails on both.

First, any purported directive to review agency grants for alignment with agency priorities is not the "consummation" of the agency's decision-making process. *Bennett*, 520 U.S. at 178. At most, it would be the start or an intermediate step in the process—as perhaps best underscored by the fact that, well more than a month after the supposed directive was issued, not even Plaintiffs claim any concrete effect on DOT or FEMA funding. Second, such a purported directive would not determine any "rights or obligations" or carry "legal consequences." The relevant final agency action here is CDC's termination of grants, as reflected by *CDC's* analysis of the consistency of those grants with its priorities, *CDC's* decision memoranda, *CDC's* notification of Congress, and *CDC's* termination letters to the grantees. It is that final step that marks the consummation of the agency's decision-making process—and only the COFC has jurisdiction over it.

Plaintiffs' creative attempts to plead around this basic jurisdictional fact fail because, even if the posited OMB directive existed, it would not constitute final agency action within the meaning of the APA. For example, in *Lujan v. National Wildlife Federation*, the Supreme Court rejected an attempt "to challenge the entirety of petitioners' so-called 'land withdrawal review program'" because it was "not an 'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704." 497 U.S. 871, 890 (1990). Rather, that purported program

19

was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by" statute. *Id.* But this was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.* (citation omitted). That was especially true given that the so-called review program encompassed "1250 or so individual classification terminations and withdrawal revocations." *Id.* (citation omitted).

Here, Plaintiffs seek to sweep into a so-called targeting directive not just the 66 grant terminations made so far, but potentially innumerable future grant terminations by Defendants or other agencies, *see* Am. Compl. ¶ 2 (describing "Targeting Directive" as commanding "agencies to cut, freeze, or otherwise withhold funding" by potentially HHS, DOT, DHS, and FEMA); *id.* ¶ 30 (alleging that "Targeting Directive" was originated by OMB and "so far has been implemented by defendants HHS, USDOT, and DHS")—with perhaps more to come. But this wide-net approach fails to track the careful statutory framework of the APA and runs afoul of its final agency action requirement. Rather, it resembles "the kind of broad programmatic attack" on agency operations that the Supreme Court has made clear is not cognizable on APA review. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The Court should therefore decline Plaintiffs' invitation to monitor OMB coordination with grantmaking agencies.[2]

---

[2] Plaintiffs' attempts to tie any challenge to the President fail as a matter of law. The APA does not apply to the President. *Franklin v. Massachusetts*, 505 U.S. 788 (1992). To the extent that Plaintiffs challenge any future termination of grants, Plaintiffs "c[an]not possibly … rel[y] on the APA for a cause of action prior to [a] Secretary's" actions "implementing" any Presidential direction. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996).

## B. Plaintiffs Seek To Challenge Actions Committed To Agency Discretion By Law

Independently, Plaintiffs' APA claims fail because they challenge agency decisions about how to allocate and expend lump-sum appropriations. Such decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In *Lincoln v. Vigil*, plaintiffs challenged the Indian Health Service's "decision to terminate the Program" that provided health services to children in the southwest. 508 U.S. 182, 190 (1993). Framing the issue as whether "the Service's decision to terminate the Program [is] reviewable under the APA," *id.*, the Supreme Court held it was "unreviewable under § 701(a)(2)." *Id.* at 191. Because the various legal authorities on which the *Lincoln* plaintiffs relied at most spoke "about Indian health only in general terms[,]" the agency was not required to undertake or continue any particular program. *Id.* at 194. Plaintiffs' efforts to subject a funding allocation decision to APA review based on similarly general statutory provisions should meet the same result. To the extent that Plaintiffs challenge other discretionary actions, such as how to prioritize their review of grants, such claims are an impermissible programmatic attack that fail to identify discrete final agency action. To the extent that Plaintiffs broadly challenge Defendants' decisions about how to review grants generally, those decisions are committed to agency discretion by law.

Plaintiffs' argument that it was somehow impermissible for grants to be terminated in those States but not others is equally misguided. An "agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities," *Mobil Oil Expl. & Producing Se., Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230–31 (1991), and the "proper ordering of its priorities"—which an "agency is far better equipped than the courts to deal with"— is presumed unreviewable under the APA. *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). Such enforcement decisions "often involve a complicated balance of a number of factors which are

peculiarly within [the agency's] expertise." *Id.* at 831. Indeed, even in the criminal context, enforcement decisions are presumptively committed to agency discretion. *See id.* ("an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"); *see also Wayte v. United States*, 470 U.S. 598, 607 (1985) (describing "'broad discretion' as to whom to prosecute") (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). The central question would be whether any particular action—whether it be a criminal prosecution, agency enforcement action, or grant termination—is supported under the relevant standards. *Cf. Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 353 (10th Cir. 1989) ("Because neither Congress nor HHS itself, however, has promulgated substantive guidelines for the agency to follow when deciding whether to terminate a grant or impose a lesser sanction for violation of the rules, there is no law for the court to apply."). Here, the only agency action susceptible of challenge is whether CDC lawfully terminated the 66 awards. As explained above, they did because they were not aligned with agency priorities, as required by the terms of the awards.

### C. Plaintiffs' Statutory Authority Claim Fails

Plaintiffs complain that "[t]he Targeting Directive exceeds defendants' statutory authority." ECF No. 56 at 30. But the relevant law here is the terms of the grants, which are contracts between the grant applicant and the agency. Consistent with Federal regulations, these all incorporate the terms of 2 C.F.R. § 200.340, which provides that "The Federal award may be terminated . . . if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). Here, CDC terminated each grant at issue because it failed to align with agency priorities. Despite production of an administrative record and discovery, Plaintiffs point to nothing in the record tying the termination of these grants to their theory that "[t]he administration is either

22

conditioning billions of dollars of funding on compliance with its unrelated immigration-policy preferences, or depriving States of the same based on nothing more than arbitrary animus." ECF No. 56 at 30. Indeed, Plaintiffs identify no particular statutory provision with which the terminations conflict, and that alone dooms this claim. The same logic would apply to any future grant terminations made by any other Defendant agencies, which Plaintiffs fail to show are ripe for review. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

### D. Plaintiffs' Arbitrary And Capricious Claim Fails

On APA review, an agency's decision is presumed valid, and a court reviews only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Review is "deferential[,]" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and simply examines whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Moreover, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 43. Because the contract terminations here were both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), they satisfy this deferential standard.

Here, the relevant agency action is CDC's termination of grants. The agency identified priorities, reviewed grants for alignment with those priorities, and identified with specificity how each grant at issue was misaligned with a specific agency priority. The agency made individualized decisions, memorialized in decision memoranda, explaining the basis for each

decision, citing the legal authority invoked, and addressing reliance interests. On arbitrary and capricious review, even "a decision of less than ideal clarity" will be "uph[e]ld . . . if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). That standard is easily met here.

To the extent that Plaintiffs urge the court to subject a purported OMB directive, rather than CDC's termination decisions, to APA review, any such directive would not constitute final agency action, as explained above. But even on its own terms, the argument would fail. Plaintiffs principally allege that the supposed directive "singles out jurisdictions for disfavor" untethered to "any rational purpose related to the goals of any program." Am. Compl. ¶ 221. But Defendants' explanation of the misalignment between the grants at issue and CDC's priorities flatly refutes that contention. AR at 148-552. And Plaintiffs' backup argument—that Defendants "changed . . . position without explanation" and without sufficient consideration of "serious reliance interests," Am. Compl. ¶ 222—also fails. Here, CDC did not simply depart from a prior decision "sub silentio," *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009); rather, it acknowledged "that it *is* changing position," *id.*, set forth that the reason was changed agency priorities, and explained why any reliance interests were outweighed. *See, e.g.*, AR at 575. The change-in-position doctrine requires no more. *See Fox TV*, 556 U.S. at 515 ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates.").

Nor do Plaintiffs plausibly argue that the grants at issue are in fact aligned with agency priorities. *See, e.g.*, AR at 569 (award for racial and ethnic approaches to community health). Relying on *Department of Commerce v. New York*, 588 U.S. 752 (2019), Plaintiffs nonetheless contend that CDC's decisions were "contrived" and "cannot be reasoned decisionmaking." ECF

24

No. 56 at 29. But Presidential rhetoric does not preclude agencies from later acting on independently lawful grounds under their own statutes, regulations, and award terms. Here, a robust administrative record demonstrates that CDC did just that when it used AI to identify whether grants were aligned, and then determined to terminate grants that were not aligned with agency priorities. The appropriate standard is to review actual final agency action and the actual grounds for it, award by award where necessary, not by inferring some overarching political motive drawn from speeches and press coverage. "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com.*, 588 U.S. at 781.[3]

### E. Plaintiffs' Constitutional Claims Likewise Fail

Plaintiffs' effort to repackage their contract claims as constitutional ones fares no better. The APA contemplates that constitutional challenges to agency action would proceed through its framework, 5 U.S.C. § 706(2)(B) (authorizing courts to set aside agency action "contrary to constitutional right"), and makes review unavailable where adequate remedies exist elsewhere. *See Dalton*, 511 U.S. at 476; *see also Glob. Health Coun.*, 153 F.4th at 14 (noting that the Supreme Court has already "rejected that effort to recast statutory claims as constitutional ones"); *Sols. in*

---

[3] To the extent that the Court may have suggested other theories of relief, Plaintiffs have waived those theories by failing to make them in this filing. *See Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1057 (7th Cir. 2025) (explaining "principle of party presentation" and finding waiver where party "ha[d] not raised the arguments … proffered" by judge). Specifically, Plaintiffs do not claim that the Defendants' use of AI inherently renders their consideration of these grants arbitrary and capricious; that the specific prompts used for AI renders them invalid; or that they may assert jurisdiction under *NIH* by challenging any AI guidance documents. Agency officials used AI to identify whether any language in the grants at issue suggested that they were misaligned; but agency officials made the final determinations whether any particular grants were misaligned and whether to terminate those awards. The fact that Plaintiffs do not meaningfully contest their misalignment is further proof that this process was neither arbitrary nor capricious.

*Hometown Connections*, 165 F.4th at 844 (holding that plaintiffs were unlikely to prevail on merits of ultra vires and separation of powers claims challenging grant terminations, where "plaintiffs had pointed to no statute or other law that would support the claims"). Regardless, Plaintiffs' claims fail on the merits.

### 1. Plaintiffs' Separation of Powers Claim Fails

Plaintiffs argue that the purported "Targeting Directive and defendants' implementing actions … violate the separation of powers because … Congress has not delegated the authority to spend less than what was appropriated." ECF No. 56 at 33. The "basic principle" underlying the separation of powers doctrine is that "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). But here, Plaintiffs' theory is overbroad and would effectively preclude any agency from ever terminating grants for misalignment with agency policies. Such claims, even if established, do not rise to the level of separation of powers violations. *Dalton*, 511 U.S. at 471. In any event, Plaintiffs do not identify any obligation, much less a constitutional one, requiring the Executive Branch to provide Plaintiff recipients with these specific funds—which, again, are discretionary grants. "A refusal to fund" a particular "activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (citation omitted). Here, Defendants have shown that these grants no longer aligned with agency priorities, and that is all that is required under the terms of the agreements.

### 2. Plaintiffs' Spending Clause Claim Fails

Next, Plaintiffs argue that "Defendants violated the Spending Clause by surreptitiously imposing post-acceptance, non-germane immigration conditions on all funding via the Targeting

26

Directive." ECF No. 56 at 34. They point to no record documents supporting this contention. Regardless, their Spending Clause challenge would fail. U.S. Const. art. I, § 8, cl. 1.

For starters, "[t]he Spending Clause grants authority to Congress in Article I. It does not, on its face, purport to limit what the Executive Branch may do under Article II." *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 212 (D.D.C. 2025). Therefore, it is applicable only when *Congress* imposes a spending or funding condition. *See, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013). But where, as here, Plaintiffs fail to challenge "congressional action," they cannot state a claim under the Spending Clause. *Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025).

Regardless, while a Spending Clause claim may lie where an ambiguous condition left a state "unaware of" or "unable to ascertain what is expected of it," such that there was no knowing acceptance, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), here, Plaintiffs agreed to grants that, by their terms, permitted the Government to suspend or terminate them based on a change in priorities. *See* 2 C.F.R. § 200.340. Plaintiffs cannot now claim that they no longer wish to be bound by because they did not "exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted). After all, the Government may well not have entered into these contracts at all if it had known that it would not be able to terminate them pursuant to the terms outlined.[4]

## III.  Plaintiffs Cannot Show Irreparable Harm

Plaintiffs have no cognizable interest in receiving Federal funds to which they are not legally entitled. Further, "the loss of money is not typically considered irreparable harm.'" *NIH*,

---

[4] Although Plaintiffs also allege a Tenth Amendment claim, their preliminary injunction motion does not rely on it, so Defendants do not address it here.

145 S. Ct. at 2659. Nor can Plaintiffs credibly argue that the "funds 'cannot be recouped' and are thus 'irrevocably expended,'" when the Federal government has made available relief in the COFC. *Id.* (citation omitted). If Plaintiffs "ultimately prevail, they can recover any wrongfully withheld funds through suit" there. *California*, 604 U.S. at 652. "[I]f [Plaintiffs] instead decline to keep the programs operating, then any ensuing irreparable harm would be of their own making," which the Supreme Court has characterized as "self-imposed costs" not properly subject of such relief. *Id.* (quotation omitted). Plaintiffs are sovereigns with ample funds and the sovereign authority to raise taxes. "Moreover, the plaintiffs' contention that they lack the resources to continue their . . . projects without federal funding is inconsistent with the proposition that they have the resources to make the Government whole for money already spent." *NIH*, 145 S. Ct. at 2658. To the extent that Plaintiffs cite downstream effects of lost awards, such as loss of certain jobs, ECF No. 56 at 36 (losing "hundreds of public health jobs"), the Supreme Court has made clear that loss of government employment generally does not constitute irreparable injury. *Sampson v. Murray*, 415 U.S. 61, 91-92 *n.68 (1974).

## IV. The Public Interest And Balance Of The Equities Weigh Against Injunctive Relief

Plaintiffs' proposed relief would compel the government to disburse funds that it cannot recover. *See, e.g.*, *Thakur v. Trump*, 163 F.4th 1198, 1208 (9th Cir. 2025) ("We conclude that the public interest would be harmed by requiring the agencies to continue to make payments pursuant to the grants."). Plaintiffs "have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed." *California*, 604 U.S. at 651-52; *see id.* 652 ("No grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond."). The government has a strong interest in safeguarding the public fisc, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976), as well "a fundamental,

28

overriding interest in eradicating racial discrimination," *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983), which agencies hope to achieve by terminating DEI and other grants inconsistent with those CDC priorities. Most significantly, Plaintiffs' failure to identify the alleged "Targeting Directive" and their heterogenous challenge to grants—some of which have been slated for termination, but many of which have not—across four Departments, presents unique concerns to crafting injunctive relief. Permitting Plaintiffs to mount such a programmatic challenge to such varied grant programs based on a still-undefined policy would present serious separation of powers concerns, should the Court enter the sweeping injunction that Plaintiffs request.

## V. The Court Must Order Security And Should Not Grant Any Further Relief

Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court must therefore order bond here, and should do so in the amount of any interest that would accumulate on the use of funds between the issuance of a preliminary injunction and final order. *See Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1129 (D.C. Cir. 1992) (explaining importance of requiring bond "[a]dequate to ensure repayment"). To the extent that Plaintiffs are not required to post bond, that further undermines their public interest arguments. *See NIH*, 145 S. Ct. at 2659. Further, the Court should deny Plaintiffs' request that, in the alternative, the Court should provide "a limited 14-day injunction pending appeal." ECF No. 56 at 37. This Court has already entered a two-week temporary restraining order and extended that a further two weeks to permit additional jurisdictional discovery. After all this, Plaintiffs have not met their burden for extraordinary injunctive relief.

29

To the extent the Court considers such relief, it must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This means it should be limited in scope to the named Plaintiffs. *Trump v. CASA, Inc.*, 606 U.S. 831, 853 (2025). Further, any prospective relief should be narrowly crafted to Plaintiffs' theory of the case and explicitly clarify that any injunction against still-unidentified guidance documents does not prevent Defendant agencies from terminating grants pursuant to their terms based on their independent evaluation, separate and apart from any purported directions from the President or OMB. In particular, ordering Defendants to undo already terminated grants is not an available remedy here, *see NIH*, 145 S. Ct. at 2661 (Barrett, J. concurring) ("Vacating the guidance does not reinstate terminated grants."); *contra* ECF No. 56 at 30 ¶ 2 (requesting such relief), and the Court erred in ordering otherwise in the TRO. Similarly, an order prohibiting any "similar" directive in any way "impeding access to federal funds by plaintiffs" irrespective of the rationale, *see* ECF No. 56 at 30 ¶ 3 (requesting such relief), would be impermissibly vague, overbroad, and unwarranted.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: March 10, 2026                                      Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Director

_/s Michael Velchik_
MICHAEL VELCHIK (DC #187249)
Senior Counsel to the Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Ave
Washington DC 20530
(202) 860-8388
Email: michael.velchik@usdoj.gov

_Counsel for Defendants_