# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFLCIO and AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES Council 31,<br><br>    Plaintiffs,<br><br>    v.<br><br>RUSSELL VOUGHT, *in his official capacity as Director of the Office of Management & Budget*; THE OFFICE OF MANAGEMENT AND BUDGET; ROBERT F. KENNEDY JR., *in his official capacity as Secretary of the U.S. Department of Health & Human Services*; THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JAY BHATTACHARYA, *in his official capacity as Acting Director of the U.S. Centers for Disease Control & Prevention*, UNITED STATES CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC"); and the UNITED STATES;<br><br>    Defendants. | Case No. 26-cv-2656 |  |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

American Federation of State, County, and Municipal Employees, AFL-CIO

("AFSCME") and AFSCME Council 31 (collectively, "Plaintiffs"), are labor organizations

representing employees of state and local governments throughout Illinois, California, Colorado,

and Minnesota that receive federal grants from the United States Centers for Disease Control and

Prevention ("CDC"). Plaintiffs' members work in a broad range of public health roles at local and state agencies, performing essential work to keep their communities healthy and safe. Plaintiffs bring this complaint against CDC, the U.S. Department of Health and Human Services ("HHS"), the Office of Management and Budget ("OMB"), and their officers, as outlined below, seeking declaratory and injunctive relief to enjoin a directive from OMB commanding agencies, including the CDC, to punish states disfavored by the Trump-Vance administration as well as Defendants' unlawful decision to terminate numerous public health grants administered by the CDC. Plaintiffs hereby allege as follows:

**INTRODUCTION**

1.      Since taking office, President Trump has consistently reached for the purse to punish his perceived political opponents, with particular ire for Democratic-led States and cities. Among other grievances, he has railed against so-called "sanctuary" jurisdictions whose residents and elected officials he perceives as having dared to express support for and to enact immigration policies with which he disagrees. He has made crystal clear his intent to punish those communities by cutting off federal funding. In January 2026, President Trump and Defendant OMB intensified their threats to funding awarded to "sanctuary" jurisdictions. In this latest salvo, President Trump ordered his administration to cut off crucial public health funding to four such States: Illinois, California, Colorado, and Minnesota (the "Targeted States").[1]

2.      OMB implemented this order by issuing a directive commanding federal agencies to cut, freeze, or otherwise withhold funding to the Targeted States (the "Targeting Directive"). Based on the Targeting Directive, HHS announced its decision to terminate a first set of over

---

[1] Nearly all of the states targeted by the OMB appeared on a list of sanctuary jurisdictions published by the Department of Justice in August 2025, including the four implicated in this lawsuit. *See* Press Release, Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://perma.cc/SW8A-GG4D.

$600 million dollars' worth of public health grants made by the CDC in only these four states. HHS and CDC used an artificial intelligence ("AI") tool to contrive a *post hoc* and pretextual rationale for terminating these pre-identified grants, namely that they no longer aligned with CDC priorities.

3.      CDC effectuated the Targeting Directive in two phases. First, on February 9, 2026, Defendants notified Congress of their intent to terminate a first set of CDC grants. *See* Consolidated Appropriations Act of 2026, Pub. L. No. 119-75, § 524, 140 Stat. 173 (requiring such notification). Two days later, Defendants began to notify the Targeted States that they were planning to terminate this first subset of grants, effective immediately. Then, also on February 11, 2026, the CDC notified Congress of a second set of grants it also intended to terminate. (collectively, the "CDC Grant Termination Decision").

4.      OMB's Targeting Directive and the CDC Grant Termination Decision, the two agency actions challenged in the instant lawsuit, threaten Plaintiffs and their members in the Targeted States from doing their essential work of tracking diseases and outbreaks, of collecting and managing related health data, and of protecting the public health of our communities. Their actions threaten the jobs and livelihoods of Plaintiffs' members who work on projects funded through these grants as well as those who do the work of administering these federal grants at the state and local levels. A gap in access to these funds will disrupt this essential work and cause the layoffs of Plaintiffs' members. It will also harm these members as residents of the Targeted States who suffer the impact of diminished public health services.

5.      Defendants' planned termination of congressionally appropriated public health grants as punishment for these communities' perceived views on unrelated immigration issues is the epitome of arbitrary and capricious agency action. The Targeting Directive and CDC Grant

Termination Decision also exceed Defendants' authority under statutes governing these public health programs, which do not authorize HHS to condition funds based on the President's political whims and feuds over wholly unrelated issues. Finally, the Targeting Directive and CDC Grant Termination Decision run afoul of the Separation of Powers doctrine (by refusing to spend funds appropriated by Congress), the Spending Clause (by imposing retroactive, unrelated, and vague conditions on funding), the First Amendment (by punishing residents of the Targeted States for their perceived viewpoints on immigration and other political issues), and the Equal Protection Clause (by singling out residents of the Targeted States based on the President's political animus).

6.     The Targeting Directive and the CDC Grant Termination Decision violate the Administrative Procedure Act ("APA") and the Constitution and must be set aside.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., and 5 U.S.C. §§ 702, 704.

8.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705–706, and the Court's inherent equitable powers.

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because Plaintiff AFSCME Council 31 is headquartered in this district. Additionally, Plaintiffs AFSCME and AFSCME Council 31 represent state and local government employees whose place of employment is within the Northern District of Illinois. A substantial part of the events or

4

omissions giving rise to these claims occurred in the Northern District of Illinois, Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and Plaintiffs represent members who are citizens of Illinois and residents of this District, where many of the harms alleged have occurred and will continue to occur unless Defendants' alleged unlawful conduct is enjoined.

## PARTIES

### I.   Plaintiffs

10.   Plaintiff **American Federation of State, County, and Municipal Employees, AFLCIO ("AFSCME")** is a labor organization and unincorporated association headquartered in Washington, D.C.

11.   AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME members include state and local public health workers, nurses, corrections officers, child care providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer.

12.   AFSCME's members are harmed by the Targeting Directive and the CDC Grant Termination Decision in numerous ways. AFSCME has members in numerous government agencies and departments that perform public health work funded by the grant money at issue in all four Targeted States. Many AFSCME members also benefit from the public health services that are funded by the federal government, as members of the communities served by these public health grants.

5

13.     Under the AFSCME International Constitution, AFSCME Affiliates include AFSCME councils, AFSCME locals, and unions that have joined AFSCME through a direct affiliation. All members of AFSCME Affiliates are members of both the AFSCME Affiliate and AFSCME International. AFSCME members pay voluntary membership dues, a portion of which are remitted to the AFSCME Affiliate and a portion to AFSCME International. AFSCME has, and asserts here, both associational standing to represent the rights and interests of its individual members as well as organizational standing to address the harms to AFSCME as an entity due to the Targeting Directive and Grant Terminations.

14.     Plaintiff **AFSCME Council 31** is an AFSCME affiliate representing employees throughout the state of Illinois, including both state and local government public employees. AFSCME Council 31 represents care workers, correctional officers, maintenance workers, school bus drivers, clerical workers, social workers, nurses, lawyers, doctors, probation officers, and other public servants in Illinois. Among AFSCME Council 31's members are employees of the Illinois Department of Health, Chicago Department of Public Health, and many other local public health departments in Illinois that perform public health work funded by the federal grants at issue.

## II.     Defendants

15.     Defendant **Russell Vought** is the Director of OMB, and that agency's highest ranking official. He is responsible for overseeing OMB, providing direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements, and ensuring that its directions are implemented by all federal agencies that provide relevant funding and support. He is sued in his official capacity.

16.     Defendant the **United States Office of Management and Budget** is a cabinet-level agency within the executive branch of the United States government. OMB is responsible

6

for oversight of federal agencies' performance and the administration of the federal budget. OMB is an agency within the meaning of the APA.

17.    Defendant **Robert F. Kennedy, Jr.**, is the Secretary of HHS and is sued in his official capacity.

18.    Defendant **United States Department of Health and Human Services** is a federal agency headquartered in Washington, D.C. HHS is an agency within the meaning of the APA.

19.    Defendant **Jay Bhattacharya** is Acting Director of Centers for Disease Control and Prevention, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

20.    Defendant **United States Centers for Disease Control and Prevention** is an executive branch agency within the federal government and a component of HHS, headquartered in Atlanta, Georgia. CDC is an agency within the meaning of the APA.

21.    Defendant the **United States** may be named as a defendant in any action seeking relief other than monetary damages against the United States. *See* 5 U.S.C. § 702.

## ALLEGATIONS

### I.    Defendants have Engaged in a Campaign of Retaliation Against the Targeted States and Their Residents Based on Political Animus.

22.    From the very beginning of its tenure, the Trump-Vance administration has sought to use federal funding as a tool to threaten and punish its perceived political opponents. It has weaponized the federal budget against private entities that presumed to criticize the administration,[2] as well as cities and states who dared to elect Democratic candidates or enact

---

[2] *See, e.g.*, *Am. Acad. of Pediatrics v. HHS*, No. 25-cv-4505, 2026 WL 80796, at *21 (D.D.C. Jan. 11, 2026) (finding that Defendant HHS had likely terminated plaintiff's grants in retaliation for plaintiff's protected First Amendment activities critical of the administration); *Am. Bar Ass'n v. Dep't of Just.*, 783 F. Supp. 3d 236, 246 (D.D.C. 2025)

policies with which the administration disagrees.[3] Among other "blue" jurisdictions, the administration has repeatedly attacked federal funding intended to benefit the four Targeted States in this action: Illinois, California, Colorado, and Minnesota.

23.     The reason behind these repeated attacks is not hard to discern. As made clear by numerous public statements documented below—including in official positions taken in litigation—the President and his administration view the residents and the elected officials in these four States as their political enemies. These States voted for Kamala Harris in the 2024 presidential election. President Trump has publicly lambasted elected officials and citizens of these States. And the administration has repeatedly clashed with these States over various policy issues, such as immigration.

24.     With respect to Illinois, for example, President Trump has said that both Chicago Mayor Brandon Johnson and Governor JB Pritzker "should be in jail" for failing to collaborate with Immigration and Customs Enforcement ("ICE") officials on the administration's controversial approach to immigration enforcement.[4] The President also suggested that he would go to "WAR" with the city of Chicago over immigration issues, posting on Truth Social: "'I love the smell of deportations in the morning'…Chicago [is] about to find out why it's called the Department of WAR…Chipocalypse now," accompanied by three helicopter emojis and an image of Trump in front of a burning Chicago skyline.[5]

---

("The ABA has made a strong showing that Defendants terminated its grants to retaliate against it for engaging in protected speech.").

[3] *See, e.g.*, Tony Romm, *Trump Seizes On Shutdown to Punish Political Foes*, N.Y. Times (Oct. 4, 2025), https://perma.cc/H5YY-UHF4 (describing President Trump's "legally dubious campaign to weaponize the federal budget…in a bid to punish Democratic-led cities and states"); Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 3, 2025, at 5:16 PM ET), https://perma.cc/HL26-9EYJ (threatening to withhold federal funds from New York City if it elected the Democratic candidate for mayor).

[4] Jacob Wendler, *Trump says Illinois' Pritzker and Johnson 'should be in jail'*, Politico (Oct. 8, 2025), https://perma.cc/E3K9-G6F4.

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Sep. 6, 2025, at 8:38 AM ET), https://perma.cc/V3XY-YQBP.



25.     Likewise, the administration's conflict with the people of Minnesota over its now-notorious immigration enforcement action, Operation Metro Surge, was front-page national news for weeks—in part because officials from ICE and Customs and Border Protection ("CBP") shot and killed two citizens.[6] Following the fatal shootings, senior officials in the Trump-Vance Administration attempted to pin the blame on the two victims, calling them "domestic terrorists"[7] and claiming that one of the victims "wanted to do maximum damage and massacre law enforcement"—allegations that were contradicted by witness videos.[8] Beyond disparaging the deceased, the President has also maligned Minnesotans and their elected officials more

---

[6] *See, e.g.*, Nancy Cordes, *In Alex Pretti's Killing, A Sharp Contrast Between What Trump Officials Say and What Video Shows*, CBS News (Jan. 25, 2026), https://perma.cc/CSR6-RLEM.
[7] *Id.*
[8] Madeleine Ngo, Alexandra Berzon, & Hamed Aleaziz, *D.H.S. Review Does Not Say Pretti Brandished Gun, As Noem Claimed*, N.Y. Times (Jan. 27, 2026), https://perma.cc/3ZRM-86T3.

broadly, saying that United States Representative Ilhan Omar and the Somali community in Minnesota are "garbage,"[9] and calling Governor Tim Walz "seriously retarded."[10]

26.     Similar examples can be found in remarks by the President—and other officials in his administration—about California and Colorado.[11]

27.     As part of these conflicts, the President and his cabinet have attempted to bludgeon their perceived opponents into submission by cutting off critical funding.

28.     Even before taking office, President Trump previewed this tactic by threatening to withhold federal funding from the disfavored States targeted in this action. For example, he promised to withhold disaster funding from California if the state did not change its water management policies, stating that if Governor Newsom did not "take care of [the state's] water situation," "we're not giving you any of that fire money that we send you all the time for all the fire, forest fires that you have."[12]

29.     The administration has delivered on such threats. On the day President Trump was inaugurated, for example, he issued an executive order directing the Secretary of the Department of Homeland Security ("DHS") to "ensure that so-called 'sanctuary' jurisdictions"— *i.e.*, states and local governments with immigration policies that this administration disagrees

---

[9] PBS News, *WATCH: Trump says he doesn't want Somali migrants in the U.S., calls people 'garbage'* (Dec. 2, 2025), https://perma.cc/F64H-V7WV.

[10] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM ET), https://perma.cc/YJ4F-GSYA.

[11] *See, e.g.*, Ben Quinn, *Trump lashes out at California governor's green energy deal with UK*, The Guardian (Feb 16, 2026), https://perma.cc/26AU-SH2W (reporting that the President referred to the California Governor as "Gavin Newscum" and said that "Gavin is a loser. Everything he's touched turns to garbage. His state has gone to hell[.]"); Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 31, 2025, at 12:27 PM ET), https://perma.cc/H7MK-ARQV (calling Colorado Governor Jared Polis a "[s]cumbag").

[12] Hannah Knowles et al., *Trump's threat to place conditions on fire aid outrages Democrats*, Wash. Post (Jan. 15, 2025), https://perma.cc/T8LA-UK3P.

10

with[13]—"… do not receive access to Federal funds[.]"[14] Pursuant to that order, the DHS
Secretary issued a memorandum in February 2025 ordering all DHS agencies and offices to
cease federal funding to "sanctuary" jurisdictions—a group that includes all four Targeted
States.[15]

30.     Likewise in October 2025, OMB Director Vought announced that the Department
of Energy would terminate grants in sixteen Democratic-led states, including the four Targeted
States in this action.[16] The administration later conceded in litigation that the "primary reason"
for terminating those grants was that the grantees were "located in [] 'Blue State[s]'" that "have
recently elected Democratic candidates in state and national elections."[17] Substantially similar
grants located in states that voted for President Trump were "[s]pared from termination."[18] As
the district court in that case found before holding the grant terminations unconstitutional, the
administration was unable to explain how that disparate treatment (between "blue" and "red"
states) was related to the purpose of the energy grants.[19]

31.     That same month, the administration singled out Illinois, freezing over $2 billion
in funding for transit projects in Chicago.[20]

---

[13] "Sanctuary jurisdiction" is a term commonly used to describe states and municipalities that have adopted policies
limiting their cooperation with federal agencies that are charged with immigration enforcement. Alejandra Aramayo,
Cong. Rsch. Serv., LSB11321, *"Sanctuary" Jurisdictions: Legal Overview* (Sept. 15, 2025),
https://perma.cc/ZDC6-WV3A.
[14] Exec. Order No. 14,159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).
[15] *See* Press Release, Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025),
https://perma.cc/SW8A-GG4D.
[16] Russ Vought (@russvought), X (Oct. 1, 2025, at 2:09PM ET), https://perma.cc/7YP9-QU4V.
[17] Stipulation, Dkt. No. 22-1, 1 (Dec. 19, 2025), *City of Saint Paul, Minn. v. Wright*, No. 25-cv-03899 (D.D.C.); *See*
Meryl Kornfeld & Hannah Natanson, *Trump Administration Admits to Targeting Blue States for Energy Grant
Cuts*, Wash. Post (Dec. 17, 2025), https://perma.cc/93FL-S9X5 (noting court filing in which administration
conceded it had targeted Democratic-run states for grant cuts).
[18] *City of Saint Paul, Minn. v. Wright*, --- F.Supp.3d ---, No. 25-cv-03899, 2026 WL 88193 *3 (D.D.C. Jan. 12,
2026).
[19] *See id.*
[20] Julie Bosman, *White House Suspends $2.1 Billion in Funding for Chicago Transit Projects*, N.Y. Times (Oct. 3,
2025), https://perma.cc/LE66-FFJC.

32.     And in December 2025, the administration sought to choke off numerous sources of federal funding to recipients in Colorado following Governor Jared Polis' refusal to pardon Tina Peters—a President Trump supporter and former Colorado elections clerk who was convicted of state crimes for orchestrating a breach of data related to the 2020 election.[21] True to form, the administration retaliated by cutting funding wholly unrelated to the dispute. Among other cuts, the administration announced plans to shutter a major climate research center in the state,[22] and President Trump vetoed funding for a clean-water pipeline he had once supported.[23] Even a political ally of the administration expressed concern, "hop[ing] that the veto has nothing to do with political retaliation."[24]

33.     The administration's retaliation against the four Targeted States alleged in this action has only increased since the new year. In early January 2026, news broke that the Trump administration was "cutting off more than $10 billion in social services and child care funding" to five Democratic-led states (the Targeted States plus New York).[25]

34.     Multiple contemporaneous statements by the President made clear that the childcare funding freeze was politically motivated. In a January 5, 2026, social media post, for example, President Trump reiterated his intent to target Democratic-led States: "Governor Walz has destroyed the State of Minnesota, but others, like Governor Gavin Newscum [sic], JB

---

[21] Colleen Slevin, *Tina Peters' lawyers try to convince Colorado court to overturn conviction for voting system breach*, PBS News (Jan. 14, 2026), https://perma.cc/33Q9-ZM5Q.

[22] Lisa Friedman, Brad Plumer, & Jack Healy, *Trump Administration Plans to Break Up Premier Weather and Climate Research Center*, N.Y. Times (Dec. 17, 2025), https://perma.cc/4LRP-N8F5.

[23] Jack Healy, *A Trump Veto Leaves Republicans in Colorado Parched and Bewildered*, N.Y. Times (Jan. 17, 2026), https://perma.cc/WZ82-494L.

[24] Maegan Vazquez and Kadia Goba, *Longtime MAGA ally Boebert lashes out at Trump over veto*, Wash. Post (Dec. 31, 2025), https://perma.cc/XY9L-V86D.

[25] Josh Christenson, *Trump cuts off $10B in funding to five blue states for child care, social services over fraud fears*, N.Y. Post (Jan. 5, 2026), https://perma.cc/NEP3-SKJW. The union plaintiffs in this case have also brought a lawsuit challenging the childcare funding cuts. *See Am. Fed'n of State, Cnty., and Mun. Emps., AFL-CIO v. U.S. Dep't of Health & Hum. Servs.*, No. 26-cv-00759 (N.D. Cal. filed Jan. 23, 2026).

Pritzker, and Kathy Hochul, have done, in my opinion, an even more dishonest and incompetent job." [26]

## II.   The Targeting Directive and CDC Grant Termination Decision are the Most Recent Salvo in Defendants' Campaign Against Targeted States and their Residents.

35.     This administration's ongoing political retaliation against the Targeted States has most recently resulted in a Targeting Directive ordering various agencies to cut funding to the four Targeted States, which has been partially implemented by the CDC through its announcement of its plans to terminate public health grants in those states.

### A.   President Trump repeatedly threatened in January to cut all federal funding to Democratic-led "sanctuary cities [and] States."

36.     Following the early January 2026 cuts to childcare funding, the Trump-Vance administration continued to broadly threaten funding for Democratic-led states (including the four Targeted States) based on political animus stemming in part from disagreements over the immigration policies of so-called "sanctuary jurisdictions."

37.     On January 13, in a speech at the Detroit Economic Club, the President declared that he would cut off funding to "sanctuary cities or States" by February 1st:

> Additionally, starting February 1, we're not making any payments to sanctuary cities or States having sanctuary cities because they do everything possible to protect criminals at the expense of American citizens, and it breeds fraud and crime and all of the other problems that come. So we're not making any payment to anybody that supports sanctuary cities. [27]

38.     The following day, the President reiterated via social media that the administration would cut off federal funding by February 1, 2026. [28]

---

[26] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 5, 2026, at 11:13 AM ET), https://perma.cc/PC25-UDED.
[27] The White House, *President Trump Delivers Remarks to the Detroit Economic Club*, at 58:47 (Jan. 13, 2026), https://perma.cc/LC56-SCFD.
[28] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 14, 2026, at 5:52 AM ET), https://perma.cc/AG96-3B87.



EFFECTIVE FEBRUARY FIRST, NO MORE PAYMENTS WILL BE MADE BY THE FEDERAL GOVERNMENT TO STATES FOR THEIR CORRUPT CRIMINAL PROTECTION CENTERS KNOWN AS SANCTUARY CITIES. ALL THEY DO IS BREED CRIME AND VIOLENCE! If States want them, they will have to pay for them! MAKE AMERICA GREAT AGAIN!!!

39.     Six days later, President Trump once again threatened to cut off funding "as of the beginning of the month" at a White House press conference:

> You've got to get rid of your sanctuary cities, and I hope our people know that we're not going to pay sanctuary cities. We're not going to pay them anymore. They are sanctuary for criminals. They hold criminals. We're not going to pay. They can sue us, and maybe they'll win, but we're not giving money to sanctuary cities anymore as of the beginning of the month.[29]

**B.  OMB issued the Targeting Directive.**

40.     Throughout the latter half of January and into early February, OMB worked behind the scenes to implement the President's January threats by issuing the Targeting Directive, which commanded federal agencies to cut funding to grant recipients in the Targeted States.

41.     OMB's Chief of Staff met with senior HHS officials to ask for a "list" on January 16, just three days after the President's speech at the Detroit Economic Club in which he promised to cut federal funding to so-called sanctuary jurisdictions. She thanked the HHS officials the next day for their "willingness to be team players and to support the President's priorities!" Decl. of Sherief Gaber, Dkt. 55-3 at 108–9, *Illinois*, No. 26-cv-1566 (N.D. Ill.).[30]

---

[29] The White House, *Press Secretary Karoline Leavitt Briefs Members of the Media*, at 1:38:26 (Jan. 20, 2026), https://perma.cc/8VV6-AVCL.
[30] In support of factual allegations in this complaint, Plaintiffs cite to the administrative record and other discovery produced and filed on the docket in *Illinois*, No. 26-cv-1566 (N.D. Ill.).

42.     On January 20, 2026, OMB sent a "Budget Data Request" to nearly all federal agencies seeking "a detailed spending report on Federal funds provided to entities in a select list of States" and "localities." *See* the administrative record related to the Targeting Directive produced in *Illinois*, No. 26-cv-1566 (N.D. Ill.), Dkt. 44 (the "AR" or the "Administrative Record") at CDC_1245-2663. Notably, the report sought to collect data on *all* funding provided by federal agencies, not just funding related to immigration. *Id.* at CDC_1245-47; *see also* Dkt. 55-3 at 57, *Illinois*, No. 26-cv-1566 (N.D. Ill.).

43.     Although the Budget Data Request purported to gather information for the "purpose" of "facilitat[ing] efforts to reduce the improper and fraudulent use of those funds," the Request sought data only with respect to "*certain* States and Localities." AR at CDC_1245 (emphasis added).

44.     The Request sought data only with respect to Democratic-led states and did not seek data on funding for Republican-led states, other than Virginia at the time.[31] *Id.* at CDC_1263. Those States are California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington.[32] Nearly all of these states either appeared on the "list of sanctuary jurisdictions" published by the Department of Justice on August 5, 2025, or contain localities that appeared on the list.

45.     The OMB Budget Data Request required agencies to respond with the required data by January 28, 2026. *Id.* at CDC_1245. In other words, the Request would allow OMB to

---

[31] The sole exception is Virginia, which recently elected a new Democratic Governor and Attorney General on November 3, 2025—well after the administration compiled its list of sanctuary jurisdictions. Press Release, Dep't of Justice, Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://perma.cc/SW8A-GG4D.
[32] Gregory Svirnovskiy, *Trump Administration Targets 14 Blue States, DC with Federal Funding Review*, Politico (Jan. 22, 2026), https://perma.cc/X63V-8UNL.

create a complete inventory of funds flowing to these 14 disfavored jurisdictions only a few days before February 1—the date the President threatened to cut off funding to Democratic-led States.

46.     On information and belief, this Budget Data Request was intended to gather information to implement the funding cuts President Trump promised would take effect in February.

47.     OMB called a meeting on January 21 of the President's Management Council—which comprises heads of major federal government agencies—to inform them of the actions they would soon be expected to take. Dkt. 55-3 at 24, *Illinois*, No. 26-cv-1566 (N.D. Ill.).

48.     OMB's Deputy Director for Management emailed the agencies the next morning on January 22 asking them to provide "recommended actions prior to February 1." *Id*. at 158.

49.     HHS officials exchanged multiple internal emails on the afternoon of January 22 to implement OMB's requests, including an email sent by a CDC official with the "active awards for Colorado, California, Minnesota, and Illinois" in an Excel spreadsheet. *Id*. at 35-36.

50.     On January 23, OMB again convened the President's Management Council. On information and belief, the OMB Chief of Staff sent a follow-up message after the meeting thanking the agency heads for their "intriguing ideas," as well as their "creativity and willingness to dive in to this important action for the President." *Id*. at 24-26.

51.     On February 1, the OMB Chief of Staff emailed HHS staff with the subject line, "Re: Grant Awards – Implementation Call follow up," purportedly giving them a list of follow-up tasks. *Id*. at 27-28.

52.     On February 2, the President then announced that he had issued an order directing broad funding cuts to certain Democratic-led jurisdictions with immigration policies that the President dislikes: "Sanctuary cities are a disaster. So I put out an order, anybody that does a

sanctuary city is not getting any money. Let's see what happens, you know, it'll get wiped out by these liberal courts."[33]

53.    The morning of February 4, Defendant Vought provided President Trump a list of grants to be cancelled that HHS had generated at OMB's instruction, upon which the President directed immediate action the same day. Dkt. 55-3 at 119, *Illinois*, No. 26-cv-1566 (N.D. Ill.).

54.    The OMB Communications Director emailed HHS officials that same day to inform them that OMB had leaked the news to the press, stating: "at 2 PM ET today, we have an exclusive going to announce the first cuts we are making in funds that we have been asking agencies to investigat[e] from 14 states and DC," referencing a story published by Real Clear Politics.[34] *Id*. at 100. That same email noted that "CDC is part of these cuts." *Id*.

55.    Pursuant to the leak, on February 4, the *New York Post* reported that OMB had directed the CDC and the Department of Transportation to "claw back more than $1.5 billion [of grants] from blue states"—including at least $602 million from the CDC and more than $943 million from the Department of Transportation ("DOT")."[35]

56.    An OMB spokesperson confirmed for *The Hill* the next day that it had directed the DOT and the CDC to terminate grants intended for the four Targeted States in this case.[36]

57.    Although the President's order and the OMB Targeting Directive were motivated by the President's animus towards the Targeted States' policies on immigration, and the perceived political views and affiliations of its citizens, the CDC and DOT grants at issue in the Targeting Directive are wholly unrelated to immigration. OMB directed the CDC to terminate

---

[33] Dan Bongino Show: *I'm Back* (Ep. 2443), at 1:34:13 (Spotify, Feb. 2, 2026), https://perma.cc/8TLK-S4KU.
[34] Philip Wegmann, *Exclusive: Trump OMB Launches Full Review of Federal Funds Sent to Blue States*, RCP (Jan. 20, 2026), https://perma.cc/R9EF-VYU3.
[35] Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026), https://perma.cc/4E8R-Z37J.
[36] Rachel Frazin, *Trump Administration Directs Rescission of $1.5B from Blue States on Health, Transportation*, The Hill (Feb. 5, 2026), https://perma.cc/9CB6-9H58.

$602 million in health grants that, among other things, would fund programs aimed at increasing the use of HIV-prevention drugs and at addressing COVID-19 health disparities.[37] With respect to the DOT, OMB directed the agency to terminate $943 million in grants that would have largely funded electric vehicle chargers and green buses.[38]

58.     OMB's Targeting Directive, which HHS has effectuated, is a direct outcome of the President's threats to stop "making any payments to sanctuary cities or States having sanctuary cities"[39] and OMB's work of identifying grants to be terminated in the Targeted States.

### C. HHS and CDC used AI to construct a post-hoc and pretextual rationale for the CDC Grant Termination Decision.

59.     After OMB had ordered CDC to terminate grants on or around February 4, 2026, HHS officials began the work of creating a post-hoc and pretextual justification for the planned grant terminations.

60.     On information and belief, late in the afternoon on February 5, senior HHS and CDC officials held a meeting titled "CDC Regroup" to discuss a "comms plan" and a "path forward regarding OMB request." Dkt. 55-3 at 96, *Illinois*, No. 26-cv-1566 (N.D. Ill.).

61.     Later that evening, the HHS Chief of Staff emailed one of the meeting attendees, attaching the *New York Post* article and asking the official to "please ensure you incorporate these into the standard process of grants for alignment to agency priorities." *Id*. at 37. On information and belief, the HHS Chief of Staff was alluding to the agency's authority to terminate grants that "no longer effectuate[]…agency priorities," 2 C.F.R. § 200.340(a)(4), an

---

[37] *Id.*
[38] *Id.;* Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026), https://perma.cc/4E8R-Z37J.
[39] The White House, *President Trump Delivers Remarks to the Detroit Economic Club*, at 58:47 (Jan. 13, 2026), https://perma.cc/LC56-SCFD.

authority this administration has used extensively, and was directing the HHS staffer to contrive *post hoc* rationales for termination using that authority.

62.     HHS and CDC staff began by gathering the documents for grants awarded to recipients located in the Targeted States. On the evening of February 6, the CDC Deputy Chief of Staff emailed other officials with an "URGENT" request to assemble "the work plans and other related documents for the following 66 grants." Dkt. 55-3 at 195–96, *Illinois*, No. 26-cv-1566 (N.D. Ill.). This first set of 66 grants were the same $602 million in awards that were reported as being terminated by the *New York Post* and which were eventually noticed to Congress for termination on February 9.

63.     HHS and CDC collected the requested grant documents for those 66 grants and provided them to an "advisor" at HHS via a shared folder on February 7. Dkt. 55-3 at 32–3, 82, *Illinois*, No. 26-cv-1566 (N.D. Ill.). HHS and CDC elected to accomplish this task by prompting an AI tool to generate rationales for terminating the grants on the grounds that the grants do not align with the agency's published priorities. AR at CDC_139-47 (AI prompt HHS and CDC provided to the AI model). On information and belief, HHS and CDC did not direct the AI tool to examine grants awarded to recipients in other states.

64.     HHS instructed the AI model that its "primary task is to analyze grant applications … and identify content that contradicts or fails to align with CDC's published priorities." AR at CDC_139.

65.     The prompt provided the AI tool with more specific instructions, directing the tool to complete the following steps:

o   Carefully read each grant application
o   Identify specific content that contradicts or fails to align with CDC priorities
o   Extract direct quotations from the application that demonstrate the contradiction

19

   o Provide precise citations (page number, section) where the contradictory content appears

   o Assign a confidence score (1-10) for each identified issue, where:

     ▪ 1-3: Possible contradiction but context may justify

     ▪ 4-7: Likely contradiction with CDC priorities

     ▪ 8-10: Clear and definite contradiction with CDC priorities.

AR at CDC_142-43.

  66. To complete this task, HHS provided the AI tool a list of thirteen "priorities" stated in bulleted form, several of which only vaguely referred to unidentified laws; for example, one instruction stated that "Federal funds should not encourage or support illegal immigration (consistent with applicable federal law)" without identifying any such applicable law. AR at CDC_141.

  67. HHS also provided the AI tool with instructions on how to "format" the "output" of the AI's analysis, directing it to create a "structured report" for each grant application. AR CDC_143. These instructions contained internal inconsistencies. For example, HHS prompted the AI to create an "overall alignment assessment[] on a scale of 1-100 (1 least aligned, 10 most aligned," which clearly provides two contradictory scales of assessment. AR at CDC_143. Half of all grants reviewed received the same score: 72/100, suggesting that the model hallucinated or erred in some way. *See* AR at CDC_153.

  68. For each grant reviewed and "structured report" produced, the AI tool was also instructed to "[w]rite a brief, skimmable, two-sentence summary of the report." AR at CDC_146.

  69. On the last page of the AI prompt, HHS told it to: "read grant reports to compile the strongest evidence to support termination. Prompt: Output the 1-3 strongest quotes from this report. Just output the quotes and page numbers with no commentary." AR at CDC_147.

  70. The AI tool produced more than four hundred pages of machine-generated texts evaluating the $602 million in the Targeted States. *See generally* AR at CDC_148–CDC_573.

71.     In addition to reports for each affected grant, the AI tool produced two nearly identical spreadsheets that summarized the universe of grants it reviewed, all of which were in the Targeted States. *Id*. at CDC_552.

72.     The AI tool was used to provide a *post hoc* rationale to justify the OMB's Targeting Directive. Based on the output reports, the AI tool simply produced a predetermined outcome that Defendants wanted. On information and belief, all of the grants fed into the AI tool for analysis were selected for termination, and Defendants did not employ human reasoning to analyze the grants terminated per the CDC Grant Termination Decision.

**D.     The CDC planned to terminate public health grants pursuant to the Targeting Directive.**

73.     An HHS spokesperson confirmed to the *New York Times* on February 9 that the agency was going forward with the CDC Grant Termination Decision because the grants "do not reflect agency priorities."[40]

74.     Also on February 9, the CDC notified Congress of a first set of grants it was planning to terminate in the Targeted States, *see* AR at CDC_1239–41, pursuant to current appropriations law, which requires agencies to "notify the Committees on Appropriations of the House of Representatives and the Senate not less than 3 full business days prior to announcing…the termination or non-continuation of any grant, including a short description of the reason for the termination or non-continuation." Pub. L. No. 119-75, § 524, 140 Stat. at 173. In its notice to Congress, HHS provided just one reason for the termination of each grant: "Inconsistent with Agency Priorities." AR at CDC_1239-41.

---

[40] Apoorva Mandavilli, *Trump Administration to Cut $600 Million in Health Funding from Four States*, N.Y. Times (Feb. 9, 2026), https://perma.cc/S8DS-KXML.

75.     Defendants began sending Targeted States notifications of the CDC Grant Termination Decision on February 11, which took the form of new notice of award ("NOAs") for each grant slated to be terminated. *See* Decl. of Olusimbo Ige, Dkt. 57-6 at ¶¶ 6-7, *Illinois*, No. 26-cv-01566 (N.D. Ill). The NOAs set February 11 as the last day of performance for each of the grants, meaning that recipients could not incur reimbursable expenses the following day. *See, e.g.*, AR at CDC_910-915 (NOA and termination letter for a grant—award number NE11OE000094—directly affecting an employer of Plaintiffs' members in Illinois).

76.     After enumerating the agency's current priorities,[41] the NOAs each state that they are "terminating some of the program awards[] in order to better prioritize agency resources towards the above-mentioned priorities." *See, e.g.*, AR at CDC_914. The NOAs thus invoke their authority to terminate awards that "no longer effectuate[] the program goals or agency priorities." *Id.* (citing 2 C.F.R. § 200.340(a)(4)). The NOAs do not explain which of the many enumerated priorities are no longer effectuated by the awards, nor explain how the awards fail to effectuate those priorities. *Id.*

77.     However, the authority to terminate awards based on agency priorities was not in place until October 1, 2025. Prior to that date, HHS rules did not permit termination of CDC grants based on changes in "agency priorities." 45 C.F.R. § 75.372 (2020) (HHS rules effective until September 30, 2025 provided grounds for termination that did not include changes in "agency priorities"); *see also* 89 Fed. Reg. 80055 (Oct. 2, 2024) (repealing HHS's previous rules governing grant terminations and adopting the OMB regulations found at 2 C.F.R. § 200.340(a)

---

[41] The NOAs first reference the priorities published on the CDC website and then state that "CDC is specifically prioritizing a commitment" to the following priorities: "gold standard science; global leadership; rebuilding trust, transparency, and credibility; rapid, evidence-based response to crises; vaccine safety and efficacy research; advancing our understanding of autism spectrum disorder (ASD), neurodevelopmental disorders (NDDs), and chronic disease; modernizing public health infrastructure while enhancing our approach to health data; and otherwise ensuring compliance with the goals and priorities of the Trump Administration and HHS." *See, e.g.*, AR 914.

effective October 1, 2025). Thus, for the grants at issue in this case that were awarded prior to October 1, 2025, the terms and conditions of the award did not contemplate termination based on "agency priorities." *See, e.g.*, AR at CDC_910 (award's period of performance started on December 1, 2022).

78.     The NOAs go on to state: "[a]lthough in its discretion the CDC may suspend (rather than immediately terminat[e]) an award to allow the recipient an opportunity to take appropriate corrective action before CDC makes a termination decision, after review and consideration, no corrective action is possible here since no corrective action could align the award with current agency priorities." *See, e.g.*, AR at CDC_914. The NOAs do not explain why corrective actions are not possible. *Id*.

79.     In internal agency memoranda dated February 11, the CDC recited for each grant that it "has determined that it is not possible to modify or partially terminate these awards because this is a situation of reframed agency priorities that is unrelated to the conduct of the recipient." *See, e.g.*, AR at CDC_599. The memoranda go on to summarily conclude that reliance interests of grant recipients and beneficiaries are "outweighed by the agency's substantial interest in being able to effectively advance its current priorities through a smaller and more focused portfolio that better reflects the agency's current priorities." *Id*.

80.     The notices of the CDC Grant Termination Decision sent out on February 11 are not the end of the story. On the same day, the CDC sent another notice to Congress of its intent to terminate another 41 grants providing critical public health funds in the Targeted States –in addition to the $602 million selected for termination in its first round of cuts. AR at CDC_1242-44. In the CDC's notice, it provided the very same rationale as for its first set of planned grant terminations: "Inconsistent with Agency Priorities."

**E. The Targeting Directive is temporarily enjoined until March 12 pursuant to related litigation.**

81.     The Targeting Directive is the subject of litigation in a related suit brought by the four Targeted States on February 11, 2026.[42] This Court granted Plaintiff States in that case a Temporary Restraining Order on February 12, 2026, finding that the Plaintiff States were likely to succeed on their claims that the Targeting Directive was "based on arbitrary, capricious, or unconstitutional rationales."[43]

82.     The Order prohibits Defendants from "implementing" the Targeting Directive by "identify[ing] and "terminat[ing] public health grants awarded to [the Plaintiff States]."[44] The Order also mandates that Defendants treat "any actions taken to implement" the Targeting Directive as "null, void, and rescinded."[45]

83.     The Temporary Restraining Order is in effect until March 12, 2026.[46]

84.     Upon information and belief, if the injunction is lifted, the CDC Grant Termination Decision will go back into effect.

85.     Upon information and belief, the Targeting Directive will result in additional planned grant terminations beyond those at the CDC. As an OMB spokesperson told the *New York Post*, "more cancellations" due to the Targeting Directive "are expected."[47] Likewise, a spokesperson for the Department of Transportation told *The Hill* that the Department was "moving forward with executing OMB's plan."[48]

---

[42] *See Illinois*, No. 26-cv-01566 (N.D. Ill. Feb. 11, 2026).

[43] TRO, Dkt. No. 21, *Illinois,* No. 26-cv-01566, 2026 WL 403762 (N.D. Ill. Feb. 12, 2026).

[44] *Id.*

[45] *Id.*

[46] Minute Entry, Dkt. No. 35, *Illinois*, No. 26-cv-01566 (N.D. Ill. Feb. 18, 2026) (extending the Order).

[47] Josh Christenson, *White House Instructs DOT, CDC to Cut $1.5B in Grants for Dem States, Citing 'waste and mismanagement,'* N.Y. Post (Feb. 4, 2026), https://perma.cc/4E8R-Z37J.

[48] Rachel Frazin, *Trump Administration Directs Rescission of $1.5B from Blue States on Health, Transportation*, The Hill (Feb. 5, 2026), https://perma.cc/9CB6-9H58.

## III. Plaintiffs Will Suffer Irreparable Harm if the Targeting Directive Is Implemented Through Grant Terminations.

86.     AFSCME, as the nation's largest trade union of public employees, represents

public health employees in each of the four Targeted States. In each of these states, the Targeting

Directive, by cutting off millions of dollars to AFSCME's members' employers that would

otherwise fund AFSCME members' work, will irreparably harm AFSCME members by putting

their jobs at risk, leaving them without employment and without the important benefits that come

with public employment, including health insurance coverage. Their terminations will reduce the

bargaining strength AFCSME members have through their union to bargain collectively for their

terms and conditions of employment and endanger the public health of the communities in which

they live and work. The Targeting Directive will also harm AFSCME as an entity, causing it to

lose membership, which will deprive AFSCME of dues-paying members and thereby reduce the

resources and persuasive bargaining strength that it derives from and deploys on behalf of its

members. These same harms will befall Plaintiff AFSCME Council 31 and its members as they

relate to planned grant terminations specifically in Illinois.

87.     In **Illinois**, Plaintiffs AFSCME Council 31 and AFSCME represent approximately

350 employees at the Chicago Department of Public Health ("CDPH"). As set forth in detail in

the declaration of Olusimbo Ige, Commissioner of CDPH, *see* Dkt. 57-6, *Illinois*, No. 26-cv-

1566 (N.D. Ill.), the Targeting Directive has affected six direct grants to CDPH: Strengthening

U.S. Public Health Infrastructure to Chicago Department of Public Health (Federal Award

Identification Number NE11OE000094); Support & Scale Up of HIV Prevention to Chicago

Department of Public Health (Federal Award Identification Number NH25PS005247); Sexually

Transmitted Infection Surveillance Network to Chicago Department of Public Health (Federal

Award Identification Number NH25PS005255); High-Impact HIV Prevention and Surveillance

Programs for Health Departments Grant (Federal Award Identification Number NU62PS924821); Strengthening STD Prevention and Control for Health Departments Grant (STD-PCHD) (Federal Award Identification Number NH25PS005128); and Initiative to Address COVID-19 Health Disparities (Federal Award Identification Number NH75OT000082).

88.     Commissioner Ige stated in her sworn declaration that "staffing levels at CDPH would drop significantly." Dkt. 57-6, ¶ 10, *Illinois*, No. 26-cv-1566 (N.D. Ill.). Specifically, "[i]f the awards are terminated, up to 98.45 full-time public health employees [of CDPH] could lose their jobs, Chicago would be more vulnerable to public health epidemics, and Chicago would lose approximately $48,759,752 in essential public health funding for the budget periods already awarded. That does not include the $41,131,835 CDPH anticipated receiving for the remaining budget years in the five awards discussed above." *Id.* at ¶ 49.

89.     CDPH was already in dire financial straits before Defendants announced the Targeting Directive. In 2025, the Department underwent three rounds of layoffs, which resulted in the elimination of over 100 open positions and a reduction in force that affected approximately 40 members of the AFSCME Council 31-represented bargaining unit. Ultimately, four bargaining unit members lost their jobs with the City as a result of the third round of layoffs.

90.     As set forth in more detail in the declaration of Ashley Thoele, *see* Dkt. 57-5, ¶ 8, 12, *Illinois*, No. 26-cv-1566 (N.D. Ill.), Defendants announced their intent to terminate least eight grants to the Illinois Department of Public Health ("IDPH"): Strengthening Illinois' Public Health Administration ("SIPA") (Federal Award Identification Number NE11OE000090); Behavioral Risk Factor Surveillance System Grant (Federal Award Identification Number NU58DP007844); Injury Prevention and Control Research and State and Community Based Programs Grant (Federal Award Identification Number NU17CE010045); HIV Medical

Monitoring Program Grant (Federal Award Identification Number NU62PS924862); HIV

Prevention and Surveillance Activities Grant (Federal Award Identification Number

NU62PS924843); Preventative Health and Health Services Block Grant (Federal Award

Identification Number NB01PW000090); Strengthening STD Prevention and Control for Health

Departments Grant (Federal Award Identification Number NH25PS005138); and Viral Hepatitis

Prevention and Control Grant (Federal Award Identification Number NU51PS005172).

91.　　Illinois will lose over $72,696,949.40 in funds already awarded, along with future

funds anticipated covering the whole grant periods, estimated to total approximately

$99,792,505.40. Plaintiffs AFSCME and AFSCME Council 31 represent the vast majority of

employees of IDPH, whose Chief Operating Officer has attested in her sworn declaration that the

loss of this money will require IDPH to reduce or eliminate at least 99 IDPH staff positions,

including 78 full-time employees. Decl. of Ashley Thoele, Dkt. 57-5, ¶ 35, *Illinois*, No. 26-cv-

1566 (N.D. Ill.).

92.　　IDPH also subgrants a significant portion of the Strengthening Illinois' Public

Health Administration grant to local public health departments. Plaintiffs AFSCME and

AFSCME Council 31 represent employees at many local public health departments that receive

this sub-granted federal money, including in Cook County, Champaign County, and Peoria.

IDPH's COO also attested that 674 local health department positions would lose support as a

result of these cuts, and that "[t]he loss of these critical public health professionals" would

"undermin[e] the frontline workforce that delivers essential services to communities statewide."

*Id*. at ¶ 37.

93.　　In **Colorado**, AFSCME's membership includes hundreds of employees of the

City and County of Denver, including its Department of Public Health and Environment

(DDPHE). DDPHE is a direct grantee of the CDC, as the recipient of the Public Health Infrastructure Grant (PHIG) (Federal Award Number NE11OE000034). As set forth in more detail in the declaration of Karin McGowan, Director of DDPHE, Dkt. 57-8, ¶ 7, *Illinois*, No. 26-cv-1566 (N.D. Ill.), but for the planned grant terminations at issue in this case, DDPHE "expected a total grant award of $14,475,122" from PHIG.

94.     The City of Denver was facing a budgetary shortfall that affected its workforce even before the Targeting Directive. In May 2025, Mayor Mike Johnston announced the City faced a $250 million budget deficit for 2025 and 2026. In August 2025, the City laid off 171 workers, including approximately twenty public health employees, and eliminated 665 open positions to cut $100 million from its budget. This last round of layoffs led to the termination of AFSCME members. As a result of this "difficult budgetary climate," DDPHE Director McGowan has stated in her sworn testimony that "Denver is unable to divert other local resources to fund the programs currently funded by PHIG. Losing the PHIG funds would force DDPHE to terminate all 22 DDPHE public health staffers paid with those funds." Decl. of Karin McGowan, Dkt. 57-8, ¶ 14, *Illinois*, No. 26-cv-1566 (N.D. Ill.).

95.     In **Minnesota**, AFSCME, through its affiliated Council 5, represents employees of the Minnesota Department of Health ("MDH").The Targeting Directive affected five grants to the MDH: Public Health Infrastructure Grant Program (Federal Award Identification Number NE11OE000048), Core State Injury Prevention Program (Federal Award Identification Number NU17CE010056); Preventative Health and Health Services Block Grant ("PHHS") (Federal Award Identification Number NB01PW000088); High-Impact HIV Prevention and Surveillance Program for Health Departments (Federal Award Identification Number NU62PS924837); and Strengthening STD Prevention and Control for Health Departments ("PCHD") Grant Program

(Federal Award Identification Number NH25PS005172). The termination of these grants will result in withholding over $45 million in already-awarded funds from the MDH. It will also result in the withholding of over $14 million in future funds. This money funds approximately 97 full-time equivalent positions at the MDH. The Deputy Commissioner of MDH, Wendy Underwood, has attested that, "[i]f these funds are terminated, MDH will be faced with issuing layoff notices to staff if alternative funding is not quickly identified, and it is not clear that alternative funding is available for all positions." Decl. of Wendy Underwood, Dkt. 57-9 ¶ 62, *Illinois*, No. 1:26-cv-1566 (N.D. Ill.).

96.     Minnesota distributes part of the Public Health Infrastructure Grant Program funding to local health departments. AFSCME, through its affiliated AFSCME Council 5 and AFSCME Council 65, represents employees at approximately two dozen local health agencies that receive Public Health Infrastructure Grant Program money from the State. For example, AFSCME Council 5 represents employees of the Hennepin County Community Health Board, the Saint Paul Ramsey County Community Health Board, and the Carlton-Cook-Lake-St. Louis Community Health Board, all of which are subrecipients of the Public Health Infrastructure Grant Program funds. And AFSCME Council 65 represents employees of, among others, the Kandiyohi-Renville Community Health Board, Morrison-Todd-Wadena Community Health Board, and the Stearns County Community Health Board, all of which are subrecipients of the Public Health Infrastructure Grant Program funds as well. MDH Deputy Commissioner Underwood has attested that this pass-through funding, which has been targeted for termination, supports approximately 200 Community Health Board positions. Dkt. 57-9 ¶ 64, *Illinois*, No. 1:26-cv-1566 (N.D. Ill.). She has also attested to her understanding that "some community

organizations may be at risk of closing if they lose financial support from the terminated PCHD and HIV Program funds." *Id.* ¶ 68.

97. AFSCME, through its affiliated AFSCME Council 5, represents employees of the City of Minneapolis. Minneapolis is a direct recipient of a CDC grant that was selected for termination by the Targeting Directive, depriving Minneapolis of nearly $6 million dollars in public health funding.

98. In **California**, AFSCME Affiliates represent employees of multiple direct grantees affected by the cuts at issue. For example, through AFSCME Council 36 as well as the Union of American Physicians and Dentists, AFSCME represents employees at the Los Angeles County Department of Public Health ("LACDPH"). A Public Health Infrastructure Grant, "Transforming Public Health Through a Community Collaborative Model" (Federal Award Identification Number NE11OE000036), is the LACDPH's primary source of federal public health infrastructure funding. The Targeting Directive stands to deprive the LACDPH of more than $64 million in public health funds by terminating this grant. This grant supports 109 LACDPH employees. Barbara Ferrer, the Director of the LACDPH, has attested that "[t]he staff members positions would have to be terminated" without the cancelled grant funds. Decl. of Barbara Ferrer, Dkt. 57-11 ¶ 10, *Illinois*, No. 1:26-cv-1566 (N.D. Ill.).

99. The LACDPH also receives federal public health funds through an award titled "National HIV Behavioral Surveillance of Los Angeles County" (Federal Award Identification Number NU62PS924771). That money, which falls within the Targeting Directive, supports four LACDPH staff positions.

100. Los Angeles County has attested that it will be unable to offset the loss of these grants. Dkt. 57-11 ¶ 16, *Illinois*, No. 1:26-cv-1566 (N.D. Ill.). Moreover, the Director of the

LACDPH has attested that the loss of this grant money will force the Department to terminate or reassign up to 148.5 Department personnel. *Id.* ¶ 21.

101.    With the cancellation of the grants described above, AFSCME and Council 31's state and local public health employee members' jobs will be at risk and many will be laid off as the state and local governments scramble to adapt to the significant budgetary shortfall. AFSCME and Council 31 members will lose their jobs. As a result, these members will lose important benefits like health insurance, which is provided by government employers under the terms of union-negotiated CBAs.

102.    Layoffs would also harm AFSCME and Council 31 as entities because they would mean the loss of membership dues from members who are terminated. Layoffs would also result in a loss of bargaining strength; it is well-understood that strength at the bargaining table is directly correlated to strength in numbers. That loss of strength will in turn harm those AFSCME and Council 31 members who are not laid off and whose working conditions are governed by union-negotiated collective bargaining agreements, as it will hamper the union's ability to negotiate optimal terms and conditions for those remaining employees. The same is true even if layoffs do not occur, as reduced funding available to state and local governments from the federal government reduces those state and local governments' budgets for the wages and benefits the union seeks to negotiate for its members in their CBAs.

103.    AFCSME members and AFCSME Council 31 members will also be harmed as members of the communities impacted by these grant cancellations. These grants are meant to promote the well-being of everyone in the community, including by allowing public health departments to anticipate and respond to the outbreak of disease. Public health strategies require planning, research, coordination, and community trust. Abrupt cessation of services from

31

unanticipated funding cuts undermines all those efforts and will lead to worse health outcomes for the communities in which AFSCME and AFSCME Council 31 members work and live.

## FIRST CAUSE OF ACTION
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious

104.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

105.    Defendants OMB, HHS, and CDC are "agencies" under the APA, 5 U.S.C. § 551(1). The Targeting Directive and CDC Grant Termination Decision are "agency actions" under the APA, *id.* § 551(13).

106.    Under the APA, a court shall "hold unlawful and set aside agency action…found to be arbitrary, capricious" or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

107.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The APA requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider…important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43).

108.    The Targeting Directive and CDC Grant Termination Decision are arbitrary and capricious in numerous respects. Several examples follow.

109.    *First*, the Targeting Directive and CDC Grant Termination Decision are neither reasonable, nor reasonably explained. The Targeting Directive and CDC Grant Termination Decision are not reasonable because they targeted the disfavored states based on political animus

and disagreements over immigration policy, rather than for any rational purpose related to the goals of the funding programs at issue. "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that…work a violation of the arbitrary-and-capricious standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation omitted).

110.    The CDC Grant Termination Decision also fails to provide a reasonable explanation, stating merely that the affected grants "no longer effectuate[] the program goals or agency priorities" and that "no corrective action is possible…since no corrective action could align the award with current agency priorities." AR at 986. To begin, these explanations are pretextual. Defendants are determined to terminate these awards based on political disagreements and animus; the purported rationale that the awards do not effectuate agency priorities was contrived after the fact through AI prompts that guaranteed the desired outcome. Providing "contrived reasons" for agency action violates Defendants' obligations to "offer genuine justifications for important decisions" under the APA. *Dep't of Com. v. New York*, 588 U.S. 752, 756 (2019); *see also Regents of the Univ. of Calif.*, 591 U.S. at 21 (agency action cannot be "upheld on the basis of impermissible '*post hoc* rationalization'") (quotation omitted).

111.    Moreover, even on their own terms, the explanations provided in the NOAs fail to explain which agency priorities are no longer effectuated by the awards, how the awards fail to effectuate those priorities, or why corrective action is not possible. AR 986. Such a "conclusory statement[] will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original) (quotation omitted).

112.    On information and belief, the Targeting Directive likewise fails to provide a reasonable explanation.

113.     *Second*, the Targeting Directive and CDC Grant Termination Decision changed agency position without explanation and without genuinely considering the reliance interests of grant recipients, their employees, or the communities they serve. Decision memoranda prepared by the CDC only summarily state, without providing anything to substantiate its conclusion that the reliance interests of grant recipients and beneficiaries are "outweighed by the agency's substantial interest in being able to effectively advance its current priorities through a smaller and more focused portfolio that better reflects the agency's current priorities." AR at 599. Such an unreasoned and unexplained change in position violates the agency's obligation to "show that there are good reasons for the new policy," *Fox Television Stations, Inc.*, 556 U.S. at 515, and to consider any "serious reliance interests" engendered by the status quo, *Regents of the Univ. of Cal.*, 591 U.S. at 30 (quotation omitted).

### SECOND CAUSE OF ACTION
### Violation of the Administrative Procedure Act
### Exceeds Statutory Authority and Contrary to Constitutional Right

114.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

115.     The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Likewise, agency actions must be set aside if they are "contrary to constitutional right." *Id.* § 706(2)(B).

116.     Defendants lack the statutory authority to implement the Targeting Directive. The substantive statutes and appropriations laws that created and funded the grant programs at issue did not evince a purpose to condition funds on the President's political whims or federal immigration priorities.

34

117.    An executive agency "literally has no power to act…unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "An agency may not confer power upon itself." *Id.* So, a federal agency lacks any inherent power to attach any conditions to federal funds unless Congress has granted it such power. *See City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020); *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985).

118.    The statutes at issue in this case authorize federal spending for a wide range of public health purposes, but none of them have anything to do with enforcing federal immigration law—let alone authorize conditioning funds on sheer whim or animus. *See* 42 U.S.C. §§ 247b, 294n, 295, 300w (authority for many different public-health grants).

119.    Defendants also lack the statutory authority to refuse to spend funds that Congress has appropriated through numerous appropriations bills. *See Train v. City of New York*, 420 U.S. 35, 43–44 (1975).

120.    Additionally, the Targeting Directive and CDC Grant Termination Decision violate the APA's prohibition on agency actions that are contrary to constitutional right. *See infra* ¶¶ 121–59; 5 U.S.C. § 706(2)(B).

### THIRD CAUSE OF ACTION
### Violation of the Spending Clause
### Retroactive, Unrelated, and Vague Conditions

121.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

122.    The Spending Clause provides that "[t]he Congress shall have Power To…provide for the…general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1

123.    Under this Clause, Congress may "attach conditions on the receipt of federal funds," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987), though "[t]he spending power is of course not unlimited." *Id.* at 207.

124.    Instead, the Spending Clause "requires that conditions [on federal funding] be 'reasonably calculated' to advance the purposes for which funds are expended." *Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277, at *14 (D.R.I. Sept. 24, 2025).

125.    The Clause prohibits retroactive conditions. It requires "clear notice" of conditions and prohibits "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

126.    The Clause also prohibits imposing conditions on federal grant programs that are wholly unrelated to the purpose of the programs. *Dole*, 483 U.S. at 207–08

127.    Finally, the Constitution prohibits vague conditions. The Spending Clause permits only unambiguous federal funding conditions. *Id.* at 207.

128.    The Targeting Directive and CDC Grant Termination Decision violate the Spending Clause by attempting to impose retroactive, unrelated, and vague conditions on funding.

129.    The Targeted States were not put on notice that their CDC funding was conditioned upon the administration's political animus, or the States' immigration-policy priorities, "sanctuary jurisdictions" labels, the perceived political affiliations of their leadership and residents, or any other condition not related to the purpose of the award at the time of acceptance.

130.    Defendants have similarly attempted to retroactively impose a condition under which grants may be terminated based on changes to the agency's priorities. However, HHS did not adopt regulations allowing for such terminations until October 1, 2025. Thus, for grants awarded before October 1, 2025, an "agency priorities" termination condition did not exist at the

time of acceptance. But Defendants purported to unilaterally impose new post-acceptance conditions on such grants in November 2025.

131.    The condition that recipients of the CDC grants only hold policy priorities and viewpoints favored by the administration lacks any connection to the purposes for which the grants were established by Congress.

132.    These conditions are also vague. Neither the Targeting Directive nor the CDC Grant Termination Decision explain which agency priorities are no longer effectuated by the awards slated for termination, how the awards fail to effectuate those priorities, or why corrective action is not possible.

133.    The Targeting Directive and CDC Grant Termination Decision are both therefore unconstitutional and in violation of the Spending Clause.

**FOURTH CAUSE OF ACTION**
**Separation of Powers Violation**

134.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

135.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.*, Inc, 575 U.S. 320, 326–27 (2015).

136.    The Constitution "grants the power of the purse to Congress, not the President." *San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

137.    Similarly, Congress possesses the exclusive power to legislate. Article I, Section 1 of the U.S. Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."

U.S. Const. art. I, §1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

138.    The executive branch must "take Care that the laws be faithfully executed." U.S. Const. Art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President…faithfully executes them.").

139.    Consistent with these principles, the executive branch's constitutional authority "is at its lowest ebb" when the executive "takes measures incompatible with the express or implied will of Congress" by attempting to unilaterally condition or decline to spend appropriated funds. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (Jackson, J., concurring); The President has no legislative authority, *Clinton*, 524 U.S. at 438, and further has "none of 'his own constitutional powers' to 'rely' upon when it comes to spending." *San Francisco*, 897 F.3d at 1233–34 (quoting *Youngstown*, 343 U.S. at 637).

140.    The Targeting Directive and CDC Grant Termination Decision violate the separation of powers doctrine because the executive branch has overridden Congress's instructions by imposing unauthorized conditions on federal funds.

141.    The Targeting Directive and CDC Grant Termination Decision also violate the separation of powers doctrine because the executive branch has overridden Congress's direction to spend all appropriated funds. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838).

## FIFTH CAUSE OF ACTION
### Violation of the First Amendment
### Retaliation and Viewpoint Discrimination

142.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

143.    "[T]he First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quotations omitted).

144.    "To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter his free speech; and (3) his protected speech was at least a motivating factor for the deprivation." *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019).

145.    Additionally, the First Amendment applies to government action that is taken on the basis of a person's actual or assumed political viewpoint. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273–74 (2016). Such viewpoint discrimination "is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). *See also Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief" is at "the core of those activities protected by the First Amendment."); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 718 (1996) ("[P]atronage does not justify the coercion of a person's political beliefs[.]").

146.    In issuing the Targeting Directive and CDC Grant Termination Decision, Defendants targeted funding in Illinois, California, Minnesota, and Colorado in retaliation for actual or assumed expression of political views by voters in those States (who include Plaintiffs' members) and their elected representatives. Specifically, Defendants retaliated against the perceived political viewpoints of both voters and elected representatives on immigration. These attacks on funding are "designed to deter"—and are likely to deter—the exercise of First Amendment rights by "a person of ordinary firmness." *Massey v. Johnson*, 457 F.3d 711, 720-21 (7th Cir 2006).

147.    Defendants' targeting of funding to Plaintiffs' members and others in the affected States in an effort to punish actual or perceived political speech violates the First Amendment's prohibition on retaliation and viewpoint discrimination.

148.    Finally, the "unconstitutional conditions" doctrine prohibits the government from "requir[ing] a person to give up a constitutional right … in exchange for a discretionary benefit," *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994), or denying "a benefit to a person on a basis that infringes [their] constitutionally protected interests—especially, [their] interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Resultingly, a funding condition is impermissible if it "unconstitutional[ly] burden[s] … First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*AID*").

149.    Although the government may attach conditions to federal funding that "define the limits of the government spending program," the First Amendment prohibits conditions that restrict speech in ways that are "not relevant to the objectives of the program" or that otherwise "seek to … regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15. *See also Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (government may not impose conditions restricting "protected [speech] outside the scope of the federally funded program").

150.    Nor may the Government use federal funding or benefits to "ai[m] at the suppression of dangerous ideas," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998), to "drive certain ideas or viewpoints from the marketplace," *id.* (quotation omitted), or to "burden the speech of others in order to tilt public debate in a preferred direction," *Sorrel v. IMS Health, Inc.*, 564 U.S. 552, 578–79 (2011).

151.    By terminating grants in the Targeted States based on the perceived political views of citizens within those jurisdictions, Defendants have imposed conditions on the grants

40

that are "not relevant to the objectives of the program" and which seek to regulate protected activity "outside the contours of the program itself." *AID*, 570 U.S. at 214-15.

152.    The Targeting Directive and CDC Grant Termination Decision thus violate the unconstitutional conditions doctrine, as well as the APA's prohibition on agency actions that are contrary to constitutional right. 5 U.S.C. § 706(2)(B).

## SIXTH CAUSE OF ACTION
### Violation of the Fifth Amendment
### Equal Protection Clause

153.    The Fifth Amendment prohibits the federal government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

154.    A plaintiff may bring an equal protection claim where "[it] has been intentionally treated differently from others similarly situated and … there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also, e.g., Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1021-23 (9th Cir. 2011).

155.    "[A] bare…desire to harm a politically unpopular group" is "not [a] legitimate state interest[]" that can satisfy equal protection analysis. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *see also Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025) ("Under the…guarantee of equal protection under the law,…settling personal vendettas by targeting a disliked business or individual for punitive government action is not a legitimate use of the powers of the U.S. government…".).

156.    By issuing the Targeting Directive and CDC Grant Termination Decision, Defendants intentionally treated the residents of Illinois, California, Minnesota, and Colorado— who include Plaintiffs' members, both as state and local government employees providing public health services and as residents who receive and benefit from those services—differently from the residents of other States that receive substantially similar grants. Specifically, Defendants

41

have decided to cut off funding across multiple federal programs to the residents of States that enact "sanctuary" immigration policies.

157. Defendants' reasons for that differential treatment are arbitrary and irrational. Defendants lack any rational, legitimate, or compelling governmental interest in treating the residents of Targeted States differently from similarly situated residents in other States.

158. Defendants' differential treatment is motivated by political animus towards the residents in the Targeted States (who include Plaintiffs' members) and their elected representatives. Specifically, Defendants are motivated by the fact that Defendants perceive that the residents of the Targeted States and their elected representatives hold disfavored political views on immigration and by the fact that the Targeted States are led by Democrats and have adopted disfavored immigration policies.

159. The Targeting Directive and CDC Grant Termination Decision thus also violate the APA, 5 U.S.C. § 706(2)(B), as contrary to constitutional right.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a. Issue a judicial declaration that the Targeting Directive and CDC Grant Termination Decision are unconstitutional and arbitrary and capricious in violation of the Administrative Procedure Act;

b. Stay the Targeting Directive and CDC Grant Termination Decision and issue all other necessary and appropriate process to preserve status or rights pursuant to 5 U.S.C. § 705;

c. Vacate the Targeting Directive, CDC Grant Termination Decision, and any other action taken pursuant to the Targeting Directive under 5 U.S.C. § 706;

d.      Preliminarily and permanently enjoin Defendants from implementing the

Targeting Directive, the CDC Grant Termination Decision, and any other actions taken

pursuant to the Targeting Directive, including by prohibiting Defendants from treating

any of the grants at issue in this case as terminated;

e.      Enjoin Defendants from effectuating any policy similar to the Targeting Directive

under a different name;

f.      Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements

as appropriate; and

g.      Grant any other relief as this Court may deem proper.


Date: March 9, 2026

/s/ Joel McElvain

Joel McElvain (DC Bar No. 448431)
Shiva Kooragayala (IL Bar No. 6336195)
Kristen Miller (DC Bar No. 229627)*
Cortney Robinson Henderson (DC Bar No. 1656074)*
Yenisey Rodríguez (D.C. Bar No. 1600574)*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 297-4810
jmcelvain@democracyforwward.org
skooragayala@democracyforward.org
consultantkmiller@democracyforward.org
crhenderson@democracyforward.org
yrodriguez@democracyforward.org


Matthew Blumin (DC Bar No. 1007008)*
Georgina Yeomans (DC Bar No. 1510777)*
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO (AFSCME)

1625 L Street NW
Washington, DC 20036
(202) 775-5900
MBlumin@afscme.org
GYeomans@afscme.org

***Counsel for All Plaintiffs***