UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL VOUGHT, et al., <br><br> Defendants. | No. 26 CV 1566 <br><br> Judge Manish S. Shah |

**ORDER**

Plaintiffs' motion for a preliminary injunction, [56], is granted in part, denied in part. Enter Preliminary Injunction Order.

**STATEMENT**

Plaintiffs are four states that usually receive billions of dollars in federal funds through the Department of Health and Human Services, the Department of Transportation, and the Department of Homeland Security. Other states receive federal funding from similar sources and based on similar criteria. But these four are on a list that the federal Office of Management and Budget pushed out to agencies in January 2026. Around the same time and over the next few days, word got out (formally and informally) that there would be no money from grants administered by HHS and no funds obligated from DOT and DHS to the four states. These funds support health and safety initiatives, infrastructure modernization projects, and disaster recovery and relief—projects deeply embedded in basic operations of state and local government. The funds are authorized by Congressional appropriations that are unrelated to immigration policies or political pique, and, for many grants from the Centers for Disease Control, that set a floor for required spending.

Plaintiffs seek a preliminary injunction to enjoin the defendants (excluding the President of the United States) from executing or implementing a plan to target Illinois, California, Colorado, and Minnesota for funding cuts or suspensions.

A district court may grant a preliminary injunction where the movants show that they are likely to succeed on the merits of their claims, traditional legal remedies would be inadequate, and they would suffer irreparable harm without injunctive relief. If the movants make this showing, the court next balances the harms and weighs the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008). An applicant for preliminary relief bears a significant burden and must show more than a mere possibility of success on the merits to prevail. *See Illinois Tamale Co., Inc. v. LC Trademarks, Inc.*, 164 F.4th 648, 654–55 (7th Cir. 2026). "The standard is the same for an application for a stay under section 705 of the APA." *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

The central issue here is whether there is a final agency action that is reviewable in this court. Only the Court of Federal Claims has jurisdiction over suits based on an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). There's no dispute that the federal grants and awards alleged in the complaint and described in the declarations submitted in support of plaintiffs' motion are contracts with the United States. This court does not have jurisdiction to enforce an obligation to pay money pursuant to a federal grant. *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025). To the extent plaintiffs' motion for a preliminary injunction seeks review of grant-termination decisions with a corresponding order to enforce payment obligations under the terms of grants, the motion is denied.

Plaintiffs filed suit before HHS terminated any subject grant and they argue that the decision for this court to review is an earlier one, something they call the Targeting Directive—a direction from the Office of Management and Budget to single out Illinois, California, Colorado, and Minnesota, and cut or withhold funding to those states.

There is no formal, official memo in the record announcing a federal government decision to bring Illinois, California, Colorado, and Minnesota to heel or otherwise punish them by withholding money committed to those states by our national government. Plaintiffs' case for such a directive is circumstantial.

On January 13, 2026, the President announced that starting February 1, 2026, the federal government would not make any payments to "states having sanctuary cities." [56] at 14 n.3.[1] Earlier, in April 2025, Executive Order 14287 directed the U.S. Department of Justice to publish a list of states "that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" and directed each department or agency to coordinate with the Office of Management and Budget to identify federal funds to sanctuary jurisdictions "for suspension or termination, as appropriate." Exec. Order No. 14287 §§ 2, 3, 90 Fed. Reg. 18,761 (Apr. 28, 2025). Illinois, California, Colorado, and Minnesota were on the list of sanctuary jurisdictions. [56] at 13 n.2. In August 2025, another executive order directed agencies "to review discretionary grants to ensure that they are consistent with agency priorities and the national

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings.

interest" through "continuation of existing coordination with OMB." Executive Order No. 14332 § 3, 90 Fed. Reg. 38,929 (Aug. 7, 2025).

Three days after the January 13, 2026 announcement, the Office of Management and Budget discussed something with HHS that led to OMB asking for a list and acknowledging the effort to support the President's priorities. [57-1] at 2. A few days later, OMB sent out a Budget Data Request to federal agencies to collect a detailed report on federal funds provided to certain states, with a response deadline of January 28, 2026. [44-10] at 245. The list of 14 states included Illinois, California, Colorado, and Minnesota. [44-10] at 263.

The Budget Data Request did not direct agencies to suspend or cut payments and did not request any analysis of grants. After a call with the President's Management Council, OMB scheduled a follow-up call to discuss actions. [57-1] at 4. The Office of Management and Budget asked for recommended actions before February 1. [57-2] at 36. The reasonable inference from that February 1 deadline is that OMB's post-January 13 efforts to obtain data on federal funds and obtain recommended actions was to implement an OMB-led decision to not make payments to states with sanctuary jurisdictions. Between January 22 and 23, the Centers for Disease Control put together a list of active awards to Colorado, California, Minnesota, and Illinois. [57-2] at 5–6, 14–15, 22. There is no explanation in the record for why those four states were treated as a group for data collection. But the chronology suggests that this scramble was tied to the January 13, 2026 announcement.

On February 1, the Chief of Staff of OMB thanked a team of HHS representatives for participating in "Grant Award – Implementation Call" and referred to ideas on how to approach the project, along with a list of action items. [57-1] at 8; [57-2] at 26. On February 2, an HHS representative circulated a spreadsheet to OMB listing specific contracts/grants. [57-2] at 26. On Wednesday, February 4, the Director of OMB shared with the President "a list of grants that HHS/CDC indicated could be cancelled from the previous HHS data request." [57-2] at 35. The President "directed immediate action," and OMB publicly announced cuts that day. [57-2] at 24, 35. Officials at OMB told HHS that "CDC is part of these cuts." [57-2] at 24. The cuts were tied to funds OMB asked agencies to investigate from "14 states and DC." [57-2] at 24. The January 20 Budget Data Request was an OMB request about 14 states and DC. [44-10] at 245, 263.

Beginning on February 5, after OMB announced the cuts, HHS personnel developed a "path forward regarding OMB request." [57-2] at 20. On February 6, HHS officials instructed its personnel to incorporate a *New York Post* article about the cuts into a process for aligning grants with agency priorities. [57-2] at 7–8. Officials at HHS used an artificial intelligence model to generate language supporting grant terminations based on misalignment with agency priorities, *see* [44-3] at 139–147,

3

and eventually, notified Congress and grant recipients of a series of termination decisions. [44-10] at 239–243, [56] at 18 n.11 & 12.

The government argues that plaintiffs have failed to identify the so-called Targeting Directive or its parameters. The record, it says, merely discloses standard OMB coordination with HHS, without any legal consequence; the only decisions with any legal consequence are the grant-termination notices, for which the government certified an administrative record demonstrating HHS deliberation and action.

The government has not, through sworn declaration, denied that OMB directed the cuts before HHS conducted its grant-termination process. The government has not certified that it has no documents responsive to the discovery request for any OMB directives to the CDC to rescind $602 million in funding. *See* [50] at 2–3; [28-1] at 5.

What remains, then, is a matter of inference. The sequence of events does not suggest mere inconsequential coordination. Instead, the reasonable inference is that the Office of Management and Budget directed HHS to cut funding for plaintiffs by February 1 because plaintiffs were on a list of states with sanctuary jurisdictions. There was an OMB "project" to be implemented. Both OMB and HHS missed the target date by a few days, but the most plausible inference is that OMB drove HHS's decision. Coordination and influence are not surprising, and it is not improper to work with other agencies to substantiate the legal basis for a preferred policy. *See Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). But this looks instead like a final decision by OMB with a different motive than what HHS used to explain its grant-termination decision.

Plaintiffs rely on news reports and their state agencies' experience with delayed receipt of obligated funds for transportation projects and disaster relief to argue that the same directive that guided HHS to terminate plaintiffs' grants is at work against them at DOT and DHS. Plaintiffs' experience with delayed transportation and disaster-relief funding predates January and February 2026 and the official record in this case is limited to HHS (because of the scope of the lawsuit before plaintiffs filed an amended complaint). A circumstantial case has been made for an agency directive that guided HHS. But the record does not yet support plaintiffs' catch-all term, Targeting Directive, as an overarching multi-agency action. That term amounts to a description of the federal government's hostility to certain states and its effort to undermine the basic functions of those states' governments. The breadth of the term is akin to a programmatic challenge that is not subject to review under the Administrative Procedure Act. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And as a term without any preexisting understanding or definition, "Targeting Directive" does not provide the particularity required for an enforceable injunction.

The Office of Management and Budget's directive to HHS to target plaintiffs for funding cuts is likely a final agency action that does not fall within the exclusive jurisdiction of the Court of Federal Claims. Final agency action must mark the consummation of the agency's decisionmaking process. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And it must be an action from which legal consequences will flow. *Id.* The Office of Management and Budget directed immediate action on the list of grants on February 4. That demonstrates the consummation of its decisionmaking—the implementation of its grants project—and stands apart from HHS's later actions. Legal consequences flow from OMB's directive to HHS because the guidance puts plaintiffs at substantial risk of altering their legal relationships with employees and subcontractors, and undermines long-term planning. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (discussing a pragmatic approach to finality).

As noted above, this court cannot hear a challenge to grant terminations seeking payment on grants. When the relief sought is to vacate internal guidance, however, that is a standard APA challenge that district courts have original jurisdiction over. *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. at 2661 (Barrett, J., concurring). Plaintiffs cannot get around the Tucker Act by artful pleading, *see Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982), but there remains a distinction between "challenges to agency-wide policies, which belong in district court, and challenges to the withholding of contractually awarded funds that result from those policies, which belong in the [Court of Federal Claims]." *Massachusetts v. Nat'l Institutes of Health*, 164 F.4th 1, 11 (1st Cir. 2026). Plaintiffs' challenge is not to grant-by-grant, award-by-award terminations, but instead to agency-wide policies targeting states. That falls outside Tucker Act exclusivity.[2]

Plaintiffs are likely to succeed on their claim that OMB's targeting of them for HHS cuts must be set aside under the Administrative Procedure Act. The Act requires courts to set aside agency action that is arbitrary, capricious, contrary to constitutional right, or in excess of statutory authority or limitations. 5 U.S.C. § 706. The government argues that deciding whether and how to review grants for potential termination are discretionary decisions, unreviewable under the APA. But deciding whether OMB lawfully targeted plaintiffs is a question for which legal standards exist. Courts apply the fundamental principle of equal sovereignty among the states. *See Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013). The absence of explanation for agency action is arbitrary or capricious. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). While there are stated explanations for grant terminations, the government has not explained why or how plaintiffs were selected for the publicly announced cuts on February 4 before HHS could machine-generate

---

[2] Plaintiff's amended complaint was filed under Federal Rule of Civil Procedure 15(a) and was not a supplemental pleading under Rule 15(d). The automatic stay from 28 U.S.C. § 1292(d)(4)(B) did not preclude the amendment, which did not involve a proceeding, and the stay does not bar the granting of preliminary injunctive relief.

its explanation. And where an explanation appears contrived or incongruent with what the record reveals about the process, then the agency violated the reasoned explanation requirement of administrative law. *Dep't of Com. v. New York*, 588 U.S. at 785. That is likely the case here, where there is a disconnect between the government's expressed hostility to the plaintiffs as states with certain immigration-related policies (the apparent motive for OMB's January–February 2026 grants project) and later grant-specific explanations.

Plaintiffs are also likely to succeed in their claim for statutory and constitutional infirmity in the project to direct HHS to cut funding for Illinois, California, Colorado, and Minnesota, which in turn is a basis to set aside agency action under the Administrative Procedure Act. Agencies cannot pursue the policy objectives of the executive branch through the power of the purse. *City of Chicago v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). Plaintiffs' evidence supports the inference that OMB's objective behind the decision to identify grants awarded to plaintiffs (and not similar grants awarded to other states) was unrelated to the Congressional authorization for public-health grants. This is likely unlawful as in excess of the statutory authorization for the grants and as an improper use of legislative power by the executive.

Money is ordinarily an adequate remedy for a financial harm. But here, the harm to plaintiffs from OMB's effort is irreparable and intangible. Plaintiffs are sovereign states, equal to the other states of the Union. To undermine one set of states that are similarly situated to other states inflicts intangible harm to the established system of governance. The loss of capacity to fund and maintain public health infrastructure puts the health of plaintiffs' residents in jeopardy. For example, losing 25 lead poisoning prevention programs, [57-5] ¶ 38, risks generational harm to people that cannot be repaired after-the-fact with contract payments.

Conflict between federal and state governments puts weighty interests on both sides of the scales.[3] The federal government has an interest in evaluating grants for alignment with agency priorities, and in safeguarding the federal fisc. The states' sovereign interests here outweigh the executive branch's likely unlawful interest in using preauthorized funding to shape state-run governance. On balance, the public interest is "served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers." *Barr*, 961 F.3d at 918. The balance of harms favors injunctive relief.

An injunction requires security sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The government seeks security in the amount of any interest that would accrue on the use of funds. Because the injunction granted here is not as

---

[3] *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 400–01 (1819) (federal-state conflict "must be decided peacefully" or become a source "of hostility of a still more serious nature").

sweeping as the one plaintiffs requested, and is limited to enjoining guidance or directives at the OMB-level (without necessarily prohibiting independent agency determinations), monetary harm to the government is not likely. If issues with enforcement or implementation of the injunction raise concerns of inadequate security, the government may seek modification of its terms. For now, no bond is required.

ENTER:

                                              Manish S. Shah
                                              United States District Judge

Date: March 12, 2026